UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| ROOFERS' PENSION FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DXC TECHNOLOGY COMPANY, MICHAEL J. SALVINO, JOHN SWEENEY, KENNETH P. SHARP, and ROBERT F. DEL BENE,<br><br>Defendants. | Civil Action No.<br><br><br>**CLASS ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Roofers' Pension Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by DXC Technology Company ("DXC" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning DXC; and (d) other public information regarding the Company.

**INTRODUCTION**

1. This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired shares of DXC common stock between May 26, 2021, and May 16, 2024, inclusive (the "Class Period"). The claims asserted herein are alleged against DXC and certain of the Company's current and former executive officers, and arise under Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2. Based in Ashburn, Virginia, DXC is an information technology ("IT") services and consulting company. Founded in 2017, DXC offers a portfolio of services to help clients modernize their IT systems, including consulting, applications services, and infrastructure services. Since 2017, DXC has acquired several other companies to help expand its capabilities and market reach. Prior to the start of the Class Period, DXC announced that it had begun a new "transformation journey" that would position DXC for the future.

3. The Class Period begins on May 26, 2021, when DXC announced its year-end financial results for 2021, and told investors that DXC had "changed the direction of [its] revenues and margin from declining to improving."

4. Throughout the Class Period, the Company misrepresented its ongoing "transformation journey" and the Company's ability to integrate previously acquired companies and business systems. While touting its ongoing success in implementing that integration, DXC repeatedly stressed its commitment to reducing the Company's restructuring and transaction, separation, and integration ("TSI") costs in order to increase its free cashflow and "unleash [its] true earnings power."

5. These and similar statements made by Defendants during the Class Period were materially false and misleading. In truth, Defendants knew or recklessly disregarded that the Company was only able to reduce its restructuring and TSI costs by limiting its integration efforts. As a result of Defendants' misrepresentations, shares of DXC common stock traded at artificially inflated prices throughout the Class Period.

6. The truth began to emerge after the market closed on August 3, 2022, when DXC reported disappointing first quarter results, despite having reiterated its guidance just six weeks prior. DXC blamed its poor performance on the fact that its "cost optimization efforts have moved at a slower pace than anticipated." These disclosures caused the price of DXC common stock to decline by 17%, from $31.52 per share to $26.15 per share. Despite these disclosures, Defendants continued to misrepresent DXC's transformation and successful reduction in restructuring and TSI costs in order to "transition[] DXC from stability to higher performance."

7. Then, on December 20, 2023, DXC announced the sudden departure of its Chief Executive Officer ("CEO") and Chairman of the Board, Defendant Michael Salvino, effective December 18, 2023. This disclosure caused the price of DXC common stock to decline by 12%, from $25.03 per share to $21.99 per share.

8. Months later, on May 16, 2024, DXC's new CEO admitted that "the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth" because the systems that were acquired over time were "never integrated, never deduped," and admitted that the Company was "not [a] fully functional organization." DXC also announced it would need to spend an additional $250 million to achieve the restructuring and integration process it falsely claimed to have been successfully implementing during the Class Period. These disclosures caused the price of DXC common stock to decline nearly 17%, from $19.88 per share to $16.52 per share.

## JURISDICTION AND VENUE

9. The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5, promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1331 and 1337.

10. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). DXC transacts business in Virginia, including in this District. Moreover, the Company is headquartered in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A. Plaintiff

11. Plaintiff Roofers' Pension Fund is a pension fund for the Local No. 11 of the United Union of Roofers Waterproofers & Allied Workers. Local No. 11 represents the rights of its members who work in all segments of the roofing and waterproofing industry, promoting skilled craftsmen and women through apprenticeship training. As indicated on the certification submitted herewith, Roofers' Pension Fund purchased shares of DXC common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B. Defendants

12. Defendant DXC is incorporated in Nevada and maintains its corporate headquarters at 20408 Bashan Drive, Suite 231, Ashburn, Virginia. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DXC." As of May 6, 2024, DXC had over 178 million shares of common stock outstanding, owned by hundreds or thousands of investors.

13. Defendant Michael J. Salvino ("Salvino") served as DXC's President and CEO from September 11, 2019, until December 18, 2023. Defendant Salvino also served as Chairman of the Board of Directors from May 17, 2022, until December 18, 2023.

14. Defendant John Sweeney ("Sweeney") served as DXC's Vice President of Investor Relations from January 2021 through June 2024.

15. Defendant Kenneth P. Sharp ("Sharp") served as DXC's Executive Vice President and Chief Financial Officer from November 30, 2020, through June 1, 2023.

16. Defendant Robert F. Del Bene ("Del Bene") has served as DXC's Executive Vice President and Chief Financial Officer since June 2023.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

17. The Class Period begins on May 26, 2021, when DXC held a conference call with analysts to discuss the Company's earnings and operations for the fourth quarter and full year 2021.[1]  On that call, Defendant Salvino "highlight[ed] the progress we are making on our transformation journey" and stated that "[w]e have achieved our goal of $550 million of cost savings in FY 2021. . . . We have done well optimizing our costs and continuing to deliver for our customers without disruption." On that same call, Defendant Sharp stated "[o]ne of our key initiatives, we are employing to drive cash flow and improve earnings power is to wind down restructuring and TSI costs."

18. On June 17, 2021, DXC held its annual Investor Day meeting with analysts.  At that meeting, Defendant Sharp stated "we are working to build a stronger financial foundation and drive the company in a disciplined and rigorous fashion to unleash our true earnings power." Defendant Sharp also stated "we have an unyielding focus on reducing restructuring and TSI expenditures," and "[o]ne of our key initiatives we are employing to improve the earnings power and ultimately drive free cash flow is to wind down our restructuring and TSI expenditures."

---

[1] DXC's fiscal year ends on March 31 of each year.

19. On August 4, 2021, DXC held a conference call with analysts to discuss the Company's earnings and operations for the first quarter of 2022. On that call, Defendant Sharp stated "[o]ne of our key initiatives to drive cash flow and improve earnings power is to wind down restructuring and TSI cost." Defendant Sharp also stated "we will continue to make decisions to better position the company for the longer-term, creating a sustainable business."

20. On September 14, 2021, Defendant Salvino represented DXC at the Citi Global Technology Conference. At that conference, in response to a question about how DXC's current restructuring differed from prior restructuring efforts at DXC, Defendant Salvino responded "[w]e're running a very structured playbook . . . now, we're in building the foundation for growth. Meaning, simply put, everything we do this year will help us grow as it relates to us hitting our 2024 targets that we put out there." Defendant Salvino went on to say "[e]very quarter, we continue to adjust the thinking of our business in terms of long-term stuff. So, when you look at what we did, again, with free cash flow last quarter, we dealt with stuff that long-term is going to put us in a much, much better situation."

21. On November 3, 2021, DXC held a conference call with analysts to discuss the Company's earnings and operations for the second quarter of 2022. On that call, Defendant Sharp stated "[a] key driver of improving cash flow is to continue to reduce our restructuring and TSI spend. Our restructuring and TSI efforts are highly focused, and we believe are a prudent investment in the business. . . . We remain on track to reduce restructuring in TSI from an average of $900 million per year over the last four years to $550 million in FY 2022 and about $100 million in FY 2024." On the same call, Defendant Salvino represented that reducing costs, including "shrinking restructuring and TSI costs" were "all sustainable and a result of the operational work

we are doing.  This gives us confidence that we will achieve our FY 2024 double-digit margin guidance."

22.     On June 6, 2022, Defendant Sweeney represented DXC at the Baird Global Consumer, Technology, and Service Conference.  At that conference, Defendant Sweeney stated "I'm going to take you through how DXC has been executing on the goals of its transformation journey.  The company's made significant progress over the past couple of years and it's now delivering strong financial results . . . we're just getting started.  We think our solid financial performance and our improving business trajectory is going to continue for years to come based on how we currently manage the business."  Defendant Sweeney went on to say, "in FY 2022, you can really see the financial results of our transformation journey" which "has changed the entire trajectory of the business. . . . [I]t's the execution of this program that stabilized DXC, and we believe, this is going to be our blueprint for future growth."

23.     At the same Conference, Defendant Sweeney stated "[t]hroughout the transformation journey, we've instilled financial discipline; we strengthened the balance sheet; we've improved cash generation, capital efficiency; we've lowered, we used to have $1 billion a year spend in restructuring TSI . . . [w]e continue to reduce our quarterly restructuring, transaction, separation and integration expense."  Defendant Sweeney also stated:

> [G]ot [] restructuring under control.  In FY 2022, we reduced restructuring [and] TSI by $550 million in spending . . . and that's sustainable, too . . . [q]uarter in, quarter out, we were wading through all the sins of the past, and I think the real reason we've been able to do this is because we're down in the details and we're managing everything at a very low level.  As we continue to work on a transformation journey, we believe that the structural changes we put in place and the ongoing focus we put at DXC are going to help us to generate and to hold on to more cash.

24.     The statements set forth above in ¶¶ 17-23 were materially false and misleading. In truth, Defendants knew, or recklessly disregarded, that the Company had reduced restructuring

7

and TSI costs during the Class Period by curbing the Company-wide "transformation" and had thereby simply deferred costs that DXC would ultimately need to spend to finally implement the restructuring that it claimed to be successfully addressing during the Class Period.

## THE TRUTH EMERGES

25. After the market closed on August 3, 2022, DXC held a conference call with analysts to discuss the Company's earnings and operations for the first quarter of 2023. On that call, Defendant Sharp explained that "our cost optimization efforts have moved at a slower pace than anticipated as we were thoughtfully building our plan." These disclosures caused the price of DXC stock to decline by $5.37 per share, or 17%, from a closing price of $31.52 per share on August 3, 2022, to a closing price of $26.15 per share on August 4, 2022.

26. Despite these disclosures, DXC continued to misrepresent the Company's transformation and successful reduction in restructuring and TSI costs. For example, on February 1, 2023, DXC held a conference call with analysts to discuss the Company's earnings and operations for the third quarter of 2023. On that call, in response to an analyst question regarding what factors drove the Company's strong quarterly performance, Defendant Sharp responded "[t]he biggest driver, right, if you had to just kind of look holistically at the business, has been the focus on driving down the restructuring and TSI. So I think that's been somewhere around $600 million swing year-to-year. So I think that's a pretty big piece."

27. On August 2, 2023, DXC held a conference call with analysts to discuss the Company's earnings and operations for the first quarter of 2024. On that call, Defendant Salvino stated "[w]e are managing areas that we can control very well, like free cash flow and restructuring and TSI." Defendant Del Bene also represented "[w]e continued to tightly manage restructuring and TSI expense, which was $21 million in the first quarter."

28. On November 1, 2023, DXC held a conference call with analysts to discuss the Company's earnings and operations for the second quarter of 2024. On that call, Defendant Salvino stated "[a]s you have heard consistently from us over the last several quarters, our management team is laser-focused on transitioning DXC from stability to higher performance." Defendant Salvino further stated "[w]e obviously are pretty excited about our execution. Our execution was aligned with our expectations, and in some cases, even better."

29. The statements set forth above in ¶¶ 25-28 were materially false and misleading. In truth, Defendants knew, or recklessly disregarded, that the Company had reduced restructuring and TSI costs during the Class Period by curbing the Company-wide "transformation" and had thereby simply deferred costs that DXC would ultimately need to spend to finally implement the restructuring that it claimed to be successfully addressing during the Class Period.

30. On December 20, 2023, after the market closed, DXC issued a press release announcing that DXC's CEO and Chairman of the Board, Defendant Salvino, had left the Company, effective December 18, 2023. As a result of this disclosure, the price of DXC stock declined by $3.04 per share, or 12%, from a closing price of $25.03 per share on December 19, 2023, to a closing price of $21.99 per share on December 20, 2023.

31. DXC continued to misrepresent the Company's transformation and successful reduction in restructuring and TSI costs. For example, on March 4, 2024, Defendant Del Bene represented DXC at the Morgan Stanley Technology, Media & Telecom Conference. At that conference, in response to a question from an analyst regarding the key takeaways for investors, Defendant Del Bene discussed the "lack of integration of the companies that were the basis of the formation of DXC. So, as we integrate over time, we expect to improve our KPIs on the infrastructure as well. So not only implementing very strong dashboards and metrics for the

9

individual business units, but the support organizations as well.  And we think both of those are going to drive value for us."

32.     The statements set forth above in ¶ 31 were materially false and misleading.  In truth, Defendants knew, or recklessly disregarded, that the Company had reduced restructuring and TSI costs during the Class Period by curbing the Company-wide "transformation" and had thereby simply deferred costs that DXC would ultimately need to spend to finally implement the restructuring that it claimed to have addressed during the Class Period.

33.     On May 16, 2024, DXC held a conference call with analysts to discuss the Company's earnings and operations for the fourth quarter and full year for 2024.  On that call, DXC's new CEO stated, in response to an analyst's question, that, after having "really spent a lot of time operationally looking at our systems, [and] our processes" it was clear that "the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth" because, despite a years-long integration effort, systems were "never integrated, never deduped" but were rather a "number of business processes that got stacked on top of each other; [a] number of legal entities."  DXC also announced it was undertaking a "real reset" from the "bottom up" that was "absolutely needed, because otherwise, we'd just continue to carry a really not fully functional organization."  DXC further revealed it would need to spend an additional $250 million to achieve the restructuring and integration process it falsely claimed to have been implementing during the Class Period.  As a result of these disclosures, the price of DXC stock declined $3.36 per share, or nearly 17%, from a closing price of $19.88 per share on May 16, 2024, to a closing price of $16.52 per share on May 17, 2024.

34. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## LOSS CAUSATION

35. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of DXC common stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of DXC stock fell precipitously as the prior artificial inflation came out of the price over time. As a result of their purchases of DXC common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

36. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of DXC during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of DXC and their families and affiliates.

37. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of May 6, 2024, DXC had over 178 million shares of common stock outstanding, owned by hundreds or thousands of investors.

38. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)    Whether Defendants violated the Exchange Act;

    (b)    Whether Defendants omitted and/or misrepresented material facts;

    (c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)    Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

    (e)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    (f)    Whether Defendants' conduct impacted the price of DXC common stock;

    (g)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

    (h)    The extent of damage sustained by Class members and the appropriate measure of damages.

39.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

40.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

41.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

42.    DXC's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

43. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of DXC who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## **PRESUMPTION OF RELIANCE**

44. At all relevant times, the market for DXC common stock was an efficient market for the following reasons, among others:

(a) DXC common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, DXC filed periodic public reports with the SEC and the NYSE;

(c) DXC regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) DXC was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

45. As a result of the foregoing, the market for DXC common stock promptly digested current information regarding DXC from all publicly available sources and reflected such information in the price of DXC common stock. Under these circumstances, all purchasers of DXC common stock during the Class Period suffered similar injury through their purchase of DXC common stock at artificially inflated prices and the presumption of reliance applies.

46. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding DXC's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of DXC's purported "transformation" and supposedly reduced restructuring and TSI integration costs, that requirement is satisfied here.

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

47. Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

48. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase DXC common stock at artificially inflated prices.

49. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for DXC common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

50. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

51. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal DXC's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

53. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for DXC common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for DXC common stock had been artificially inflated by Defendants' fraudulent course of conduct.

54. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

55. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

56. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

57. The Individual Defendants acted as controlling persons of DXC within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about DXC, the Individual Defendants had the power and ability to control the actions of DXC and its employees. By reason of such conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

58. WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

16

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

59. Plaintiff demands a trial by jury.

DATED: August 2, 2024

Respectfully submitted,

*/s/ Emily M. Scott*
Emily M. Scott (VSB No. 71435)
**HIRSCHLER FLEISCHER, P.C.**
2100 E. Cary Street
Richmond, VA 23223
Tel:     (804) 771-9539
Fax:     (804) 644-0957
Email:   escott@hirschlerlaw.com

*Liaison Counsel for Plaintiff Roofers' Pension Fund*

Avi Josefson (*pro hac vice* forthcoming)
Scott R. Foglietta (*pro hac vice* forthcoming)
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 554-1400
Fax:     (212) 554-1444
Email: avi@blbglaw.com
           scott.foglietta@blbglaw.com

*Counsel for Plaintiff Roofers' Pension Fund*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Gary Menzel, on behalf of the Roofers' Pension Fund, hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Trustee and Chairman of Roofers' Pension Fund. I am authorized to sign this certification on its behalf. I have reviewed the complaint and authorize its filing by counsel.

2. Roofers' Pension Fund did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Roofers' Pension Fund is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Roofers' Pension Fund's transactions in the DXC Technology Company securities that are the subject of this action are set forth in the chart attached hereto.

5. Roofers' Pension Fund has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Roofers' Pension Fund will not accept any payment for serving as a representative party on behalf of the Class beyond Roofers' Pension Fund's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of July, 2024.

_____
Gary Menzel
Trustee and Chairman
*Roofers' Pension Fund*

**Roofers' Pension Fund**
**Transactions in DXC Technology Company**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 6/24/2021 | 3,550 | 38.2584 |
| Purchase | 6/25/2021 | 3,462 | 39.2380 |
| Purchase | 8/25/2021 | 2,066 | 37.2521 |
| Purchase | 8/26/2021 | 2,072 | 37.1993 |
| Purchase | 10/27/2021 | 1,588 | 32.2556 |
| Purchase | 4/14/2022 | 5,706 | 31.1375 |
| Sale | 8/17/2022 | (18,444) | 25.8661 |