**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| In re DXC Technology Company Securities Litigation | Case No. 1:24-cv-1351-AJT-WEF<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CORRECTED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................................... 1

II.   JURISDICTION AND VENUE .............................................................................. 9

III.  PARTIES .................................................................................................................. 9

    A.    Plaintiff .......................................................................................................... 9

    B.    Defendants ...................................................................................................... 9

        1.    DXC .................................................................................................... 9

        2.    The Executive Defendants ................................................................ 10

    C.    Relevant Non-Parties ................................................................................... 11

IV.   FACTUAL ALLEGATIONS ................................................................................. 14

    A.    Overview of DXC's Business and Organizational Structure ....................... 14

        1.    Global Business Services Segment .................................................. 15

        2.    Global Infrastructure Services Segment .......................................... 16

    B.    DXC is Formed in 2017 Through the Merger of CSC and HP..................... 17

    C.    Following its Inception, DXC Immediately Embarks Upon an Aggressive
        Acquisition Strategy...................................................................................... 19

        1.    Growth Through Acquisitions .......................................................... 19

        2.    DXC's 2017-2019 Acquisitions ....................................................... 21

        3.    DXC's "Transformational Journey" Purportedly Begins ................. 26

    D.    Throughout the Class Period, Defendants Assure Investors that DXC Has
        Integrated its Businesses .............................................................................. 29

    E.    In Truth, DXC Had Not Integrated its Operations and Systems................... 40

    F.    The Relevant Truth Is Revealed .................................................................. 50

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ......................... 57

    A.    May 26, 2021 – FY4Q21 Conference Call .................................................. 57

    B.    June 27, 2021 – Investor Day ...................................................................... 59

    C.    August 4, 2021 – FY1Q22 Conference Call................................................. 62

D.     September 14, 2021 – Citi Global Technology Conference ..................................65

E.     November 3, 2021 – FY2Q22 Conference Call.............................................67

F.     February 2, 2022 – FY3Q22 Conference Call ...............................................70

G.     May 25, 2022 – FY4Q22 Conference Call ...............................................73

H.     June 2, 2022 – Cowen & Company Technology, Media & Telecom Conference ..........................................................................................75

I.     November 3, 2022 – FY2Q23 Conference Call.............................................78

J.     February 1, 2023 – FY3Q23 Conference Call ...............................................80

K.     May 18, 2023 – FY4Q23 Conference Call ...............................................82

L.     August 2, 2023 – FY1Q24 Conference Call ...............................................84

M.     November 1, 2023 – FY2Q24 Conference Call.............................................87

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER ............................................91

VII.     LOSS CAUSATION...............................................................................98

VIII.     A PRESUMPTION OF RELIANCE APPLIES ..........................................104

IX.     THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DOES NOT APPLY ...............................................................................105

X.     CAUSES OF ACTION UNDER THE EXCHANGE ACT ...........................................106

XI.     PRAYER FOR RELIEF ...........................................................................109

XII.     JURY TRIAL DEMANDED...................................................................110

Lead Plaintiff Sparinvest S.A. ("Sparinvest" or "Lead Plaintiff"), by and through Lead Plaintiff's counsel, brings this action individually and on behalf of all other persons and entities who purchased or otherwise acquired common stock of DXC Technology Company ("DXC" or the "Company") between May 26, 2021 and May 16, 2024, both dates inclusive (the "Class Period"), and who were damaged thereby. Lead Plaintiff alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters, including the investigation of Lead Plaintiff's counsel, which included, among other things, interviews with former DXC employees, a review of DXC's U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by DXC, analyst reports and advisories about the Company, media reports concerning the Company, judicial filings, and other publicly available information. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION[1]

1.    In April 2017, two companies offering professional IT services, Computer Sciences Corporation ("CSC") and HP Enterprise Services ("HP"), merged to form DXC.

2.    At the time of its creation, DXC was in trouble. As explained by its then-Chief Executive Officer ("CEO"), John Michael Lawrie ("Lawrie"), the newly-minted DXC was "on the lower end of growth and . . . profitability," and its revenue base already was declining. As a result, Lawrie announced a plan to transition DXC's revenue base, expand its margins, and grow the business by: (i) integrating CSC and HP; (ii) cutting costs from the combined business; and (iii) achieving "1% to 2% of revenue growth through acquisitions." With this strategy, Lawrie

---

[1]    Unless otherwise stated, all emphasis is added.

claimed DXC would "begin[] to stabilize," "grow [its] revenue profile," and "change [its] revenue mix over the next three years."

3.      Between 2017 and 2018, DXC acquired eight companies. Analysts initially saw these acquisitions as a positive for DXC; they expected the transactions would gradually improve DXC's top-line revenue trajectory and increase profits as the Company cut costs and achieved synergies from the acquisitions. However, during the November 2018 earnings call and Investor Day, Lawrie was forced to acknowledge that DXC's cost-cutting efforts had gone too far and blunted the positive impact that these acquisitions were expected to have on the Company's top-line revenue growth. Accordingly, Lawrie admitted that DXC needed to turn its attention from cutting costs to growing revenues. Thereafter, DXC acquired six more companies in 2019, including Luxoft Holding Inc. ("Luxoft"), which it acquired for $2 billion in the first half of 2019.

4.      Despite an influx of revenue from these acquisitions, the Company continued to report poor performance in 2019, leading Lawrie to abruptly resign as CEO in September 2019. DXC chose Defendant Michael J. Salvino ("Salvino") to replace Lawrie and lead the Company "into its next phase of growth." After a year of what analysts described as "multiple revenue and earnings disappointments and a collapse in the stock price," the market welcomed the new CEO. While analysts acknowledged that he "face[d] some stiff headwinds" in his "attempt[] to revive the business," they hoped that Salvino could "drive organic growth" because "a pivot to[ward] growth [wa]s the only way forward."

5.      During his first few earnings calls as CEO, Salvino described DXC as a fragmented and complex company that had difficulty operating and servicing its customers. Based on his initial assessment of the business, Salvino's immediate focus was on integrating the myriad businesses DXC had acquired since its inception. Indeed, Salvino told investors that DXC needed

2

to "focus more on selling *integrated* solutions" to its customers that "leverage[d] multiple DXC offerings and capabilities" and to "*simplify*" its "complex" operating model. Accordingly, DXC's goal under Salvino "[wa]s to *consolidate* and further scale [DXC's] delivery operations" and "to *streamline* [the Company's] offering portfolio." Per Salvino, DXC needed to ensure that it was "*combining* the capabilities" it had "to compete in the market." In other words, DXC needed— yet again—to commit time and money integrating its myriad businesses, including the 13+ businesses it had acquired between 2017 and 2019, before shifting its sights to improving the Company's top-line revenue growth.

6.      Given these required integration efforts, Salvino told investors that fiscal year 2021 (which spanned from April 1, 2020 to March 31, 2021) would be a "transitional year" for DXC, as it undertook these necessary integration efforts. But he assured investors that, by fiscal year 2022, the costs associated with transforming DXC from a fragmented set of businesses into a single, integrated company—known within DXC as restructuring and transition, separation and integration ("TSI") expenses—would begin to moderate.

7.      By November 2020 (more than halfway through fiscal year 2021), Salvino told the market that the Company's integration efforts had progressed to the point where "things are starting to quiet down" and he could finally begin "run[ning] this business"—i.e., Salvino could shift his focus from integrating DXC's businesses to improving DXC's operations and driving growth.

8.      DXC's new Chief Financial Officer ("CFO"), Defendant Kenneth P. Sharp ("Sharp"), echoed these sentiments a few months later, telling investors in February 2021 that the Company would begin "reducing spend in areas such as restructuring, transaction and integration" and would transition its focus to "stabilizing revenues, expanding margins and delivering free

3

cash flow." Sharp stated that this shift in priorities would "demonstrate the true earnings power of DXC." These statements indicated to investors that DXC's integration efforts were largely complete and had positioned the Company to finally begin growing its revenues.

9.     Thereafter, on the first day of the Class Period, May 26, 2021, Defendants Salvino and Sharp laid out the five financial priorities of what they referred to as the "new DXC," which would focus on stabilizing DXC's revenues through improved customer relationships. Salvino and Sharp explained that "[o]ne of [the] key initiatives" for the new DXC was to improve cash flows by "***wind[ing] down restructuring and TSI costs***." Specifically, while DXC had spent, on average, $900 million per year in restructuring and TSI expenses, Salvino and Sharp committed to reducing those expenses to $550 million in FY22 and, ultimately, to just $100 million by FY24. With the reduction of these expenses, DXC represented that it expected to generate ***positive*** free cash flow ("FCF") of $500 million in FY22—a vast improvement over the ***negative*** $652 million FCF DXC generated in FY21—and $1.5 billion in FCF by FY24.

10.    Analysts understood DXC's commitment to "***wind down***" restructuring and TSI costs to mean that DXC "ha[d] moved through the worst" aspects of its integration efforts and had already engaged in "a fair amount of the internal work" needed to resolve its "historical issues." Analysts applauded DXC's efforts to "increas[e] transparency [and] disclosure and show[] all intents to clean up its FCF [and] restructuring" as a clear indication that DXC's protracted and costly integration efforts were nearly complete and that management would begin "re-direct[ing] their bandwidth to focusing on the future and driving growth."

11.    Defendants reinforced analysts' beliefs that DXC had nearly completed its restructuring and integration efforts during the Company's June 17, 2021 Investor Day. In describing restructuring and TSI expenses as "a thorn in our side," Salvino confirmed that the

4

"*integration that we've done*" was "*done [i]n the appropriate way*." Sharp doubled down, representing that DXC had "go[ne] through and evaluat[ed] and end[ed]" its ongoing restructuring and integration projects, "*shutting them down, getting them completed, and getting . . . the right results*." As a result, Sharp stated, restructuring and TSI expenses would "continue to decline."

12.     Thus, the market understood that: (i) DXC was lowering restructuring and TSI expenses—and thereby increasing FCF—because it had successfully integrated and stabilized DXC's businesses; (ii) DXC's costly integration efforts were a thing of the past; and (iii) the Company was finally poised to reap the benefits of operating as a unified company.

13.     Over the next few quarters, Defendants represented that DXC was continuing to "*significantly reduc[e]*" and "*tightly manag[e]*" its restructuring and TSI expenses. In fact, Defendants reported that they were so successful in their efforts to complete DXC's ongoing restructuring and integration projects that DXC "expect[ed] to spend $500 million less on [r]estructuring and TSI expense" in fiscal year 2022 than it did in fiscal year 2021, which would "expand[] margins by over 200 basis points." According to Sharp, the Company had "taken significant strides" to shift its focus from integration and restructuring to "the normal performance of the business." Put differently, Defendants' statements again indicated to investors that DXC had largely completed its integration and restructuring efforts and was finally positioned to grow its top-line revenues.

14.     During a February 2023 earnings call, Defendant Sharp told investors that Defendants did "a lot of work" over the past couple years to reduce DXC's restructuring and TSI costs and generate "2 years in a row of positive cash flow over $600 million." He further assured investors that, through these efforts, DXC had "come a long way" and now rested "on a much stronger foundation."

15.     Analysts applauded Defendants' efforts throughout fiscal years 2021 and 2022. Defendants' accelerated reduction in DXC's restructuring and TSI costs led analysts to conclude that DXC's plan to significantly increase FCF by FY24 was "well ahead of expectations." Further, analysts repeatedly expressed the view, based on Defendants' public statements, that DXC was showing "continued progress in transitioning to stable growth," that its "turnaround trajectory continues in the right direction," and that "the underlying turnaround in DXC's business remains on track."

16.     The truth about DXC's integration efforts, however, was far different from the portrait Defendants were painting for investors. In reality, and as confirmed by seventeen former employees, DXC had not, in fact, integrated the many businesses it had acquired, as Defendants' statements led investors to believe. Instead, DXC remained a patchwork of unintegrated and duplicative systems and workforces. For example, former DXC employees have stated that several of DXC's acquired businesses still maintained their own email addresses, back-office systems, sales teams, clients, and human resources ("HR") applications during the Class Period. Far from acting as a unified company, these unintegrated business units oftentimes *competed* with one another for business—sometimes issuing competing proposals to a single DXC client.

17.     Thus, in truth and contrary to Defendants' representations, DXC lacked the fully integrated baseline necessary to support Defendants' promises of stable and sustainable top-line growth. Instead, Defendants' failure to integrate DXC's operations eroded customer relationships and created significant inefficiencies and duplication within DXC's business units. These undisclosed issues put DXC's revenues at risk and could only be remedied through significant additional restructuring and TSI expenditures.

6

18.     Investors learned the relevant truth over three corrective events beginning on August 2, 2023. Despite repeatedly telling investors that DXC's significant integration and restructuring work had set the Company up for sustained earnings and cash flow growth, Defendants announced sharply disappointing financial results for 1Q24. In addition, they disclosed significant reductions in DXC's FY24 guidance for both revenues and cash flow.

19.     Analysts were shocked by DXC's disclosures. For example, TD Cowen stated that DXC's disclosure undercut "all legs of the [investment] thesis," which—based on Defendants' prior representations—"had been predicated on revenue growth inflecting into positive territory in the coming quarters, a cleaner path to improved profitability, and continued FCF momentum." In response to the news, the price of DXC's common stock declined 29.44% from a closing price of $27.07 on August 2, 2023 to a closing price of $19.10 on August 3, 2023.

20.     Then, on December 20, 2023, following another negative earnings call on November 1, 2023, DXC blindsided investors by announcing that Salvino was immediately stepping down as CEO—just six months after Sharp unexpectedly resigned from the Company. In the press release announcing Salvino's departure, the Company reaffirmed its FY24 cash flow guidance, but it conspicuously did not reaffirm its revised organic revenue guidance for the year, thus indicating to investors that there was even further risk to those figures. In response to the news, the price of DXC's common stock declined 12.15% from a closing price of $25.03 on December 19, 2023 to a closing price of $21.99 on December 20, 2023.

21.     Finally, on May 16, 2024, the Company held an earnings call to discuss its fiscal year 2024 financial results. During that call, DXC's new CEO, Raul Fernandez ("Fernandez") finally admitted what Defendants had concealed throughout the Class Period—DXC had not, in fact, integrated its myriad businesses. Fernandez told investors that, in truth, DXC had a "number

of systems still in place that were acquired over time" that were "never integrated, never deduped" and thus, it was "clear to [him] that the previous restructurings" under Lawrie and Defendant Salvino "did not set a real, clean, solid, fully integrated baseline for profitable growth."

22.     According to Fernandez—and in sharp contrast to Defendants' prior misrepresentations that DXC was finally ready to begin focusing on growing its business and organic revenues—what DXC needed now was yet another massive "reset" from the "bottoms up." Fernandez stressed that this "reset" was "absolutely needed because otherwise, we just continue to carry a really not fully functional organization." Fernandez conceded that the Company needed to "dedupe, streamline and do some work that should have been done before that wasn't." As a result, Fernandez announced lower than expected guidance for fiscal year 2025, including FCF of just $400 million, and confirmed that DXC was now "undertaking a restructuring initiative aimed at simplifying and enhancing our operation[s]."

23.     The market was blindsided by DXC's disclosures regarding its lack of integration and the need for yet another bottoms-up "reset." Guggenheim analysts lamented that this was now "the [C]ompany's ***third attempt*** at steering this ship in the proper direction," while TD Cowen, in a report titled "Ctrl + Alt + Delete . . . Again" noted that "[i]nvestors have seen this movie before & patience is thin." Finally, RBC analysts pointedly stated that, at this time, "***one has to ask the question as to if this business can be fixed***."

24.     In response to the news, the price of DXC's common stock declined 16.9% from a closing price of $19.88 on May 16, 2024 to a closing price of $16.52 on May 17, 2024.

25.     DXC's investors suffered substantial losses as the truth about Defendants' alleged misstatements and omissions was revealed to the market. This action seeks to recover for that harm.

8

## II.      JURISDICTION AND VENUE

26.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

28.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). DXC carries out business in Virginia, including in this District. Additionally, the headquarters of DXC are located in this District.

29.      Further, in connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.      PARTIES

### A.      Plaintiff

30.      Lead Plaintiff Sparinvest S.A. is a resident of Luxembourg. As noted in the certification attached to this Complaint as Exhibit A, Lead Plaintiff acquired shares of DXC common stock at artificially inflated prices during the Class Period and was consequently damaged by the revelation of the Company's false and misleading statements and omissions of material fact.

### B.      Defendants

#### 1.      DXC

31.      Defendant DXC Technology Company, a Nevada corporation, is headquartered at 20408 Bashan Drive, Suite 231, Ashburn, Virginia. DXC is an information technology ("IT")

services and consulting company that assists clients in modernizing their IT systems, optimizing data architectures, and ensuring cloud security. As of its 2024 fiscal year, DXC employed approximately 130,000 employees worldwide. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DXC." As of May 6, 2024, DXC had over 178 million shares of common stock outstanding, owned by hundreds of thousands of investors.

32.     As is relevant here, between 2017 and 2019, DXC acquired more than thirteen companies, including the following: Tribridge Holdings, LLC ("Tribridge"), BusinessNow, Logicalis SMC ("Logicalis"), Fenergo Ltd., System Partners Pty Ltd., Luxoft, Sable37, eBECS Ltd., Xchanging Solutions Ltd., Virtual Clarity Ltd. ("Virtual Clarity"), Argodesign LLC ("Argodesign"), TESM, Bluleader Pty Ltd., and Syscom AS.

33.     Prior to and during the Class Period, DXC utilized an April 1 to March 31 fiscal year ("FY"), issuing quarterly financial results for April 1 to June 30 ("1Q"), July 1 to September 30 ("2Q"), October 1 to December 31 ("3Q"), and January 1 to March 31 ("4Q"). On the first day of the Class Period, May 16, 2021, DXC reported its financial results for 4Q21 and FY21.

### 2.     The Executive Defendants

34.     Defendant Michael J. Salvino was DXC's President and CEO from September 12, 2019 to December 18, 2023. In addition, Salvino served as Chairman of the Board of Directors from July 26, 2022 to December 19, 2023. During the Class Period, Salvino made false or misleading statements or omitted material facts in DXC's press releases and earnings calls.

35.     Defendant Kenneth P. Sharp was DXC's Executive Vice President and CFO from November 30, 2020 through June 1, 2023. During the Class Period, Sharp made false or misleading statements or omitted material facts in DXC's press releases and earnings calls.

36.     Defendant Robert F. Del Bene ("Del Bene") has been DXC's Executive Vice President and CFO since June 2023. Del Bene took over the role of CFO from Defendant Sharp following his exit from DXC. During the Class Period, Del Bene made false or misleading statements or omitted material facts in DXC's press releases and earnings calls.

37.     Defendants Salvino, Sharp, and Del Bene are collectively referred to herein as the "Executive Defendants." DXC and the Executive Defendants are collectively referred to herein as "Defendants."

38.     The Executive Defendants, because of their positions within the Company, possessed the power and authority to control, and did in fact control, DXC's public statements to the market, including in SEC filings, press releases, the Company's website, and presentations to securities analysts, money and portfolio managers, institutional investors, and the media. In their respective roles, each Executive Defendant was directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market.

### C.     Relevant Non-Parties

39.     Former Employee #1 ("FE-1") was a manager in DXC's Security division from fall 2021 through summer 2024. FE-1 reported to David Langlands, DXC's former VP of Security. FE-1's responsibilities included, among other things, designing the Security division's product management, portfolio sales, and development of marketing materials.

40.     Former Employee #2 ("FE-2") was a member of DXC's Cloud and ITO division from 2022 through the end of 2023. FE-2's group reported up through several managers during FE-2's tenure including Directors Ryan Schoenfeld and Steve Hammond. FE-2 was involved in GIS's sales operations.

41.     Former Employee #3 ("FE-3") had various roles within DXC's Modern Workplace division during the Class Period, including Lead Architect. FE-3 reported to DXC's VP of

Engineering and Technology for the Modern Workplace division. FE-3 was responsible for the development of the Modern Workplace offerings portfolio.

42.     Former Employee #4 ("FE-4") was an account manager in DXC's Consumer and Retail division from early 2022 through the end of the Class Period. FE-4 oversaw a team of Consumer and Retail sales managers in the North America region.

43.     This paragraph has been intentionally omitted.

44.     Former Employee #6 ("FE-6") was a manager in DXC's Aerospace, Defense, and Manufacturing division from 2021 through 2023. FE-6 was one of several employees who reported to Rob Grey, who at that time, was DXC's Global Lead for Custom Applications. FE-6 was responsible for, among other things, selling DXC's aerospace, defense, and manufacturing solutions to customers globally.

45.     Former Employee #7 ("FE-7") was an Enterprise Account Manager in DXC's Insurance division from 2022 through mid-2023. FE-7 reported to Bryce Mohlenhoff, DXC's General Manager of Insurance and Business Process Services.

46.     Former Employee #8 ("FE-8") was a Solutions Architect from prior to the Class Period through spring 2024. FE-8 reported directly to Dave Gershon, a DXC Regional Manager. FE-8's responsibilities included, among others, communicating designs and plans to customers to promote understanding of the services that DXC would provide.

47.     Former Employee #9 ("FE-9") was a Modern Workplace Offering Lead from the beginning of the Class Period through summer 2023. FE-9 was responsible for Microsoft 365 Workplace integration. FE-9 reported to Rick Nunez, DXC's Intelligent Collaboration Office Director. FE-9's responsibilities included, among others, the integration of and development of a standardized delivery for the Microsoft 365 Workplace.

48.     Former Employee #10 ("FE-10") was a Senior Partner and Principal Technologist from prior to the Class Period through the end of 2023. FE-10 reported to various managers including Rob Grey. FE-10's responsibilities included, among others, communicating with clients about their transformation journey goals, assistance with client mainframe systems and transfers to the cloud, as well as integration with DXC's version of ServiceNow.

49.     Former Employee #11 ("FE-11") held a senior role in Strategy and Operations from prior to the Class Period through the end of 2022. FE-11 reported to DXC's Chief Marketing and Communications Officer. FE-11's responsibilities included, among others, managing DXC's budget for marketing and communications.

50.     Former Employee #12 ("FE-12") was a Chief Enterprise Architect at DXC from prior to the start of the Class Period through summer 2022. FE-12 worked with Dan Padilla, DXC's General Manager of New Orleans. FE-12's responsibilities included, among others, the implementation of customer solutions across industry verticals for both GIS and GBS systems.

51.     Former Employee #13 ("FE-13") held a senior role in program management DXC from prior to the start of the Class Period through fall 2022. FE-13 reported to multiple managers, including a DXC Global Account Executive. FE-13's responsibilities included, among others, tracking and confirming that DXC's workforce reduction program was meeting its goals and employee terminations were in fact taking place.

52.     Former Employee #14 ("FE-14") was a Chief Technology Officer in the IoT segment at DXC from prior to the start of the Class Period through the end of 2023. FE-14 reported to Rob Link, a Director within the IoT segment. FE-14's responsibilities included, among others, leading an IoT team to deliver services to customers.

13

53. Former Employee #15 ("FE-15") was a senior manager in the Consumer & Retail portfolio at DXC from prior to the start of the Class Period through fall 2021. FE-15's responsibilities included, among others, managerial oversight for larger accounts, facilitation of larger deal structures, and the maintenance of client conversations.

54. Former Employee #16 ("FE-16") was a Lead Consultant in Transformation Strategy at DXC from prior to the start of the Class Period until fall 2024. FE-16 reported to multiple managers, including a systems owner in IT and a Global VP and AI Lead for Cross Industries. FE-16's responsibilities included, among others, system development at DXC and "transformation work," which entailed providing advisory services to help clients design solutions for their businesses.

55. Former Employee #17 ("FE-17") was a Senior Director of Client Management with DXC from prior to the start of the Class Period through early 2023. FE-17 reported to Vincente Pava, EVP Cross Industry Line of Business. FE-17's responsibilities included, among others, sales management of accounts, revenues, margins, and oversight of product delivery and service quality.

## IV.  FACTUAL ALLEGATIONS

### A.  Overview of DXC's Business and Organizational Structure

56. Born out of a merger between CSC and HP in April 2017, DXC provides IT and professional services globally. The Company, which is headquartered in Ashburn, Virginia, employed over 130,000 employees in more than 70 countries during the Class Period. At the start of the Class Period, DXC reported revenues of $17.7 billion for FY21.

57. Throughout the Class Period, DXC operated in its two "reportable segments": (i) Global Business Services ("GBS"); and (ii) Global Infrastructure Services ("GIS"). DXC's customers within these segments spanned a spectrum of industries, including companies in the

aerospace and defense, automotive, banking, retail, healthcare, manufacturing, travel, and hospitality industries.

### 1.    Global Business Services Segment

58.    According to DXC, GBS provides "innovative technology solutions that help [its] customers address key business challenges and accelerate transformations tailored to each customer's industry and specific objectives." During the Class Period, GBS was comprised of three "offerings": (i) Analytics and Engineering; (ii) Applications; and (iii) Business Process Services.

59.    The Analytics and Engineering offering included services that allowed DXC's customers to "gain rapid insights, automate operations, and accelerate their transformation journeys." The offering purportedly enabled customers to leverage their data and increase efficiencies through automation.

60.    The Applications offering provided solutions for customers in specific industry verticals such as insurance, banking and capital markets, and automotive. For example, DXC offered its software, "DXC Assure," to health insurance providers to manage their claims, billing, and policies. For the banking industry vertical, DXC offered real-time payment processing and fraud alert software, among other solutions.

61.    The Business Process Services offering, also referred to as "BPS," allowed customers to "integrat[e] and optimiz[e]" their back and front office processes, and provided "agile process automation" during the Class Period. The BPS offering has significant overlap with Applications in the services that it provides to DXC customers. For example, like Applications, BPS also offers DXC customers real-time payment processing software and DXC Assure. Over the course of the Class Period, DXC rebranded the segment "Insurance Software and [BPS]."

### 2.     Global Infrastructure Services Segment

62.     GIS provides "technology offerings that deliver predictable outcomes and measurable results while reducing business risk and operational costs for customers." During the Class Period, GIS was comprised of three offerings: (i) Cloud and Security; (ii) IT Outsourcing; and (iii) Modern Workplace.

63.     The Cloud and Security offering helped customers "modernize by adapting legacy apps to cloud, migrate the right workloads, and securely manage their multi-cloud environments." For example, DXC offered customers 24x7 security monitoring for their networks. Over the course of the Class Period, DXC rebranded the segment "Security."

64.     The IT Outsourcing offering purportedly supported "infrastructure, applications, and workplace IT operations, including hardware, software, physical/virtual end-user devices, collaboration tools, and IT support services" for DXC customers during the Class Period. For example, within the ITO offering, DXC runs IT for its customers by managing their servers and mainframe computers. Over the course of the Class Period, DXC rebranded the segment "Cloud Infrastructure and IT Outsourcing."

65.     The Modern Workplace offering provided "services to fit [DXC's] customer's employees, business and IT needs from intelligent collaboration, modern device management, digital support services, Internet of Things ("IoT") and mobility services, providing a consumer-like digital experience" during the Class Period. For example, Modern Workplace offered DXC customers a solution to manage the devices being used by employees and manage software licenses.

66.     While GBS and GIS each accounted for approximately half of DXC's revenue throughout the Class Period, GBS was considered DXC's crown jewel. That is, as described by Defendant Salvino, GBS was DXC's "flywheel," which provided the Company with "sustainable

16

growth," whereas, leading up to and throughout the Class Period, GIS was the segment facing "historical challenges."

**B.      DXC is Formed in 2017 Through the Merger of CSC and HP**

67.      CSC was DXC's principal predecessor and one of the largest software companies in the United States. CSC surged in the 1990s due to the uptick in outsourcing information technology operations, including existing hardware, software, and employees. At the time of the merger, CSC was generating nearly a billion dollars annually in cash from operating activities, but it was suffering from an ongoing brand crisis following governmental investigations into CSC's accounting practices, a resulting $190 million settlement with the SEC, and the upheaval of CSC's leadership.

68.      The merger with HP presented a solution to CSC's growing negative reputation and in May of 2016, CSC leadership unveiled their plan to merge the two companies to form DXC. When the merger was complete, the newly-formed DXC, which was led by CSC's former CEO, Lawrie, boasted combined revenues of $26 billion with approximately 5,000 clients.

69.      In connection with the finalization of the merger, Lawrie hosted DXC's first investor day on March 29, 2017 (the "2017 Investor Day") during which he delivered a sobering message. The newly-minted DXC was "on the lower end of growth and . . . profitability" as compared to its competitors. DXC's revenue already was "declining." The Company likewise was "beginning to see" a 4% to 7% "deceleration" in its customer base.

70.      DXC executives also expected to experience "some dis-synergies associated with bringing the two companies together." Dis-synergies typically impact revenues—i.e., the revenue of the merged company is less than the sum of the revenues generated by the two stand-alone businesses—or costs—i.e., it is more expensive to run the merged company than to run the two

17

stand-alone businesses. Dis-synergies can exist at the time of the merger or develop as the newly merged businesses are integrated.

71.     While DXC did not further identify the dis-synergies they expected from the transaction, the fact that the Company was at the lower-end of growth and profitability and had declining revenues and customer base meant that the merger had created a multibillion-dollar company facing serious obstacles to becoming a profitable, competitive leader in the industry.

72.     Thus, DXC needed to immediately "transition" the Company's revenue base, "expand [its EBIT] margins by capturing [] synergies" from the merger transaction, and use the resulting "very strong free cash flow . . . to continue to grow the business." DXC planned to do this by: (i) integrating the CSC and HP business; (ii) cutting costs; and (iii) growing revenues by acquiring other companies.

73.     With respect to integration, Lawrie explained during the 2017 Investor Day that the "scale" of the combined business "can really be leveraged." He further noted the benefits of DXC's cost-cutting plan. Indeed, while cost cuts alone would result in increased margins, cost cuts plus integration of the CSC and HP operations would allow DXC to both increase its margins and begin to organically grow the newly-combined business.

74.     With respect to DXC's new growth-by-acquisition strategy, Lawrie announced that DXC wanted to achieve "1% to 2% of revenue growth through acquisitions," comprised of "smaller tuck-in acquisitions geared to our industry portfolio or our digital portfolio." Lawrie claimed that through this strategy, DXC would "begin[] to stabilize[,] . . . grow [its] revenue profile[,] and change the revenue mix over the next three years." Lawrie concluded that if DXC's management "execute[d] this plan," the Company would "have stable revenue growth, consistent with the industry and significantly improved profitability."

18

C. **Following its Inception, DXC Immediately Embarks Upon an Aggressive Acquisition Strategy**

1. **Growth Through Acquisitions**

75.    Attempting to grow a company's revenues through mergers and acquisitions is a well-known strategy. When executed correctly, the acquiring company is able to quickly expand into new markets, remove competitors from its existing markets, fill gaps in its product portfolio, and/or acquire people with certain skill sets, while adding to its revenue and, ultimately, its profitability. The revenue growth associated with this strategy is referred to as "inorganic" because it is not attributable to internal sales efforts utilizing existing resources. While growth by acquisition is a viable business strategy, eventually investors want to see that a company is capable of generating "organic" revenues and, thus, organic growth from within the company.

76.    In addition to obtaining new source of revenues, the acquiring company typically will benefit from positive synergies once the newly-acquired business is integrated into the company's existing business. For example, the newly-combined company should be able to identify cost savings, which often result from eliminating duplicate roles and redundant facilities or from reducing professional services fees. Revenue synergies may also exist if the acquired company has complementary products that can be cross-sold to the acquiring company's existing customers.

77.    While acquisitions can provide companies with rapid revenue growth, there are certain risks associated with this strategy, including dis-synergies (*see supra*) and significant restructuring and TSI expenses.

78.    Restructuring and TSI expenses include costs related to workforce and real estate optimization and other similar charges, along with integration, planning, financing and advisory fees and other costs associated with an acquisition.  A company may be required to devote

significant resources to integration if the newly-acquired company operates on different IT, finance, and/or HR systems. If an acquiring company decides not to (or tries but fails to) integrate acquired businesses, it can lead to dis-synergies, increased operational costs, and other inefficiencies.

79.    Dis-synergies and restructuring and TSI expenses can negatively impact the acquiring company's revenues, margins, and FCF. FCF, like revenues and margins, is an important metric for investors to evaluate a company's financial health. FCF represents the cash that a company generates minus cash outflows required to support its operations and maintain its capital assets. FCF tells investors how much cash is available to pay a company's creditors, to pay investor dividends, to acquire other businesses, or to make additional reinvestments into the business. Restructuring and TSI costs directly impact the amount of a company's FCF. Prior the Class Period, DXC reported FCF excluding these costs but during the Class Period, the Company reported its FCF including these costs.

80.    With respect to DXC, specifically, analysts and investors viewed FCF as "an important driver of [its] longer-term outlook." In fact, in an August 9, 2019 report, BMO analysts reported that "the appropriate valuation metric for DXC is FCF." Later, in a May 20, 2019 report, BMO analysts further commented that FCF, in addition to revenue growth, was "the most relevant metric[] for the shares." In a February 3, 2022 report, Wolfe Research analysts similarly found FCF to be a crucial metric as they remained "sidelined on shares as [they] wait[ed] for additional signs of traction and evidence in . . . sustainable FCF conversion . . ." Likewise, in a March 4, 2022 report, Cowen ("TD Cowen") analysts reported that "[e]xecution on cash flow generation is a key pillar of the investment thesis and a metric that is clearly moving in the right direction"

20

and that operational execution, including "FCF improvement" "should beget increased Street confidence; we see an attractive investment."

### 2.   DXC's 2017-2019 Acquisitions

81.    DXC immediately began executing on its growth strategy by acquiring Tribridge in July 2017 and Logicalis in October 2017. DXC also acquired six companies in 2018, including Argodesign, TESM, BusinessNow, Xchanging Solutions Ltd., Sable37, and eBECS Ltd.

82.    Analysts saw these acquisitions as positives for DXC's revenue growth. Cowen analysts reported in July 2017 that they believed that Tribridge would immediately begin contributing to DXC's revenues. Similarly, Berenberg analysts concluded in an April 2018 report that DXC's growth by acquisition strategy would "add 1-2ppt of revenue growth by 2020."

83.    Throughout 2018, the market maintained an optimistic view of the Company's acquisitions, which were expected to gradually improve DXC's top-line trajectory, particularly as DXC was able to cut costs and achieve synergies through integration. For example, a February 2018 RBC report attributed DXC's positive results to its recent acquisitions, which allowed the Company to further "shift towards digital solutions to general growth partially counteracting pressure on traditional solutions." BMO Capital Markets reported in May 2018 that it expected DXC to continue to use "M&A to diversify and enhance its revenue base" and further benefit from cost-savings synergies in excess of $1 billion. Likewise, Deutsche Bank analysts reported that DXC's "[m]erger [s]ynergies [c]ontinue [t]racking [a]head" as the Company reported "strong margins." Deutsche Bank also reported that it expected DXC to benefit from "further M&A which could provide upside" to the Company's revenues. For its part, TD Cowen believed that DXC's "focused M&A within next-gen capabilities" was a net positive for the Company and its investors.

21

84.     By the end of 2018, however, it had become clear that DXC's ongoing efforts to improve its profit margins by cutting costs had gone too far and negatively impacted the Company's ability to grow its revenues, notwithstanding DXC's multiple acquisitions to date.

85.     Following the October 24, 2018 publication in the Register of an article reporting that DXC had terminated its recently-hired head of Americas due to a double-digit decline in sales for that region, the stock price declined nearly 20%, and analysts expressed concern that DXC's focus on raising operating margins through its cost-cutting initiatives would negatively impact the Company's ability to grow its revenues.

86.     For instance, Cantor Fitzgerald explained that "DXC's prior success has been primarily attributable to creating shareholder value due to cost takeout initiatives" and, as a result, "[t]he articles [sic] content would bring into question the company's ability to execute on growth initiatives," including, for instance, the Company's plan to grow revenues through acquisitions. Analysts at Morningstar further stated: "We believe the firm's historically patchy returns on invested capital (from CSC and HP[]), along with the unknown future performance of the newly created company creates a high degree of risk," leaving them "dubious over [DXC's] long-term ability to patch together its many parts into a cohesive, single-minded organization."

87.     During the Company's earnings call and Investor Day in November 2018, Lawrie acknowledged for the first time that DXC's cost-cutting efforts—including its workforce optimization and footprint rationalization plans—had gone too far and the Company needed to pivot towards revenue growth. He explained that "[o]ur plan was to get those costs out and then turn our attention to growth, which is what we are now in the early stages of doing."

88.     Lawrie's professed renewed focus on revenue growth did little to assuage analysts' concerns. In fact, following the November 6 earnings call, analysts noted that "[c]oncern [r]elated

22

to [r]evenue [g]rowth [was] [r]ising," especially given DXC's affirmation that "[a]quisitions [were] still expected to contribute" only "about a point of the revenue growth despite the string of recent deal announcements." Wells Fargo analysts reported their belief that "investors will be more focused on [the] revenue trajectory as we suspect more will question if the aggressive cost cutting moves aren't hurting potential revenue growth." In other words, DXC's revenues did not benefit nearly as much as expected from the eight acquisitions between 2017 and 2019 because the inorganic revenue growth had been blunted by the effects of the cost-cutting initiatives.

89.     After the Company's Investor Day on November 8, 2018, BMO reported that "management [wa]s aware of the need for a more balanced strategy to include meeting consensus revenue expectations." To that end, BMO stated: "Rather than meeting non-GAAP EPS targets by raising margins and missing revenues, we think DXC would be better served by lowering margin targets, either through greater organic investments—i.e., investing in the business, including, through integration efforts—"or more M&A, and meeting revenue expectations." BMO concluded, "We think management more fully appreciates the need to hit revenue targets now compared to the past when the focus was on integrating and selling deals."

90.     Thus, following the November 2018 calls, DXC forged ahead with its growth-by-acquisition strategy, acquiring six more companies in 2019. Of note was DXC's January 2019 announcement that it would acquire Luxoft for $2 billion. Lawrie, touted the "strategic combination" of the two companies as being "enormously beneficial for our clients." Analysts responded in kind with Wolfe Research reporting that Luxoft would be the "crown jewel in the business and [that DXC] sees the revenue synergy potential by allowing the segment to tap into [its] massive installed base and sales engine."

91.     Despite the accolades and a quick $45 million boost to DXC's top-line revenue from the Luxoft acquisition, the Company again reported poor performance in the second half of calendar year 2019. After DXC lowered its guidance for FY20 revenues, adjusted operating margins, and adjusted earnings per share in August 2019, analysts questioned "the Company's ability to drive revenue longer term." Analysts also believed that DXC's FCF "has been very weak" and the Company's "focus on cost cutting could impact efforts to grow revenues."

92.     One month later, on September 11, 2019, Lawrie resigned as DXC's CEO and was replaced by Defendant Salvino.

93.     During a call to discuss the management changes, Lawrie told investors that DXC had "successfully integrated the CSC and HP businesses and delivered on [its] synergy targets while establishing a strong foundation to build on." He further noted that DXC had "strengthened and focused [its] portfolio of assets through acquisitions such as Luxoft" and "made investments in the business and our people." But, Lawrie concluded DXC "need[ed] to move faster" to address its customers' shift to digital solutions and transition the Company "to growth." Accordingly, DXC had chosen Salvino to lead it "into the next phase."

94.     In response to analyst questions about the transition, Salvino explained that his focus as the new CEO would "be on accelerating the execution of our strategy to drive growth" and that he would focus, in part, on "the operational execution" of the business. He further noted that Lawrie had "done a great job putting together CSC and HP," and "made some very nice strategic acquisitions in things like Luxoft," and DXC was now "able to put Phase 1 . . . behind [it] and move to Phase 2, which is the focus on growth." In other words, Salvino was ready "to get on with that program and [] accelerate [DXC's] strategy."

95.     J.P. Morgan described Lawrie's resignation as "a bit premature as we expected him to retire on a high note (the stock at multi-year low)." Nonetheless, J.P. Morgan concluded "the time seems right to transition the company to growth under new leadership, after Lawrie's 7-year run of executing difficult turnarounds and transforming a sub-scale CSC into one of the largest independent IT services firms in DXC with above-average margins."

96.     As for Lawrie's replacement, Salvino, analysts hoped that he would "quickly develop a plan and bolster investor confidence and heal the multiple with stock trading <4x forward earnings." In a September 2019 report, Wells Fargo reported that DXC's approach to date "has not been working as the last year saw multiple revenue and earnings disappointments and a collapse in the stock price," while noting that "DXC offered that [] Salvino is taking over now to facilitate Phase II, the 'growth' phase." TD Cowen further explained that while DXC's "cost takeout is exemplar, one of the few knocks on DXC management has been an inability to drive organic growth." Critically, according to TD Cowen, "a pivot to[ward] growth is the only way forward" for DXC.

97.     Approximately two weeks after DXC announced the management change, Wells Fargo issued a report lowering its outlook for DXC's revenue and EPS, as well as its price target for the Company's stock. According to Wells Fargo, "the recent unexpected and abrupt resignation of CEO Mike Lawrie and the immediate shift to new CEO Mike Salvino" has "investors . . . increasingly concerned" as to "whether DXC can actually revive organic growth without meaningfully reducing the EBITDA outlook." Wells Fargo explained that "[i]nvestors for years have looked past 'recurring non-recurring' expenses (expected the company to be approximately $750MM in FY20), and revenue growth that reflects acquisitions not organic growth" but that "Salvino faces some stiff headwinds as he attempts to revive the business."

98.     In short, given that DXC had purportedly integrated the CSC and HP businesses and engaged in significant cost-cutting initiatives, investors now wanted the Company and its new CEO, Salvino, to finish integrating DXC's dozen plus acquisitions and begin to focus on generating organic revenue growth.

### 3.     DXC's "Transformational Journey" Purportedly Begins

99.     During his first call as DXC's CEO, Defendant Salvino reported being "impressed with the company's track record of enhancing capabilities through targeted strategic acquisitions, including innovative assets like Luxoft and recently, Blueleader and Virtual Clarity." However, Salvino noted that he also had "seen several areas for improvement that DXC needs to address to enable growth."

100.    Salvino explained that the Company's "delivery teams were not able to execute the more complicated phase of operational cost improvements." Salvino also highlighted the fact that DXC had "an opportunity to shift from providing individual services for many of [its] customers, to *integrated industry solutions*" that "*leverag[e] multiple DXC offerings and capabilities*" and thus "need[ed] to *focus more on selling integrated solutions*" to its customers.

101.    Salvino further identified "execution challenges" that had "negatively impacted some of [DXC's] large customers," which "result[ed] in lower margins, delayed revenue and bookings as customers have placed [] additional work on hold." Per Salvino, DXC's "current operating model [wa]s complex, resulting in unclear accountabilities as well as slow decision-making"; in order "to do a better job running operations," DXC needed to "*simplify[]* this structure" and "the way [it] *work[s] together* to drive increased accountability." Put simply, DXC needed to integrate its many acquisitions, simplify its business, and leverage the resulting synergies in order to grow.

102.   Ultimately, Salvino was "not pleased" with DXC's operations or financial results, and he vowed to investors that "[g]oing forward, ***DXC will run as one company***."

103.   During the next earnings call on February 6, 2020, Salvino updated the market on DXC's "transformational journey." With respect to "operational execution," Salvino reported that the Company's "goal [wa]s ***to consolidate*** and further scale [DXC's] delivery operations" and "to ***streamline*** our offering portfolio to better align with the enterprise technology stack." Salvino also emphasized that, looking ahead, FY21 would be a "transitional year" for the Company.

104.   During the question-and-answer portion of the February 6 call, one analyst noted that DXC's restructuring and TSI costs were "running about 1/3 or so of adjusted free cash flow," and inquired as to whether these expenses would "be [] a big piece of [DXC's] cash flow for the foreseeable future?" In response, then-CFO Saleh explained that although FY21 would be a "transitional year" for DXC, the Company's restructuring costs would begin "to moderate" in FY22. Additionally, in response to a subsequent analyst question regarding the impact DXC's "multiple turnaround initiatives" on revenues, Salvino confirmed that DXC was "bringing [its] automotive and banking [businesses] ***together*** with Luxoft" and otherwise "mak[ing] sure that we're ***combining*** the capabilities that we have to compete in the market."

105.   Then, during the November 5, 2020 earnings call, Salvino introduced the "new DXC," telling investors "we are bringing the new DXC to the market" and "have demonstrated solid momentum in executing on [the Company's] transformation journey." Salvino further reported that DXC "delivered a strong Q2" and was "executing against [] plans to stabilize revenue quarter-on-quarter" and "improve margins sequentially." In response to an analyst seeking "an update" on DXC's efforts to "***simplify***[] the organization," Salvino reported that in addition to "tak[ing] the best of platform DXC and Bionix" and "piloting" a combined offering

called "Platform X," the Company would "continue to look at **consolidating** our real estate footprint and data centers."

106.   During the same call, another analyst noted that "restructuring and transaction-related costs [] have been pretty persistent and a big of a drag on cash flow" and asked Salvino whether he had a "line of sight" as to "when we might see those go down," and, separately, how Salvino was "thinking about M&A going forward." With respect to restructuring and TSI costs, Salvino confirmed that "we are now getting to a point where I can run this business . . . . **things are starting to quiet down a bit, and now we can drive this business**." Salvino further confirmed that restructuring and TSI costs "should be coming down." Investors thus understood that DXC was well on its way to completing its efforts to integrate, consolidate, and simplify its business, and as a result, the Company would begin reporting lower restructuring and TSI costs and shifting its focus to driving increased growth.

107.   On November 12, 2020, DXC announced that Defendant Sharp would be taking over as DXC's CFO from Saleh. During his first earnings call as CFO on February 4, 2021, Sharp outlined his "investment thesis of how DXC would create value." This "thesis"—which Sharp was "convinced that DXC can execute"—included "stabilizing revenue, expanding margins and delivering free cash flow." Sharp explained that DXC would "be disciplined in reducing spend in areas such as restructuring, transaction and integration, capital expenditures, excess facilities and our outsized overhead" in order "to demonstrate the true earnings power of DXC."

108.   Sharp also reported that DXC would begin reporting in its earnings releases "organic revenue," which was "something that [DXC leadership] feel[s] will help our investors better understand the underlying performance of the business." Per Sharp, "organic revenue[s]" "mean[]" organic growth and . . . improving cash flow." As discussed *supra*, organic revenue is an important

28

metric for investors to see that a company is capable of generating increased revenues from its existing businesses and not solely through acquisitions.

109.    Moreover, Salvino confirmed that "this [wa]s the second straight quarter of revenue stabilization," and DXC "expect[ed] this trend to continue in Q4." Salvino further noted that DXC's "sequential revenue stabilization [wa]s positive evidence that [it] will achieve year-on-year revenue stability." Salvino concluded his prepared remarks: "[W]e're bringing the new DXC to the market and have demonstrated solid momentum in executing on our transformation journey" which "is translating into consistent quarter-on-quarter revenue stability."

110.    Thereafter, in response to an analyst question regarding a potential merger with Atos, Salvino further stated: "[O]n revenue stability, we just delivered our second quarter of revenue stability and have guided towards the third quarter. So we believe we're headed towards revenue stability year-on-year in FY'22. And I think anybody that has followed DXC would say that's a pretty strong accomplishment."

111.    Defendants' statements indicated to investors that DXC had made substantial progress with its efforts to integrate, consolidate, and simplify its business and those efforts had already begun translating into more stable revenues, increased organic revenues and cash flows, and decreased restructuring and TSI expenses.

**D.    Throughout the Class Period, Defendants Assure Investors that DXC Has Integrated its Businesses**

112.    On May 26, 2021, the first day of the Class Period, Defendants laid out their updated vision for the "new DXC," which included the following five "Financial Priorities":



113.   During a conference call held with analysts and investors that day, Defendant Sharp stated that "[o]ne of [the] key initiatives" DXC was "employing to drive cash flow and improve earnings power [was] to ***wind down restructuring and TSI costs***." In that regard, Defendants announced a concrete plan to reduce DXC's restructuring and TSI expenses from $900 million per year to $550 million in FY22 and $100 million in FY24. With the "***wind down***" of these expenses, DXC expected to generate positive FCF of $500 million in FY22, as compared to negative FCF of $652 million in FY21, and positive FCF of $1.5 billion in FY24.

114.   In response, analysts issued reports asserting, based on Defendants' statements, that DXC was finally on its way to completing its restructuring and integration efforts. For instance, Wells Fargo upgraded DXC to overweight and increased its price target to $48 per share, and noted that while the "work[] to improve the DXC enterprise" "is not completed," "***enough work has been done to give us incremental confidence that [DXC is] laying a foundation for a company that is poised to deliver predictable growth and . . . shareholder value***."

115.    Wells Fargo also reflected on Defendant Salvino's and DXC's management team's efforts "[o]ver the last 6-7 quarters" to integrate and restructure the business, including "streamlin[ing] operations" and making investments in "its people," "product development, sales and client delivery," and "client engagement." Additionally, Wells Fargo noted that DXC's winding down of restructuring and TSI costs, as announced on the May 2021 conference call, demonstrated that "over a year into this journey [DXC] has moved through the worst" aspects of this transition and had already engaged in "a fair amount of the internal work" needed to execute its transformational journey. Wells Fargo likewise stated that resolutions for "historical issues" were "now well under way, and showing signs of success" such that DXC's management could finally "re-direct their bandwidth to focusing on the future and driving growth."

116.    Also during the May 26 call, Defendants acknowledged and addressed long-standing investor concerns regarding the state of DXC's cash flows.

117.    Prior to the start of the Class Period, analysts had expressed frustration with DXC's use of non-GAAP financial metrics to report its financial results. For instance, following the arrival of Defendant Salvino, BMO stated in a September 2019 report that "new management should consider taking the opportunity to offer different representation of the financial statements," given the "wide variance between" DXC's GAAP and non-GAAP reported metrics. BMO specifically cited DXC's FCF metric, explaining that DXC "has very wide variance between traditional GAAP and non-GAAP FCF, even after completing years of restructuring." According to BMO, "it is rare that a company will present non-GAAP FCF, particularly over an extended period of time." BMO concluded, "[w]hile consensus estimates would likely move sharply lower if more traditional GAAP metrics were applied, we think such a measure would remove uncertainty and provide greater transparency."

31

118.    Thus, when Defendant Sharp announced on the first day of the Class Period that the Company planned to "focus on improving cash flow" by winding down restructuring and TSI costs, acknowledged that the Company's "cash flow is hard to understand," and confirmed that DXC had now "changed [the] presentation, and . . . adopted a traditional free cash flow definition," analysts responded positively. BMO reported that while "there has been a lot of investor uncertainty around DXC's true FCF generation" DXC's move "away from providing an adjusted FCF metric" was "positive" and "will provide a lot more clarity around DXC's FCF capabilities." BMO concluded, "[n]et, we think DXC's guidance and presentation changes will give investors a much clearer picture of the state of the business."

119.    RBC likewise noted in a report following the May 26 call that DXC's 4Q21/FY21 "print and guidance continue to support the company's transition to a more consistent and transparent operator," and concluded that "[w]e believe the targets are support of a consistent and improving trajectory and specifically clarity on FCF." In fact, RBC increased its FY22 estimates and price target because it "now believe[s] management's turnaround continues to gain visibility as 1) revenues stabilize, 2) margins expand, and 3) the balance sheet and cash flows continue to improve."

120.    Similarly, TD Cowen confirmed in a report that DXC was "increasing transparency & disclosure and showing all intents to clean up FCF & restructuring items," noting that DXC's "simplification [wa]s well-received." With respect to cash flow, TD Cowen reported that DXC was "[p]roject[ing] a 3x increase in FCF from $500MM in FY22 to FY24 at $1.5Bn" after "[c]leaning up restructuring & integration items from a ~$900MM annual rate to $550MM in FY22 and $100MM by FY24."

121.   Leading into DXC's June 17, 2021 Investor Day (the "2021 Investor Day"), TD Cowen issued another report titled, "Investor Day Preview: Making the Case for Why this Time Is Different." In that report, TD Cowen stated that "DXC continues to be one of the more polarizing investment stories among our Services coverage." While "[t]here has been substantial change throughout the organization," it was unclear "whether those changes are enough to fundamentally change the entity, and the speed at which such a turnaround is possible." Nevertheless, TD Cowen explained, in reliance on Defendants' statements, that during Defendant Salvino's 18-month tenure as CEO, "the business has moved from significant degradation toward stabilization" at a "notable" pace through a strategy "that aims to build a sustainable Services business with a simplified portfolio and increased transparency."

122.   With respect to restructuring and TSI costs, TD Cowen confirmed that "[r]educing these obligations/costs represent[ed] a significant lever to adjustment margin and improved cash flow prospects." Like Wells Fargo before it, TD Cowen explained that "[a]s a result of the combination of CSC-HPE and subsequent restructuring program, DXC ha[d] undertaken material restructuring initiatives to realign its business," which "have weighed on DXC's cash flow quality & profile." To date, these "costs have largely focused on workforce reductions, procurement and facilities rationalization, . . . integration, planning, financing/advisor fees, and other similar charges associated with M&A and divestment activity." Per TD Cowen, DXC's decision to stop adjusting FCF by adding back in discretionary one-time items, "improve[d] transparency and financial disclosure rigor."

123.   During DXC's 2021 Investor Day, Defendant Salvino reaffirmed the market's view that DXC had made significant strides towards integrating its businesses and was poised to begin driving organic revenue growth. He stated that while restructuring and TSI expenses have been

33

"something of a thorn in our side," his management team was now focused on "making sure ***that any integration that we've done***" is "***done [i]n the appropriate way and move on from there***." Defendant Sharp agreed, flagging the fact that TSI expenses "continue to decline" and explaining that Defendants have otherwise "***gone through and evaluat[ed] and end[ed] those projects . . . shutting them down, getting them completed, and getting the right results***."

124.   Defendants Salvino and Sharp thus confirmed to investors that DXC had already spent most of the money needed to integrate its businesses, and that it was now "completing" these projects, "getting the right results," and preparing to move on.

125.   During an August 4, 2021 earnings call, Defendants again confirmed that DXC was "wind[ing] down" restructuring and TSI costs, and they provided the following visual to explain DXC's progress towards its goals announced on the first day of the Class Period:



126.   Defendants also touted DXC's efforts to date to reduce restructuring and TSI expenses, displaying the following slide to investors:



127.   Defendants included similar visual representations of DXC's efforts to reduce restructuring and TSI costs and increase FCF during each subsequent earnings call during the Class Period.

128.   Analysts reacted positively to Defendants' statements and the foregoing slides, with RBC reporting that DXC showed "continued progress in transitioning to stable growth" while increasing its estimates and price target for the Company. Cowen analysts similarly noted that DXC's "[t]urnaround [t]rends [c]ontinue," with "turnaround momentum continu[ing] to be shown across key metrics" and "[a]ll in, the transformation train moves onward with continued traction." Investors thus understood that Defendants were able to lower restructuring and TSI expenses, and thereby increase FCF, by successfully completing the integration and stabilization of the Company's various lines of businesses.

129.   Defendants further reported on DXC's progress towards reducing its restructuring and TSI costs, leading to positive FCF results, during a November 3, 2021 earnings call, with Defendant Sharp reassuring investors that DXC was "on track" to limit restructuring and TSI expenses to $100 million by FY24, noting that the Company's "restructuring and TSI efforts are highly focused" and "a prudent investment in the business."

130.   Defendant Sharp likewise confirmed that DXC "continue[d] to deliver" on its promise to reduce restructuring expenses in order to "improve[] our cash flow" and "narrow[] the difference between GAAP and non-GAAP earnings." Importantly, Defendant Salvino also assured investors that DXC's plan to reduce restructuring and TSI expenses was "sustainable."

Moreover, in response to analyst questions, Defendant Sharp assured investors that the Company was "thoughtfully" deploying capital to restructuring and TSI efforts, taking "a very disciplined focus effort on every dollar of spend" and "mak[ing] sure there's business cases" for the expenses.

131.   The takeaway from these statements was clear: DXC's restructuring and TSI expenses were declining because senior management had been scrutinizing every dollar spent and concluded that, given the Company's integration efforts to date, DXC was already on a path to sustainable growth such that significant further investments in restructuring and integration would not be prudent.

132.   Analysts were buoyed by DXC's results and Defendants' statements. BMO Capital Markets reported that DXC's "FCF margins were above our expectations," with the Company's reported FCF of $400 million significantly exceeding "consensus estimates of $100 million." TD Cowen analysts described DXC's cash flow performance as "a strong recovery well above expectations." Deutsche Bank echoed these sentiments, stating that "FCF in the qtr. was ~$404m, well above expectations," while J.P. Morgan called DXC's cash flow performance "a pleasant surprise."

133.   By February 2022, DXC had "made particularly strong progress with" its "continued reduction of [r]estructuring and TSI expenses" such that Defendants were able to further revise its guidance for FY22. Now instead of reporting $550 million in restructuring and TSI expense for that year, the Company guided that it would have just $400 million in these costs for FY22. By way of explanation, Defendant Sharp noted that DXC "expect[ed] to spend $500 million less on [r]estructuring and TSI expense than last year, while expanding margins by over 200 basis points," by "embed[ding] these types of expenses over time into the normal performance of the business." Thus, Defendant Sharp confirmed that DXC had "taken significant strides" to shift its

36

focus to "the normal performance of the business," i.e., DXC's post-integration operations. Defendants' efforts to reduce restructuring and TSI costs led to increased FCF, which analysts confirmed was "well ahead of expectations."

134.   DXC continued to decrease its restructuring and TSI expenses and report ever-increasing FCF, which analysts applauded as a further indication that DXC's transformation was well underway. In May 2022, DXC reported just $300 million in restructuring and TSI expenses for FY22 ($100 million less than its revised guidance) and $743 million in FCF (well above DXC's original guidance of $500 million in FCF for FY22), leaving the Company's "financial foundation [] in a much better place." In response to an analyst's inquiry as to how DXC hoped to generate $1.5 billion in FCF by FY24, Defendant Sharp confirmed that "a couple hundred million dollars" would come from removing further "restructuring and TSI expense that [was] impact[ing] cash flow." Defendant Salvino was even more sanguine: "There's literally eight things that we look at . . . on a quarterly basis, starting with restructuring and TSI [costs]. I couldn't be more pleased around our commitment from taking that to over $1 billion to now roughly $300 million and continue to drive that down."

135.   Thereafter, during the June 2, 2022 Cowen Technology, Media & Telecom Conference, Defendant Sharp again described DXC's journey to lower restructuring and TSI costs, noting that "when John [Sweeney] and I first showed up, we had a [b]oard of our big opportunities" with the "[r]estructuring and TSI [expense]" representing a "$1 billion opportunity." Defendant Sharp confirmed that DXC's management was "trying to sort our way through that" expense, "***tackling that***," and "***shutting it down***."

136.   Importantly, Defendant Sharp also confirmed that the Company had not simply stopped its integration efforts but instead was completing those efforts. Indeed, while DXC did

37

not "historically . . . report organic revenue," growing instead by "doing a series of acquisitions" without integrating all of the acquisitions, Defendant Sharp reassured investors that Defendants saw "a lot of opportunity in . . . *continuing [to] driv[e] the business together*, *drive . . . a unified face* to the customer and make sure we're *leveraging our accounts*."

137.    Over the next few quarters, DXC continued to "*significantly reduc[e]*" and "*tightly manage*" its restructuring and TSI expenses. In turn, analysts noted that DXC was "generally progressing on its transition to a more digitally focused, consistent and transparent operator." Still others "continue[d] to see attractive risk reward" because management's actions "continue to support the longer term trajectory of the business." The Company was, in the words of some analysts, heading in a "[b]etter [d]irection," such that it could "continue to grow margins/FCF at an attractive valuation." Thus, analysts understood that the Company was reducing its restructuring and TSI expenses because it was successfully combining its various acquisitions, leading to an integrated, sustainable business.

138.    During a February 1, 2023 conference call, Defendant Salvino reflected on the purported success of DXC's transformational journey, stating DXC had reached an "inflection point":

> Our clear execution of our transformation journey has built a quality company that you can depend on to deliver revenue that is not declining; change the mix of the revenue to the higher-value tech offerings of GBS; expand both margins and EPS; win new work in the market as our offerings are relevant and in demand; generate strong free cash flow; manage our debt; and return cash to shareholders.
>
> Now this is great execution, but we didn't come here to DXC to fix the challenges. With the momentum that we've created in the business, we have confidence that we are poised to deliver the business we had envisioned in FY '24 as we can see the ability to drive revenue flat to 1% growth, expand both margins and EPS, rotate the revenue to the new tech of GBS and generate increased free cash flow.
>
> Getting this inflection point was no small task, and my management team and I are proud of the quality company we have created, along with being clear and excited about the future of DXC.

139.   With respect to the Company's financial condition, Defendant Sharp confirmed that he and Defendant Salvino "envisioned a business that could grow with solid margins and good quality cash flow" at a time when DXC's "organic revenue was declining double digits," "[a]djusted EBIT margins were approximately 6%," "[f]ree cash flow was negative $650 million," and "annual reoccurring restructuring and TSI costs" were "$900 million." In order to transform the business, Defendants had to "do[] a lot of work . . . . across the entire business" and, among other things, significantly reduce restructuring and TSI costs to generate "2 years in a row of positive cash flow over $600 million." Indeed, according to Defendant Sharp, "[t]he biggest driver" of DXC's improved cash flows "has been the focus on driving down the restructuring [and] TSI [costs]." As Defendant Sharp noted, "[f]rom our vantage point, we have come a long way over the last 2 years as the business is on a much stronger foundation."

140.   During the February 1 call, Bryan C. Keane, a Deutsche Bank analyst, pressed Defendant Salvino about whether investors should believe that DXC's purported transformation was "real this time." Keane noted that "in its history, [DXC] hasn't been able to do it, but it sounds like maybe . . . we're finally at a point that the visibility is strong enough that you feel confident this can be a positive organic growth, not only next year, but just from years to come." Defendant Salvino responded in the affirmative, stating that "[t]his is where we wanted to be," that "you're leaning into what you should feel now because I meant what I said," and that "I can now stop talking about [it] and we can show you guys the results."

141.   Generally, analysts were encouraged by DXC's transformation progress. For example, TD Cowen analysts reported that "there is continued evidence of progress on [DXC's] transformation plan with FCF and bookings at the top of the list." Likewise, Wolfe analysts described DXC's FCF as "sound," and RBC reported that DXC's "[t]ransformation journey

continues with stability and visibility coming to fruition." For its part, Susquehanna International Group noted that "DXC has made substantial progress repositioning the business to grow."

142.    Thereafter, during the Company's May 18, 2023 earnings conference call, Defendant Salvino again touted DXC's purported significant progress in transforming its business, stating that "[o]ur clear execution of our transformational journey by our talented team in FY'23 has delivered a better culture, stronger customer relationships, a better sales model, revenue stability, expanded margins and free cash flow[.]" He went on to state: "I'm happy that our focus in FY'24 will not be on fixing challenges but delivering higher quality revenue, margin and EPS, expanding fee cash flow and returning another $1 billion to shareholders while maintaining our investment-grade profile." Defendant Salvino also stated that, through their work over the prior years, he and Defendant Sharp "built a solid financial foundation and fixed many of the challenges at DXC."

143.    Analysts again reacted positively to Defendant Salvino's statements, with TD Cowen noting that "forward progress on the turnaround continues" and Susquehanna International Group similarly stated on May 19, 2023 that "DXC has made **substantial progress** repositioning the business to grow."

**E.    In Truth, DXC Had Not Integrated its Operations and Systems**

144.    As described above, Defendants' repeated statements to investors about DXC's transformational journey and its plan to reduce restructuring and TSI expenses conveyed to the market that DXC had successfully integrated the myriad businesses it had acquired and was finally operating as a single company that was poised for sustained growth. Unbeknownst to investors, however, and contrary to these representations, DXC had not integrated its operations and systems, and it was far from being a unified company that was ready to move on from

40

integration and begin a period of stabilized organic growth. Rather, DXC remained a hodgepodge of duplicative, overlapping systems and competing business units throughout the Class Period.

145.   For instance, FE-1 stated that it was common knowledge amongst DXC employees that the Company had no real interest in meaningfully integrating the businesses it acquired. FE-1 also confirmed that DXC had never integrated the CSC and HP businesses, explaining that CSC employees were frustrated and complained that they were still having to use the CSC email and time sheet systems. Per FE-1, DXC never made the investment to do meaningful and successful integration and did not have a strategic plan in place, a fact of which FE-1 confirmed upper management at DXC was aware.

146.   According to FE-1, DXC kept the "house of cards" afloat through layoffs while at the same time talking up successful integration and lower TSI costs to investors. The repeated layoffs, which began in 2018 and continued throughout the Class Period, meant that there were no subject matter experts or qualified employees left to maintain the business.

147.   FE-1 recalled that in mid-2023, DXC was frequently laying off employees. FE-1 attended monthly meetings beginning in summer of 2023 with Debbie McKee, who worked under Hermann Heimhardt, VP Security, regarding the work reduction layoffs for the Security division. FE-1 learned through these monthly discussions that DXC was trying to use the layoffs to get into the "black" financially. FE-1 stated that ultimately with all the layoffs at DXC, there were not enough qualified people left to do the work and the Company had to use non-DXC employees for some of the work, which was more expensive in the long-run.

148.   According to FE-2, DXC did not want to integrate because it was less expensive not to integrate. It also was consistent with what FE-2 described as the Company's internal "Survivor" mentality. While customers came to DXC looking for one solution to an issue, the Company had

multiple internal business units compete with each other for the account, leading DXC to propose separate competing proposals to clients that wanted a simple answer. FE-2 recalled one customer telling FE-2 that DXC had to get its act together.

149.   Additionally, FE-2 confirmed that DXC's failure to integrate impacted the Company's customer relationships. For instance, DXC would tell its customers that it was closing certain data center sites and give the customers limited time to decide whether to switch their data to an untested site, pay to move to another site in another geographic area, or leave DXC altogether. FE-2 also stated that DXC was firing top sales personnel with established customer relationships and replacing them with newer inexperienced employees, which upset DXC's customers.

150.   Moreover, FE-3 stated that there was "lots of duplication" in the financial and other core systems across the acquired companies because many of the big consolidation efforts did not receive the necessary resources. According to FE-3, DXC took a "hub and spoke approach" rather than eliminating duplication. Additionally, per FE-3, nobody at DXC was willing to spend to consolidate the Company's financial tools, leading to a data picture that was so complicated that it could not be put together or managed. FE-3 stated, "there was no visibility into cost or billing."

151.   FE-3 further confirmed that after its acquisition by DXC, Luxoft remained quasi-separate. Luxoft employees considered themselves "Luxoft" and they had their own computers and systems that were not integrated with DXC's systems.

152.   Similarly, FE-4 stated that DXC had made very little progress integrating many of its acquisitions throughout FE-4's tenure at DXC. FE-4 stated that there were many examples of companies that DXC had acquired that "did not play nice together" and were not fully integrated, including CSC, Luxoft, Argodesign, and Molina Healthcare. According to FE-4, many of DXC's

acquired companies, including Luxoft, had their own non-DXC email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. In fact, Luxoft even had their own pay "rate cards" for Luxoft contractor services, leading to DXC customers being quoted different rates to hire a DXC developer versus a Luxoft developer.

153. This paragraph has been intentionally omitted.

154. Similarly, FE-17 recalled that Luxoft maintained its own system, which was similar to an Enterprise Resource Planning (or "ERP") system, that DXC employees did not have access to for resource and cost planning, payroll, staffing allocations, and cost and revenue reporting. Additionally, Luxoft maintained its own instance of Salesforce, which was separate and apart from DXC's Salesforce instance. FE-17 stated that the lack of integration between DXC and Luxoft slowed down operational tasks like sharing sales data.

155. FE-6 likewise recalled that there was no real integration at DXC. According to FE-6, DXC did not invest in or provide the needed funding to properly integrate the companies it had acquired. FE-6 also confirmed that following its acquisition by DXC in 2018, Argodesign maintained its own brand identity all the way down to the logo and pieces of paper on which Argodesign carried out its deals. Argodesign also refused to introduce DXC to its clients. FE-6 likewise stated that when FE-6 was hired in 2021, Luxoft still maintained its own brand name and identity, even though DXC had acquired the Luxoft business in 2019.

156. FE-16 also recalled Argodesign's resistance to working with DXC. FE-16 explained that the acquisition of Argodesign, a high-concept design firm, was intended to expand business with DXC's existing client base into IT transformation initiatives. This did not pan out, however, due to DXC's existing reputation as a "company that managed mainframes," and not as one capable of leading clients' IT transformations. Thus, after initial efforts by former Argodesign

43

employees to attend meetings with their new DXC counterparties failed to materialize in any revenue, Argodesign employees stopped attending DXC-led meetings altogether. FE-16 said that this exacerbated integration issues because Argodesign feared the association with DXC would further negatively impact the Argodesign brand. FE-16 recalled that the same was true of Smashing Ideas, a subsidiary of DXC's Luxoft acquisition. That is, DXC clients simply did not have enough trust in DXC's ability to transform their organizations, thus customers did not want to pay Smashing Ideas' prices.

157.    FE-7 stated that after the merger of HP and CSC, employees from each organization still operated as distinct teams. Even five years after the merger, in 2022, there was still talk of integrating HP and CSC, which were referred to internally as "Team Green" and "Team Red," respectively, but no steps actually were taken to integrate these businesses. This was true even after Defendant Salvino spoke of the need to integrate Team Red and Team Green at DXC's internal Insurance Group conference in Charleston, South Carolina, in the spring of 2022. FE-7 recalled there was no follow through after the meeting to integrate the HP and CSC businesses and that workflows remained disparate. For example, HP and CSC used DXC's CRM system, Salesforce, in completely different ways.

158.    FE-15 likewise recalled that the message that DXC needed to come together to form "Team Purple" was nothing more than a logo and a color change. According to FE-15, DXC did not consistently use its CRM system, Salesforce, nor was there any appetite to spend the money necessary to improve DXC's Salesforce system during FE-15's tenure. Indeed, rather than use Salesforce to accurately track and forecast sales, there were three different places where DXC employees could log this information. This meant that reporting of sales and forecasting data to management was done manually in a combination of Excel and PowerPoint reports. FE-15

described a weekly standing meeting that Salvino held with his direct reports to discuss these Excel and PowerPoint reports that showed metrics like portfolio tracking, customer satisfaction, revenue, in-year sales, productivity in terms of revenue per account, and head count on each of the accounts for existing clients and the pipeline. FE-15 said that this method of reporting was less accurate than if DXC had implemented Salesforce properly.

159.   FE-16 also recalled that DXC's inconsistent use of Salesforce meant that DXC had no automated or intelligent way to review deal data. FE-16 explained the inefficient processes by which DXC's employees performed all of the pricing, quoting and tracking of their opportunities in Excel spreadsheets. FE-16 explained that employees were burdened with using multiple tools and manually transferring data between their tools. On a monthly basis, each DXC unit placed their revenue and projections data from their Excel spreadsheets into a PowerPoint presentation and a report that gets provided to DXC executives. FE-16 believes the report was titled something to the effect of, Monthly Revenue Projections and Pursuits Report. DXC relied on these roll-ups from the individual business units but, as FE-16 noted, this was not real data.

160.   In fact, it was not until June 2024—after the Class Period ended—that FE-16 was tapped to lead an internal initiative at DXC to standardize the Company's use of Salesforce. However, prior to June 2024, FE-16 confirmed DXC leadership had no view into the real-time deal data in one central location across all business units, present or historical—an issue that the Salesforce initiative sought out to solve.

161.   FE-9 confirmed that as of August 2023, DXC still had not integrated back-end systems from the original HP and CSC merger, as well as other back-end systems of other acquired companies. According to FE-9, DXC was not concerned with fully integrating these systems and was more concerned with displaying a "veneer" of a fully integrated company. FE-

9 explained that it was better for DXC if the market believed that the Company was operating efficiently because it would expand customer sales. Ultimately, DXC's success was held back as a result of the lack of integration. As noted by FE-9, if DXC had been fully integrated, the Company would have been able to deliver its products and services at a lower cost because there would be "less intervention by humans."

162.   FE-9 also stated that the Offering Development Team was repeatedly hamstrung because the group was given a limited budget to develop DXC's Microsoft 365 Workplace product. As a result of the Company's decision not to invest in the development and delivery of this product, the Offering Development Team had to allocate its limited budget to minimal maintenance actions to keep the platform running. The decision to sacrifice improvement of its offering to save dollars had the unintended consequence of DXC's "on-shore personnel" leaving the Company, according to FE-9.

163.   FE-10 recalled that as late as 2021, the back-end payroll systems of HP and CSC had not been integrated. FE-10 explained that CSC legacy employees utilized SAP and HP utilized an entirely separate ADP system. This was true even for DXC employees hired after the merger, as new DXC employees were still categorized as working on an HP or CSC requisition.

164.   FE-15 similarly confirmed that DXC ran multiple pay-roll and human resources systems, including the legacy HP and CSC payroll systems during FE-15's tenure of 2021 through 2024. FE-15 explained that human resources-related activities were segmented depending upon where the employee came from previously (i.e., CSC or HP). This made tracking employees assigned to a particular a project a nightmare. FE-15 recalled an instance where there were approximately 450 DXC employees working on a customer's account, but FE-15 had no singular view into which employees those were and how they were spending their time.

165.   Further, FE-10 confirmed that DXC's acquisitions did not want to integrate with DXC. The resistance to integration took on multiple forms. Regarding Argodesign, FE-10 stated that it did not want to use DXC's Microsoft enterprise platform and opted to keep its operations on Google and Zoom. Simply put, FE-10 said that Argodesign "did not want to play" with DXC. This led to Argodesign's refusal to use DXC branding and its withholding of Argodesign's work product from DXC employees. FE-10 confirmed that the same was true of DXC's acquisition, Luxoft, whose systems were entirely separate from DXC's. For instance, FE-10 was unable to access Luxoft's "shared" document repository, which included presentations that could have been used in meetings with clients. FE-10 recalled that Luxoft was embarrassed to be associated with DXC, and requests to have former Luxoft employees join DXC-led deal meetings were rebuffed. This made cross-selling Luxoft solutions to existing DXC customers difficult.

166.   Argodesign's resistance to integration also was seen in its refusal to participate in DXC-led deals. FE-10 stated that Argodesign only would participate if, for example, the revenue came directly to Argodesign and the DXC customer agreed to a $250,000 consulting agreement— of which Argodesign demanded half. The same was true of DXC's acquisition, Virtual Clarity. FE-10 recalled that Virtual Clarity would only participate in a DXC-led deal if the majority of the revenue went to Virtual Clarity.

167.   FE-11 believed that DXC senior management's goal was to operate DXC's acquisitions in as lean a manner as possible, with the ultimate goal of selling off the acquisitions. FE-11 explained that DXC made no real financial investment in its acquisitions, rather it was all about "cost optimization." According to FE-11, this cost optimization strategy was incorporated in all aspects of budgeting for the acquired companies such as reductions in personnel headcounts

47

to operations budgets. FE-11 recalled this was a top-down strategy to reduce costs during the Class Period.

168.    As a Senior Manager for DXC's Corporate Marketing and Communications team, FE-11 had first-hand knowledge of DXC's marketing and communications budgets for the acquired companies, which he said were set by the Company's C-suite executives, including Defendants Salvino and Sharp. FE-11 recalled that these budgets were cut significantly by management year-over-year throughout his tenure from 2017 through the end of 2022

169.    Moreover, DXC failed to integrate technology and intellectual property it obtained through its acquisition spree. FE-12 recalled that after DXC acquired a company that had software utilized by American Airlines to manage their passenger check-in process, DXC "mothballed" the technology instead of integrating it into DXC's operations. This meant that after DXC purchased the company, the acquired company's software "fell out existence" and was no longer serviced by DXC.

170.    In this particular instance, FE-12 recalled that while DXC offered American Airlines a different solution, the airline needed to be able to continue to use the technology DXC had mothballed. With few options, FE-12 confirmed that American Airlines was forced to bring in its own software development contractors. Thereafter, at an October 2021 in-person meeting, American Airlines' representative told FE-12 that they had lost confidence in DXC. By the time FE-12 left the Company in July 2022, DXC had lost approximately 60% of American Airlines' business.

171.    FE-12 further stated that DXC also lost a significant portion of Boeing's business just prior to the start of the Class Period because the Company mothballed a specific software framework it had acquired, terminating the people required to run it. Thereafter, DXC attempted

to sell Boeing a SAP system, but Boeing wanted to continue to maintain its existing system. Ultimately, Boeing had to take its business to Hitachi. FE-12 said that as a result, DXC lost 25-30% of its business with Boeing.

172.   According to FE-6, Defendant Salvino's and DXC executive level management's strategy in 2021 and 2022 was to carry out reductions in its workforce and let contractual service with clients slip just short of complete failure. This was known internally at DXC as the "green to yellow strategy." According to FE-6, Defendant Salvino and Michael Corcoran, DXC's President of Analytics and Engineering, received a monthly key performance indicator ("KPI") report depicting which accounts were "green," meaning the service level agreements were being met, "yellow," depicting those that were at risk," and "pink," depicting those that had failed to meet the terms of the contract.

173.   FE-6 stated that this strategy resulted in constant complaints from DXC's customers, who, in some cases, would reach the point of threatening to cease doing business with DXC unless improvements were made by DXC to fulfill their service agreements. Nonetheless, DXC started reducing their staff haphazardly across projects in connection with this strategy, which sometimes resulted in DXC reimbursing clients when they met the penalty embedded in the customers' contracts.

174.   FE-13 implemented 2,000 workforce reductions ("WFRs") in 2021, which equaled well over $100 million in cost savings. FE-13 recalled that this was not done in an effort to integrate or remove duplicative roles; it was purely a cost-savings measure. FE-8 recalled that DXC's Merger and Acquisition group, that was responsible for integration, had difficulty transitioning all of the various entities. FE-8 described DXC as a "hodgepodge" of its acquired companies. FE-8 also stated that once a customer's infrastructure was under DXC's management,

49

DXC's business plan was to outsource the management of the customer's account to DXC employees located in India, Belarus, and Costa Rica, among other countries, where labor costs are much lower. DXC was hyper aware of how much time was billed to a particular customer's account, which was tracked via "WBS" codes. FE-8 explained that 80% of a DXC employee's time must be billed to a customer's account, or that employee would risk being laid off as part of DXC's WFR program. FE-14 stated that DXC sent customer projects to European employees who worked at less expensive rates.

### F.     The Relevant Truth Is Revealed

175.    On May 18, 2023, the Company announced that Defendant Sharp was resigning as CFO, effective June 15, 2023. While the Company stated that Defendant Sharp was leaving DXC for personal reasons, analysts, including those at Wolfe Research, noted that the departure raised "incremental concern" about the Company.

176.    Less than three months later, on August 2, 2023, DXC held a conference call for analysts and investors to discuss its financial results for the first quarter of fiscal year 2024 (the "August 2, 2023 Conference Call"). During the call, DXC reported a larger than expected decline in organic revenue for the GIS segment of -9.9% for the first quarter of 2024 due to declines in Cloud ITO and Modern Workplace. The Company also shocked investors by significantly reducing its FY24 guidance, including slashing its expected FY24 organic revenue growth rate from a range of negative 0.5% to positive 0.5% to a range of negative 4% to positive 3%, and reducing its expected FCF for FY24 from $900 million to $800 million. In a same day press release, DXC also reported negative FCF of $75 million for the first quarter of 2024. In response to the news, the price of DXC's common stock declined 29.44% from $27.07 on August 2, 2023 to $19.10 on August 3, 2023.

177.   The market was shocked by Defendants' negative disclosures regarding earnings and cash flows and viewed this as a significant step backwards in the Company's transformational journey, particularly given Defendants' prior assurances that their reductions in restructuring and TSI costs were positioning the Company for sustained revenue and cash flow growth.

178.   Specifically, TD Cowen analysts described DXC's disclosure as a "[s]urprising [s]tep [b]ack [t]hat [f]urther [d]elays [f]inancial [p]rogress" and stated that it is "hard to sugarcoat this as ***all legs of thesis are undercut***," including a "notable cut" to FY24 FCF. TD Cowen went on to state that—consistent with management's prior statements—its investment thesis for DXC "had been predicated on revenue growth inflecting into positive territory in the coming quarters, a cleaner path to improved profitability, and continued FCF momentum," and that the "magnitude of the downside surprise in 1Q results and reduced FY24 outlook leave us with little to support for our thesis." TD Cowen concluded that "***all legs for optimism and our thesis were undercut here***, and while valuation is deeply discounted, the catalyst for that to appreciate is ***now more distant***."

179.   Similarly, BMO Capital Markets analyst, Keith Bachman, reported that "[w]e are stepping to the sidelines on DXC . . . . Given that DXC has been executing cost optimizations for several years, we believe it is difficult to do both [improve margins and cost optimize], which could lead to ongoing disappointment."

180.   Notwithstanding these negative disclosures, Defendants continued to mislead the market on August 2, 2023. For example, Defendant Salvino attempted to downplay DXC's disappointing financial results as a short-term hiccup, assuring investors that: "[w]hile the execution of any transformation journey is never a straight line, we feel strongly that we are making the right long-term decisions to position DXC for success."

181.   In addition, during the call, TD Cowen's analyst expressed "surprise[] the free cash flow view is not reduced even further" and asked Defendants to explain "the levels that are partly inflating free cash flow" and "what you're doing to support expenses without cutting into the bone." In response, Del Bene in his new role as CFO, stated that DXC was "confident" in its FCF guidance because they had "cost reduction plans" in place "that support the . . . reduced [EBIT] margin" and "operational actions and line of sight to deliver working capital and capital expenditure reductions to get to the $800" million in FCF guidance. Defendant Salvino concurred, attempting to reassure analysts that DXC was "focused and will continue to focus on [its] expenses," but "there's more room there." He also noted that "we think that our cost takeout initiatives will deliver at the same levels of FY23" when the Company reported $737 million in FCF.

182.   Not satisfied, another analyst asked whether DXC was "borrowing from next year's potential free cash flow generation by some of the things that you're doing to support the [$]800 [million FCF] target versus a more significant degradation associated with the EBIT line?" Del Bene responded bluntly: "***The answer to that is no. . . . we are not trying to accelerate anything temporarily***." Separately he claimed that "we think there are operational improvements that will benefit us over the long term, which will help us drive capital savings over time and get the receivables to what we think is the right sustainable future level." He continued, "[w]e're more focused on just operational discipline and getting to the right levels . . . on a sustained basis."

183.   Despite Salvino's and Del Bene's assurances, analysts were skeptical of their promises that the now-reduced FCF guidance could be achieved while sustaining the necessary growth, causing some analysts to downgrade their price targets for DXC.

184.   During DXC's 2Q24 earnings call on November 1, 2023, Defendants again sought to falsely reassure analysts with respect to the Company's efforts to cut restructuring and TSI expense and its $800 million FCF FY24 guidance. For instance, in response to an analyst seeking "the factors that are giving you confidence [in] being able to achieve that $800 million [FCF] outlook," Defendant Del Bene explained that "several factors that hit free cash flow in the first half of the year [] won't be repeated in the second half," accounting for a $580 million impact to FCF, and that DXC had "identified" opportunities to improve FCF in the second half of the year.

185.   Another analyst asked Defendant Del Bene to "unpack how" DXC had "achiev[ed]" its "impressive . . . free cash flow." For his part, Del Bene identified "several factors that contribute to the free cash flow performance," including "significant cost reduction activities that the teams have embarked on." Calling this a "big contributor" to the FCF result, Defendant Del Bene explained that DXC was "very successful in achieving the cost reduction goals this year," and the Company was "on track with [its] cost reduction goals."

186.   Later in the call, Defendant Salvino added to Defendant Del Bene's remarks, noting that "we keep overlooking [DXC's] operating model." According to Defendant Salvino, "it takes most companies a year or two to get these operating models right" but DXC is "starting to see the benefits of it." While "every transformation hit some bumps," Defendant Salvino noted that he was "proud of the execution of [the] team this quarter":

> So when I talk about the right model, right leader approach, to me, that's the catalyst that we're giving to the market at this point in time. You're starting to see a team really starting to deliver now. . . . and having a consistency around hitting our financial performance. So we don't have more much on the free cash flow. We're happy with where it is and where it's going to be, and we'll go forward from there.

187.   The November 2023 call was Defendant Salvino's swan song as the Company's CEO. On December 20, 2023, DXC filed a Form 8-K announcing that Defendant Salvino was stepping down as Chairman, President, and CEO effectively immediately ("December 20, 2023

Form 8-K"). DXC announced that the Board of Directors named Fernandez Interim President and CEO. In addition, the Form 8-K reaffirmed DXC's FY24 guidance but *only* with respect to FCF. In response to the news, the price of DXC's common stock declined 12.15% from $25.03 on December 19, 2023 to $21.99 on December 20, 2023.

188.   Analysts were shocked by the abrupt departure of Defendant Salvino. For example, TD Cowen analysts reported on the "surprise announcement of CEO transition," noting that "[t]he surprise move is apt to raise Street concerns & comes ~7 months after a CFO departure." TD Cowen also noted that this disclosure raised significant concerns regarding DXC's FY24 financial results, pointing out that DXC "only affirmed the FCF component of FY24 outlook" in its Form 8-K announcing Defendant Salvino's departure and noting that this move "suggest[s] other aspects of the full-year guide (Mar-24) may be at risk." Darrin Peller for Wolfe Research reported that "[s]hares are down ~9%, which we attribute to the abrupt nature of Salvino's departure," which came "only months following the departure of former CFO Ken Sharp in June." Later, in early February 2024, DXC announced that Fernandez would succeed Defendant Salvino as the Company's President and CEO.

189.   Thereafter, on May 16, 2024, DXC held a conference call for analysts and investors to discuss its financial results for the fourth quarter of fiscal year 2024 and full year results for 2024 (the "May 16, 2024 Conference Call"). The Company reported that revenues *declined* 5.3% in fiscal year 2024, and that DXC recorded $756 million in FCF for the year. During the May 16, 2024 Conference Call, DXC announced lower-than-expected guidance for FY25 across the board, including FCF of *just $400* million for the full year. Fernandez also shocked analysts and investors during the call when he announced that DXC was "*undertaking a restructuring initiative aimed at simplifying and enhancing our operational efficiency*." Fernandez continued:

54

We will simplify our processes, increase visibility to eliminate redundancies, reduce costs, improve resource management, and ultimately drive a more streamlined, agile and competitive organization. One specific example of this enterprise initiative is consolidating our five acquired enterprise business systems and optimizing our back-end office functions. We anticipate not only a material reduction in our operating costs but also improvements in our service delivery and responsiveness to our customers. We are also aligning our organizational structure to support streamlined operations with improved and faster decision-making. This realignment will make us more competitive.

190.    This déjà vu announcement rang of Lawrie's 2017 transformation and of Defendant Salvino's 2020 transformation. Analysts demanded an explanation. Deutsche Bank analyst, Bryan Keane, commented that "[i]t seems like every five years or so, a CEO comes in, looks at the business and restructures it," and wanted to know "how [Fernandez's] restructuring might be different than many of the CEOs that came before you that had a lot of restructuring as well." In response, Fernandez admitted:

> I know that, as you've mentioned, in the short history of this public company, ***there have been previous restructurings***. But as someone who just got here and have really spent a lot of time operationally looking at our systems, our processes, our entities, our distribution of head count, ***it's clear to me that the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth.*** You can look at that in multiple ways: ***number of systems still in place that were acquired over time, never integrated, never deduped***; ***number of business processes that got stacked on top of each other***; number of legal entities. I think anyone that came in would look at the previous work, and again, I know the history is there so I'm not running away from it, but ***I can tell you that this is a real reset. It is bottoms up***. It is a strong foundation to go from and ***it is absolutely needed because otherwise, we just continue to carry a really not fully functional organization*** that can take advantage of the opportunities that we have.

191.    James Faucette of Morgan Stanley followed up with respect to DXC's execution of its third round of transformation: "it sounds like you feel like you have all the, or at least a majority of assets, to be able to execute and deliver that cross-sell. Is that fair? Or are there other things that you think you're going to need to add into the mix?" Fernandez replied: "No. We have what we need to compete. We have what we need to compete profitably and grow. We have to get some internal systems aligned. We've got, ***as I mentioned earlier, dedupe, streamline and do***

*some work that should have been done before that wasn't, but we're going to get it done with speed*."

192.   These telling admissions confirmed that, contrary to Defendants' prior representations to investors, they had not integrated DXC's disparate businesses and had not set the Company up to generate sustained profitable growth. Instead, DXC's announcement that it needed to make further investments in restructuring and TSI costs confirmed that Defendants' reductions in those expenses throughout the Class Period were merely a short-term attempt to boost cash flows at the expense of future cash flows and organic revenue growth. In response to the news, the price of DXC's common stock declined 16.90% from $19.88 on May 16, 2024 to $16.52 on May 17, 2024.

193.   In light of Defendants' repeated assurances throughout the Class Period regarding DXC's integration efforts, the news that: (i) the Company's prior integrations were never actually completed; (ii) DXC had a number of systems that were not operationally effective due to the lack of integration; and (iii) the Company would need to implement yet another significant bottoms-up "reset," came as a shock to the market.

194.   As TD Cowen stated in a report titled "Ctrl + Alt + Delete . . . Again" that "investors have seen this movie before." TD Cowen went on to state: "[c]learly a heavy lift is required, and that requires further patience from an investor standpoint—which has already been thin, and thus a sharp stock sell-off is implied, as prior turnaround efforts have been elusive." J.P. Morgan reported its surprise at "yet another transition year," noting that the "stock tolerance for yet another restructuring effort that consumes near-term FCF . . . is likely low."

195.   Guggenheim analysts reported that DXC's FY25 outlook "represents the [C]ompany's ***third attempt*** at steering this ship in the proper direction as the refreshed

management team looks to drive a 'real reset' with this iteration of restructuring," and braced for a protracted bottoms-up reset noting that "a proper turnaround of this scale is a material undertaking, with investors likely to view this as a 'show me' story as turnarounds take time." RBC was even more skeptical, suggesting that "one has to ask the question as to if this business can be fixed."

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.   May 26, 2021 – FY4Q21 Conference Call

196.   On May 26, 2021, DXC held a conference call for analysts and investors to discuss its financial results for the fourth quarter of fiscal year 2021 (the "May 26, 2021 Conference Call"). During the conference call, Defendant Sharp identified reductions in restructuring and TSI expenses as a key lever for improving DXC's cash flows: "Fourth, we will reduce restructuring and TSI expense to approximately $550mm in FY'22 to under $100 million in FY'24, ultimately, improving cash flow." Sharp further stated:

> **One of our key initiatives we are employing to drive cash flow and improve earnings power is to wind down restructuring and TSI costs.** Since DXC was formed 4 years ago, we had significant cash outflows with approximately $900 million in expense per year on average. In FY 22, this will be reduced to approximately $550 million, with a larger portion being allocated to facilities restructuring efforts to improve the work experience for our people as we reshape our portfolio for our virtual model.

197.   Following the May 26, 2021 Conference Call, analysts issued positive reports reiterating and reflecting these statements. For instance, in a May 27, 2021 report raising its price target to $44 and expressing "a bullish view on DXC, with favorable risk reward," Cowen analysts pointed out that DXC projected a "3x increase in FCF" by FY 2024 due in part to "[c]leaning up restructuring and integration items from a ~$900MM annual rate to $550MM in FY22 and $100MM by FY2024." Wells Fargo issued a report upgrading DXC's rating to overweight and increasing its price target to $48, stating DXC leadership "has aggressively worked to improve

57

the DXC enterprise, addressing areas such as staffing and culture, client relationships and improving financial flexibility." Wells Fargo further stated, "that enough work has been done to give us incremental confidence that they are laying a foundation for a company that is poised to deliver predictable growth," and that "management streamlined operations while also balancing the need to invest in its people and improve the moral and culture of the organization, and while there were cost savings with some redundant headcount reductions, those savings were re-invested in key areas around product development, sales and client delivery."

198.   Defendant Sharp's statement set forth in ¶196 that DXC was "wind[ing] down restructuring and TSI costs" to "drive cash flow and improve earnings power" was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left a misleading impression that DXC was able to "wind down" these costs because it already had made significant progress in integrating and restructuring DXC's acquisitions and lines of business, and that as a result, the business had been stabilized and was poised for organic growth. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR

departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

199.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient  as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

### B.      June 27, 2021 – Investor Day

200.   On June 17, 2021, DXC held its Investor Day event for analysts and investors. During the financial portion of the Investor Day presentation, Defendant Sharp discussed "how [DXC] intend[ed] to drive cash." Specifically, Sharp confirmed that "we have an unyielding focus on reducing restructuring and TSI expenditures."

201.   During the question-and-answer portion of the Investor Day event, MoffettNathanson analyst, Lisa Ellis, asked Defendants Salvino and Sharp to provide additional details regarding DXC's plan to reduce its restructuring and TSI expenses in the following exchange:

ELLIS: . . . . I had a couple of questions on the free cash flow outlook. Thanks for the additional detail and focus there. It's like the lynchpin of the FY 2024 outlook. Two things. Ken, these are for you, I'll just ask them both upfront. First, you highlighted reducing TSI and restructuring as the primary lever of free cash flow improvement over the next couple of years. Can you just give a bit more color on what you're doing to reduce that line item like specifically what's different or maybe what you are stopping doing that you were doing before? . . .

SALVINO: Lisa, thanks for the question. And I'm going to take the first one on restructuring and TSI. Ever since I've sat in the seat as CEO, this has been a – something of a thorn on our side. Right? So when you look at what we did last year, around $900 million of restructuring and TSI, we're basically pretty much cut [that] in half. *And the focus there is around making sure that any integration that we've done we're absolutely just going to make through that, look, it's done [i]n the appropriate way and move on from there.* The restructuring, we're very focused on the real estate stuff. So, the plans underneath these numbers now are very detailed as it relates to how we're going to go from $900 million to $550 million and then ultimately to $100 million and look like our peer group again as it relates to restructuring and TSI. So, those were the comments I would make on that. . . .

SHARP: Wonderful, Mike. Thank you. So, Lisa, I'd just maybe touch on the TSI and restructuring. And Michael Corcoran is on the call as well and you will likely know this, but Michael runs our M&A process. *And he's been working through each and every open WBS code on TSI. And literally, we've been going through and evaluating and ending those projects and shutting them down, getting them completed and getting them to the right results.* So, you'll see that – you'll see TSI expense continue to decline as we kind of move on through the current fiscal year. So, I think that's a great result.

Mike is incredibly focused. I think it was my – probably my priorities that you gave me. I think it was number three coming in. *So, certainly, we've been drilling into them. I do think we'll have a good outcome with it.* And you said Lisa, I just want to make sure I get words right. But I think you were talking about our main lever. I would say we've got a lot of levers on cash flow. My list I put in there I would say is somewhat indicative. And we're going to work all of these together.

202.   Following Defendant Salvino's statements at the 2021 Investor Day, analysts issued positive reports reiterating and reflecting these statements. For instance, BMO issued a report raising its price target to $43/share reflecting "greater confidence in DXC realizing its plan," stating, "[w]e think DXC is taking appropriate strategic actions to materially improve positioning.

60

We found the analyst presentation credible." BMO further stated, "Cash Flow Generation Is Key" and noted "we await more clarification in future quarters." J.P. Morgan issued a report stating that it "found DXC's Investor Day presentation to be quite thoughtful," and noted that while DXC's "FY24 targets still seem ambitious to us, but DXC never better positioned." With respect to FCF, J.P. Morgan stated, "FCF guidance would require revenue stabilization, at least, which would also reduce need for restructuring and make margin goals (or higher EBITDA) easier to achieve."

203.    Defendant Salvino's statements that DXC was "making sure that any integration that we've done" is "done [i]n the appropriate way" and Defendant Sharp's statements that the Company has been "evaluating," "ending," or "shutting down" restructuring and integration projects, "getting them completed" and "to the right results" as set forth in ¶201 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because these statements left investors with the misleading impression that DXC had "end[ed]," "shut[] down," and "completed" its restructuring and integration efforts. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams,

61

clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

204. Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

## C. August 4, 2021 – FY1Q22 Conference Call

205. On August 4, 2021, DXC held a conference call for analysts and investors to discuss its financial results for the first quarter of fiscal year 2022 (the "August 4, 2021 Conference Call"). During the August 4, 2021 Conference Call, Defendant Sharp reported that DXC incurred

"[r]estructuring and TSI expenses [of] $76 million [for FY1Q22], down 58% from prior year."

With respect to DXC's cash flow performance, Defendant Sharp stated:

> As you likely realize, with Mike's leadership, ***we will continue to make decisions to better position the company for the longer term, creating a sustainable business***. Certain of these decisions impacted cash flow this quarter. As our guidance anticipated, we plan to take certain actions that impacted the Q1 cash flow. We remain on track to deliver our full year free cash flow guidance of $500 million.

206.   In addition, Defendant Sharp again identified DXC's plan to reduce restructuring and TSI expenses as a "key initiative" to position DXC to achieve its cash flow targets:

> ***One of our key initiatives to drive cash flow and improve earnings power is to wind down restructuring [and] TSI costs***. We expect to reduce this from an average of $900 million per year over the last four years to $550 million in FY '22 and about $100 million in FY '24.

207.   Following the August 4, 2021 Conference Call, analysts issued positive reports reiterating and reflecting these statements. For example, analysts at BMO Capital Markets issued a report stating that the Company "continue[d] to believe that DXC is tracking to a longer-term case of . . . ~8% FCF margins in FY24," and that "DXC has significantly more upside than downside at current values." RBC analysts similarly reported that DXC showed "[c]ontinued progress in transitioning to stable growth," and increased their price target from $42 to $47 per share for the Company.

208.   Defendant Sharp's statements that DXC "will continue to make decisions to better position the company for the longer term, creating a sustainable business" and that one of DXC's "key initiatives  to drive cash flow and improve earnings power is to wind down restructuring [and] TSI costs" as set forth in ¶¶205-06 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because these statements left investors with the misleading impression that Defendants restructuring and integration efforts had "creat[ed] a sustainable business" and now DXC was able to "wind down"

63

these expenses. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

209. Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient  as a result of multiple, duplicative back-end

systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

### D.    September 14, 2021 – Citi Global Technology Conference

210.   On September 14, 2021, Defendant Salvino represented DXC at the Citi Global Technology Conference. At that conference, Citigroup analyst, Ashwin Shirvaikar, asked Salvino how DXC's current restructuring differed from prior restructuring efforts at DXC:

> SHIRVAIKAR: Yes. So I thought maybe a good first question would be to investors who are just now coming back to the name after maybe a hiatus of a year or 2. It may look to them like DXC is still restructuring the same thing that they saw maybe a couple of years ago. But then, of course, the current management team has achieved a lot in a couple of years. And that's perhaps different partly because I think you're seeking to balance multiple priorities. You're not just focused on cost, for example. So can you maybe speak to the broad approach in terms of clients, employees, the portfolio offering and so on?

> SALVINO: Ashwin, thanks. So look, the approach is this. ***We're running a very structured playbook***. And when I say playbook, it's got 3 phases. ***First phase is over, that's the stabilization phase. That was done in FY '21, and we say stabilization***. This is where we sought to implement what I call the 5 steps of the transformation journey. Those steps stay the same through each phase. The goals just change in each step. ***So now we're in building the foundation for growth, meaning simply put, everything we do this year will help us grow as it relates to us hitting our 2024 targets that we put out there***.

211.   Defendant Salvino's statements that DXC was "running a very structured playbook," and that the "stabilization phase" is over, enabling DXC to "build[] the foundation for growth" as set forth in ¶210 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC had stabilized the business with its restructuring and integration efforts to date. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC

was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

212.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to

66

integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

### E.    November 3, 2021 – FY2Q22 Conference Call

213.    On November 3, 2021, DXC held a conference call for analysts and investors to discuss its financial results for the second quarter of fiscal year 2022 (the "November 3, 2021 Conference Call"). During the conference call, Defendant Sharp discussed DXC's reduced restructuring and TSI expense, stating:

> *A key driver of improving cash flow is to continue to reduce our restructuring and TSI spend. Our restructuring and TSI efforts are highly focused, and we believe are a prudent investment in the business*, addressing our outsized cost structure in certain countries and to reduce our facilities footprint to align to our virtual model. We remain on track to reduce restructuring [and] TSI from an average of $900 million per year over the last four years to $550 million in FY 2022 and about $100 million in FY 2024.

214.    During the November 3, 2021 Conference Call, Defendant Sharp told analysts that DXC "continue[d] to deliver on reducing restructuring and TSI expense." Defendant Salvino described the progress as "sustainable," stating:

> *The good news is the financial results that Ken just took us through* reduced debt, *shrinking restructuring and TSI costs,* increased margin and EPS *and stronger free cash flow are all sustainable and a result of the operational work we are doing*. This gives us confidence that we will achieve our FY 2024 double-digit margin guidance.

215.    During the November 3, 2021 Conference Call, analyst Ashwin Shirvaikar asked for details regarding DXC's plan to reduce restructuring and TSI expenditures:

> SHIRVAIKAR: . . . . And then restructuring [and] TSI, as I sort of look at what you've done year-to-date and the full year projection, it would seem like the current level probably be maintained for the next couple of quarters. I just want to make sure that's accurate and what leads to sort of the quarter-to-quarter step up, step

down. Any particular call outs on what you're specifically doing there? Sorry, if I missed that.

SHARP: Yeah. We've guided the $550 million for the full year. We're running probably a little bit light of that at this point. What I would say, Ash, **when we've taken a very disciplined focus effort on every dollar of spend. So we make sure there's business cases, it's being deployed thoughtfully.** So you could see it tick up in the second half of the year to get to the $550 million, but I would just say, we're working diligently to manage it. So I would say that $550 million is a good number. **But if we don't need the money, we certainly won't spend it.**

216.    Following the November 3, 2021 Conference Call, analysts issued positive reports reiterating and reflecting these statements. Cowen, for example, issued a report on November 3, 2021 describing DXC's FCF performance as "a strong recovery well above expectations" and stating that "DXC's turnaround trajectory continues in the right direction," while J.P. Morgan called DXC's cash flow performance "a pleasant surprise." BMO Capital Markets similarly stated that "FCF margins were above our expectations" and went on to state that "DXC has very positive risk/reward attributes, particularly with a focus on FY23 and FY24 opportunities."

217.    Defendant Sharp's statements that DXC's restructuring and TSI efforts were "highly focused" and a "prudent investment in the business," and that DXC had "ma[d]e sure" costs related to restructuring and TSI were "deployed thoughtfully" as set forth in ¶¶213, 215 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC was "thoughtfully" improving its cash flows through "highly focused" restructuring and integration efforts. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating

68

its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

218.    Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

219.    Defendant Salvino's statements that DXC "shrinking restructuring and TSI costs," and "stronger free cash flow" were "sustainable" as set forth in ¶214 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the same reasons.

### F.    February 2, 2022 – FY3Q22 Conference Call

220.    On February 2, 2022, DXC held a conference call for analysts and investors to discuss its financial results for the third quarter of fiscal year 2022 (the "February 2, 2022 Conference Call"). With respect to DXC's cash flow performance, Defendant Sharp stated:

> Clearly, our focus has been on improving our cash flow. Specific to new business, we have been focused on structuring our transactions to have lower capital intensity, potentially trading off revenue in favor of cash flow.
>
> ***As you can see from my prior comments, our focus on driving structural changes has improved our ability to generate and hold on to more cash***. Cash flow from operations totaled an inflow of $696 million. Free cash flow for the quarter was $550 million, an increase of $956 million as compared to prior year, and moves our year-to-date free cash flow to $650 million or $150 million above our full year guidance.

221.    With respect to restructuring and TSI expenses, Defendant Sharp stated: "***This quarter, we made particularly strong progress with cash generation and continued reduction of Restructuring and TSI expense***." He went on to state: "***We also continue to make progress on reducing Restructuring and TSI expense***. This reduction contributed $195 million to cash flow during the quarter as compared to the prior year. Further, this also achieves one of our goals of narrowing the difference between GAAP and non-GAAP earnings."

222.    With respect to the announcement during the conference call that DXC was reducing its guidance for FY22 to $400 million, Defendant Sharp stated:

> To put this all in context, we expect to spend $500 million less on Restructuring and TSI expense than last year, while expanding margins by over 200 basis points. ***Our focus is to embed these types of expenses over time into the normal performance of the business, and believe we have taken significant strides in doing so.***

70

223.   Following the February 2, 2022 Conference Call, analysts issued positive reports reiterating and reflecting these statements. BMO Capital Markets issued a report on February 2, 2022 stating that DXC "delivered a better all-around quarter highlighted by strong FCF generation," which it attributed to "[i]mprovements in restructuring and TSI." BMO further stated that DXC "is making strides towards [its] longer-term targets." RBC similarly stated in a February 2, 2022 report that "the underlying turnaround in DXC's business remains generally on track" and "is well on its way, as illustrated by the improved organic revenue growth and margins." Cowen issued a report on February 3, 2022 stating that DXC's earnings results "[c]heck[ed] the most important boxes" and noting that "the improving revenue trajectory, firmer margins, and cash flow efficiency are apt to drive the cash levels higher." Finally, Deutsche Bank stated on February 3, 2022 that DXC materially improved its FCF generation during the quarter, which "exceeded expectations," and "continues to make progress on its transformation."

224.   Defendant Sharp's statements that DXC was "focus[ed] on driving structural changes" to improve its "ability to generate and hold on to more cash," and that DXC "made particularly strong progress with cash generation and continued reduction of Restructuring and TSI expense," as set forth in ¶¶220-21 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC's "strong . . . cash generation," was the result of "structural changes" in its reduction of restructuring and integrations costs. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC

71

employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

225.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly

disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

226.   Defendant Sharp's statement that DXC had made "significant strides" to "embed [restructuring and TSI] expenses over time into the normal performance of the business," as set forth in ¶222 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the same reasons.

### G.    May 25, 2022 – FY4Q22 Conference Call

227.   On May 25, 2022, DXC held a conference call for analysts and investors to discuss its financial results for the fourth quarter and full year of fiscal year 2022 (the "May 25, 2022 Conference Call"). During the call, DXC reported that its cash flows were buoyed by a $565 million reduction in restructuring and TSI expenses during fiscal year 2022. Defendant Sharp touted the Company's success in improving its cash flows, in part through the reduction of restructuring and TSI expenses:

> As Mike mentioned earlier, ***our financial foundation is in a much better place. We achieved a lot in the year,*** improving transparency into our performance, strengthening our balance sheet, ***significantly improving free cash flow, reducing restructuring and TSI expense***, and executing on our capital allocation program.

228.   Following the May 25, 2022 Conference Call, analysts issued positive reports reiterating and reflecting these statements. RBC stated in a May 25, 2022 analyst report that it "believe[s] . . . DXC is generally progressing on its transition to a more digitally focused, consistent, and transparent operator." Wolfe issued a report on May 25, 2022 stating: "we're incrementally constructive on the story given progress towards growth and FCF improvements," while Cowen stated that "DXC's 4Q results & outlook reflect continued turnaround progress" with "fundamentals [] moving in the right direction. Growth, FCF & margin progress evident and it affirmed FY24 targets."

229.   Defendant Sharp's statements that DXC's "financial foundation is in a much better place," and that the Company had been "improving transparency into our performance, strengthening our balance sheet, significantly improving free cash flow, reducing restructuring and TSI expense," as set forth in ¶227 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC was "in a much better place [financially]," and that DXC provided investors with "improv[ed] transparency" into the Company's performance, including DXC's "significantly improv[ed] free cash flow" and "reduce[d] restructuring and TSI expense." In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

230.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among

other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient  as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

### H.      June 2, 2022 – Cowen & Company Technology, Media & Telecom Conference

231.   On June 2, 2022, Defendant Sharp spoke at the Cowen & Company Technology, Media & Telecom Conference. During the conference, Cowen analyst Bryan C. Bergin asked about DXC's free cash flow and how it planned to bridge the gap between its FY 2022 free cash flows and its $1.5 billion guidance for FY 2024:

> BERGIN: . . . . Free cash flow, let's move to that. So you touched on 4Q and '22 earlier in your commentary, but let's talk about the bridge forward. So you ended fiscal '22 at $743 million. That did include some notable proactive measures that we had discussed. You're projecting $800 million in fiscal '23, and you affirmed that $1.5 billion, []24 target. As you think about that $743 million to $1.5 billion, what are the biggest swing factors there?
>
> SHARP: . . . . So when you think about a bridge, I think there are a handful of items that jump out that are pretty big swingers for us. So certainly, the margin expansion,

that's a piece. And then when you think about restructuring and [T]SI, I think we were -- when John [Sweeney] and I first showed up, we had a [b]oard of our big opportunities. Restructuring and TSI with one of $1 billion opportunity.

SWEENEY: $900 million.

SHARP: It's probably over $100 million right -- ***so we were trying to sort our way through that and certainly shutting it down.*** And it seems like, Brian, it would be so easy just to stop it, right? It's not as easy as you think unfortunately, because it gets to be the culture. And when you said $900 million, John, it was $900 million on average for every year, DXC is created. ***So literally tackling that. I think we've got about $300 million or more cash improvement that will come out of that, which I think is a positive.*** So the margin expansion, restructuring, [T]SI, the other area for me that's a real hard one is the CapEx side. So we'll say CapEx and lease originations because we still debate over what the free cash flow definition is, is a classic we turned the analysis.

232.   During the conference, Sharp also assured the market that DXC was not simply ending its integration efforts but instead was continuing to integrate the businesses it had acquired:

The business historically didn't report organic revenue. They were doing a series of acquisitions. ***A lot of those didn't get integrated in. That's where we think we've got a lot of opportunity in the business, right, continuing driving the business together, drive kind of a unified face to the customer and make sure we're leveraging our accounts.***

233.   Defendant Sharp's statements that DXC was "trying to sort our way through [restructuring and TSI] and certainly shutting it down" and that "about $300 million or more cash improvement that will come out of that, which I think is a positive," as set forth in ¶231 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC was "shutting [] down" its restructuring and TSI efforts and the result of this would be "positive" due to the "cash improvement." In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things,

that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

234.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient  as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly

disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

235.  Defendant Sharp's statements that historically DXC's acquisitions "didn't get integrated in," and that Defendants saw "a lot of opportunity in the business" as a result, as set forth in ¶232 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the same reasons.

I.      **November 3, 2022 – FY2Q23 Conference Call**

236.  On November 3, 2022, DXC held a conference call for analysts and investors to discuss its financial results for the second quarter of fiscal year 2023 (the "November 3, 2022 Conference Call"). During the call, Defendant Sharp reported that: "***We continue to tightly manage our restructuring and TSI expenses***. These expenses totaled $57 million in the quarter or $92 million for the first half of the year. We expect to see an uptick in restructuring expense in the second half of the year as we execute on our cost optimization efforts."

237.  Following the November 3, 2022 Conference Call, analysts issued positive reports reiterating and reflecting these statements. Wolfe, for example, stated in a November 4, 2022 report that DXC's FY2Q23 earnings "showed progress in the company's ongoing efforts to turn around segments of the business."

238.  Defendant Sharp's statements that DXC "continue[s] to tightly manage our restructuring and TSI expenses" as set forth in ¶236 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC was "tightly manag[ing]" its restructuring and TSI expenses. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business

78

processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

239.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient  as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and

cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

**J.      February 1, 2023 – FY3Q23 Conference Call**

240.   On February 1, 2023, DXC held a conference call for analysts and investors to discuss its financial results for the third quarter of fiscal year 2023 (the "February 1, 2023 Conference Call"). During the call, Defendant Sharp reported that: "***We continue to tightly manage restructuring and TSI expenses***. These expenses totaled $55 million in the quarter. And year-to-date, restructuring in TSI is $147 million, down $124 million from prior year."

241.   During the call, Cowen analyst Bryan Bergin inquired into the factors impacting DXC's improved cash flow performance:

> BERGIN: Wanted to start on free cash flow. So Ken, just hoping to dig on the moving pieces here to make sure we understand this for '23 and '24. So can you first talk about some of the factors that drove the strong 3Q performance? Should we expect the continued lumpiness in free cash flow generation going forward? Or does that start to kind of smooth out?. . .
>
> SHARP: All right. Great, Bryan. And look, if I need to clarify, feel free to jump back in. Look, it's great work from the team, right? We've been at this for a couple of years, right? If you wind the clock back, the business had negative free cash flow. ***We've done a lot of work.*** Probably the biggest, you look at it now 2 years in a row of positive cash flow over $600 million. So it's really not lost on us, right? ***A lot of good work from a lot of people across the entire business.***
>
> ***The biggest driver, right, if you had to just kind of look holistically at the business has been the focus on driving down the restructuring [and] TSI.*** So I think that's been somewhere around $600 million swing, so year-to-year. So I think that's a pretty big piece. And then just this quarter, we had built up some AR. It's a little bit hard to tell on the balance sheet but -- because of FX movements and so forth. But we had built up some AR in the last couple of quarters and brought that back down this quarter to kind of a more normalized level. So really, the team has done a nice job just driving across the business.

242.   Following the February 1, 2023 Conference Call, analysts issued positive reports reiterating and reflecting these statements, with RBC stating in a February 1, 2023 report that DXC's "[t]ransformation journey continues with stability and visibility coming to fruition" and

Cowen stating the next day that "there is continued evidence of progress on [DXC's] transformation plan."

243.   Defendant Sharp's statements that DXC "continue[s] to tightly manage restructuring and TSI expenses" as set forth in ¶240 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC was "tightly manag[ing]" its restructuring and TSI expenses. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

244.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example,

as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient  as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

245.   Defendant Sharp's statements that DXC had "done a lot of work . . . across the entire business" regarding cash flows and that the "biggest driver" of cash flows "has been the focus on driving down the restructuring [and] TSI," as set forth in ¶241 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the same reasons.

### K.        May 18, 2023 – FY4Q23 Conference Call

246.   On May 18, 2023, DXC held a conference call for analysts and investors to discuss its financial results for the fourth quarter and full year of fiscal year 2023 (the "May 18, 2023 Conference Call"). During the call, with respect to restructuring and TSI expenses, Defendant Sharp stated: "***We continue to tightly manage restructuring and TSI expense***. Our restructuring and TSI expense was $232 million for the year, $68 million lower than our guide. We have been focused on improving the quality of earnings and limiting this kind of non-GAAP adjustment."

247.    Following the May 18, 2023 Conference Call, analysts issued positive reports reiterating and reflecting these statements. RBC noted on May 18, 2023 that DXC's results are evidence that "[t]he transition continues," while TD Cowen stated on May 19, 2023 that "forward progress on the turnaround continues." Susquehanna International Group similarly stated the same day that "DXC has made substantial progress repositioning the business to grow."

248.    Defendant Sharp's statements that DXC "continue[s] to tightly manage restructuring and TSI expenses" as set forth in ¶246 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC was "tightly manag[ing]" its restructuring and TSI expenses. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

249.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient  as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

**L.      August 2, 2023 – FY1Q24 Conference Call**

250.   On August 2, 2023, DXC held a conference call for analysts and investors to discuss its financial results for the first quarter of fiscal year 2024 (the "August 2, 2023 Conference Call"). During the August 2, 2023 Conference Call, DXC reported a greater than expected decline in organic revenue for the GIS segment of -9.9% for the first quarter of 2024 due to declines in Cloud ITO and Modern Workplace. Defendant Salvino addressed the Company's negative performance as follows:

We are actioning the cloud ITO and Modern Workplace offerings of G[I]S, which have been impacted by the slowing IT market and are keeping us from making the progress we desire. We are still confident that we will stabilize the performance of these two offerings. ***We have made improvements in both leadership and our operating model to grow our company and to be even more competitive. We are managing areas that we can control very well, like free cash flow and restructuring [and] TSI, and the financial analytics that Rob and his team are focused on building will allow us to deliver more predictable and repeatable results.***

251.   During the August 2, 2023 Conference Call, Cowen analyst, Zack Ajzenman, questioned why free cash flow guidance was not reduced further in light of the guidance reduction to organic revenue and margins:

AJZENMAN: . . . . And just to follow up on free cash flow and related on margins, I guess given the cut on the revenue and earnings, I guess we're surprised the free cash flow view is not reduced even further. So maybe you can speak to the levels that are partly inflating free cash flow here and maybe what you're doing to support expenses without cutting into the bone.

DEL BENE: Yeah, Zack, this is Rob Del Bene. Thanks for the question. Look, when we take a look at the EBIT margin that we expect to perform at that level for the remainder of the year, take a look at the working capital levers we have taken all together, we are confident that we could achieve this adjusted level of $800 million.

***So we have cost reduction plans that support the EBIT, the margin, the reduced margin, and we have operational actions and line of sight to deliver working capital and capital expenditure reductions to get to the $800***.

252.   Another analyst, Keith Bachman of BMO Capital Markets, piggy-backed on this question asking Defendants:

BACHMAN: . . . . On the free cash flow to EBIT, I heard the answer to a previous question on why the free cash flow performance is better, some working capital tweaks. And I want to ask it in the context of, are those working capital tweaks, are you sort of borrowing from next year's potential free cash flow generation by some of the things that you're doing to support the 800 target versus a more significant degradation associated with the EBIT line?

DEL BENE: . . . . ***The answer to that is no***. I mean, we think there are operational improvements that will benefit us over the long term, which will help us drive capital savings over time and get the receivables to what we think is the right sustainable future level.

***So we are not trying to accelerate anything temporarily. We're more focused on just operational discipline and getting to the right levels, as I said, on a sustained basis***.

253.   Defendant Salvino's statements that DXC had "made improvements in both leadership and our operating model to grow our company and to be even more competitive" and was "managing areas that we can control very well, like free cash flow and restructuring [and] TSI . . . to deliver more predictable and repeatable results" as set forth in ¶250 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC would be able to deliver "predictable and repeatable" free cash flow and restructuring and integration results because of the Company's improvements to its operating model. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-174. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

254.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among

other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient  as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

255.   Defendant Del Bene's statements that DXC had "operational actions and line of sight to deliver working capital and capital expenditure reductions to get to the $800" and was "not trying to accelerate [its free cash flows] temporarily" as set forth in ¶¶251-52 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the same reasons.

**M.     November 1, 2023 – FY2Q24 Conference Call**

256.   On November 1, 2023, DXC held a conference call for analysts and investors to discuss its financial results for the second quarter of fiscal year 2024 (the "November 1, 2023 Conference Call"). During the call, Defendant Del Bene stated: "Restructuring and TSI expense increased to $38 million, with the increase entirely due to the restructuring of facility leases part

of our effort to rightsize our facility footprint. ***We are tightly managing restructuring, and we'll continue to evaluate opportunities to streamline our operations***."

257.   Analyst James Friedman of Susquehanna International Group sought additional detail:

> FRIEDMAN: So you've had some impressive accomplishments in especially the free cash flow and the free cash flow per share. I was wondering if you could kind of unpack how you're achieving that, Rob, because it really stands out on both the numerator and denominator.
>
> DEL BENE: . . . . One of the -- there are several -- as you would imagine, there are several factors that contribute to the free cash flow performance. It starts with the value delivered by the teams and the offerings that we have, the profitability of those offerings.
>
> ***Another big contributor is a significant cost reduction activities [sic] that the teams have embarked on. And last year, they were very successful in achieving the cost reduction goals this year. We're on track with our cost reduction goals, and that will continue***.

*      *      *

258.   Rod Bourgeois from DeepDives followed up further on the $800 million target for FY23, which he described as "the key metric":

> BOURGEOIS: . . . . So thanks to Rob for outlining the free cash flow drivers to get you to the $800 million target.
>
> That's clearly the key metric here. I want to ask another question about free cash flow kind of from a different angle. Clearly, the industry is experiencing the cyclical challenges, and that's impacting your project-based revenues this year. If you weren't seeing cyclical challenges in your project-based revenues this year, would you then be in a position for free cash flow north of $800 million? In other words, I'm trying to get a take on to what extent the cyclical demand challenges are impairing your free cash flow power this year?

*      *      *

> SALVINO: So Rod, the other thing I would add to Rob's comments is we keep overlooking the operating model. So it takes most companies a year or 2 to get these operating models right. ***We now are starting to see the benefits of it*** because after last quarter, right, every transformation hit some bumps. But I couldn't be more proud of the execution of our team this quarter.
>
> What that means, is we're getting to a lower level of detail than DXC has ever seen with our customers. And that detail not only produces new project work. It also makes us have the ability to manage our margins a lot better to generate more free cash flow.

88

So when I talk about the right model, right leader approach, to me, ***that's the catalyst that we're giving to the market*** at this point in time. ***You're starting to see a team really starting to deliver now.*** Versus being able to -- and having a consistency around hitting our financial performance.

So we don't have much more on the free cash flow. We're happy with where it is and where it's going to be, and we'll go forward from there.

259.   Defendant Del Bene's statements that DXC was "tightly managing restructuring, and we'll continue to evaluate opportunities to streamline our operations" as set forth in ¶256 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading because it left investors with a misleading impression that DXC was "tightly manag[ing]" its restructuring and TSI expenses and continued to look for opportunities to integrate its existing operations. In reality, however, and as Fernandez admitted at the end of the Class Period, DXC was "really not [a] fully functional organization." Instead, DXC had a "number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other; number of legal entities." Fernandez's statements are corroborated by multiple former DXC employees, who stated, among other things, that it was common knowledge within DXC that the Company had no interest in meaningfully integrating its businesses, and that DXC, in fact, had never integrated its predecessor businesses, CSC and HP, and that numerous subsequently-acquired businesses, including Luxoft, Argodesign, and Molina Healthcare, had not been integrated into DXC's business and maintained their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments. *See* ¶¶144-74. Thus, DXC's reduction in restructuring and TSI costs was not a reflection of DXC's progress towards integration and, ultimately, a sustainable business. Rather, it was an attempt to temporarily boost DXC's earnings and cash flows.

260.   Moreover, as described above, Defendants' failure to integrate DXC's businesses negatively impacted its ability to generate sustained earnings and cash flow growth by, among other things, creating significant redundancies within the Company's core systems and operations, and severely damaging the Company's relationships with its customers. For example, as described above, as a result of Defendants' failure to integrate: (i) different DXC business units competed for the same clients (¶148); (ii) customers were quoted different rates by different DXC business units for the same services (¶148); (iii) DXC was forced to "mothball" valuable technology being used by customers (¶¶169-71); (iv) certain business units lacked access to document repositories and client lists that could be used to grow DXC's business (¶¶151, 154, 165); and (v) operations were extremely inefficient  as a result of multiple, duplicative back-end systems (¶¶150, 152-54, 157-61, 163-65). Each of these consequences of DXC's failure to integrate not only impaired the Company's ability to grow its organic revenues during the Class Period, but it also created the significant risk that the Company's customer base, revenues, and cash flows would deteriorate, rather than grow over time. Further, as the Company belatedly disclosed at the end of the Class Period, these issues could not be remedied without incurring significant additional restructuring and TSI expenses.

261.   Defendant Del Bene's statements that DXC's "significant cost reduction activities" were "very successful" and that the Company was "on track with our cost reduction goals, and that will continue," as set forth in ¶257 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the same reasons.

262.   Likewise, Defendant Salvino's statements that DXC was "starting to see the benefit" of its restructuring and integration efforts and "starting to see a team really starting to deliver

now" following those efforts as set forth in ¶258 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the same reasons.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

263.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing or severely reckless issuance and/or control over the alleged materially false and/or misleading statements and omissions. Defendants acted with scienter in that they knew or were severely reckless in disregarding that the public statements set forth above in Part V were materially false and/or misleading when made, and knowingly or was severely reckless in participating or acquiescing in the issuance or dissemination of such statements as primary violators of the Federal securities laws. In addition to the facts set forth in Part IV above, numerous additional facts give rise to the strong inference that, throughout the Class Period, Defendants knew or were severely reckless in disregarding that their statements were materially false and/or misleading when made.

264.    *First*, Defendants were aware of and/or severely reckless in disregarding undisclosed, material adverse facts contrary to their alleged misrepresentations and omissions. As revealed by Fernandez on May 16, 2024, DXC had "never integrated, never deduped" the five acquired enterprise business systems nor optimized its back-end office functions. Instead, as Fernandez admitted, DXC was a "number of business processes that got stacked on top of each other," and was "really not [a] fully functional organization."  Indeed, DXC's lack of integration was so apparent internally at the Company that Fernandez was able to conclude that DXC had never integrated its businesses within just *three months* of assuming the role of CEO. It is implausible that Defendants Salvino, Sharp, and Del Bene, who collectively were at the helm of DXC for *years* were not aware of the same facts that Fernandez discovered immediately.

265. *Second*, it is equally implausible that Defendant Salvino was unaware of the Company's integration issues when he claimed to be intimately involved with its operations and client base within weeks of joining DXC and throughout the Class Period. That is, when Defendant Salvino took over as CEO in September 2019, he immediately announced that in his first weeks he would "be meeting with many of our top clients to identify opportunities to better serve them," as well as meeting with DXC "employees to listen to their ideas." Defendant Salvino also claimed that he would "review our operations, and . . . take a fresh look of our businesses and make sure they are consistent with the overall strategy and my playbook."

266. Defendant Salvino subsequently publicly recounted the results of these efforts beginning with his first earnings call as CEO in November 2019, stating that "[o]ver the past 2 months, I have met with 40 of our largest customers, each of our strategic partners and more than 80,000 of our people around the world." He further confirmed that he had "taken a fresh look at DXC's businesses," including the Company's "innovative assets like Luxoft and recently, Bluleader and Virtual Clarity." Based on his review of the business, moreover, Defendant Salvino admitted that he had "seen several areas for improvement that DXC needs to address to enable growth." He explained that DXC's "delivery teams were not able to execute the more complicated phase of operational cost improvements."

267. Thereafter, in a February 2020 call, Defendant Salvino confirmed that DXC had "held town halls in every region" and "completed a global employee survey," noting that "[w]e received over 140,000 comments" from the Company's employees.

268. In the lead up to the Class Period, Defendant Salvino "continue[d] to meet customers," and updated the market on "the progress we are making with our customers, people, operational execution, and unlocking value." For instance, during a February 2020 earnings call,

Defendant Salvino stated that he had been on "up to 92 calls" with DXC's customers "to make sure that our performance is where it needs to be." Defendant Salvino further confirmed that if DXC's performance "wasn't where it needed to be," he "put them into the [Company's] program" for troubled customer accounts. He likewise stated that he "and the leadership team" were "getting involved" in conversations with DXC's customers that were considering moving to the cloud. To that end, Defendant Salvino stated that he "want[ed] to see [] detailed plans . . . for existing accounts" and for "new client[s]" "before we walk into the conversation" with those clients.

269.   Additionally, as Defendant Salvino recounted on the May 28, 2020 earnings call, "I have *personally* checked in with [DXC's top 200 accounts] *numerous* times, making sure I gave them an update on how DXC was doing . . . and asking them to please let me know if they ever see any issues." He further told investors that DXC's "focus on customers is really starting to pay off," and that "this focus . . . will enable us to stabilize revenue."

270.   Defendant Salvino also repeated this narrative of his involvement with customers throughout the Class Period. For instance, he reminded the market during the November 3, 2021 earnings call, "[y]ou guys know that ever since I've been here, I've been very customer focused." Again, during the November 3, 2022 earnings call, he explained "that's why I harp so much on you have to deliver for your customers," because "[i]f you're not delivering for your customers, you're never going to get new work."

271.   Given Defendant Salvino's repeated interactions with DXC's customers, it is implausible that he was unaware of, among other things, the detrimental impact that DXC's lack of integration was having on the Company's relationships with its customers.

272.   *Third*, former-DXC employees have confirmed that Defendant Salvino was aware of operational issues related to DXC's acquisitions from the start of his tenure. FE-12 recalled

that Defendant Salvino toured each of DXC's operational centers in the fall of 2019. When Defendant Salvino visited FE-12's location, FE-12 attended a meeting with Defendant Salvino and other DXC leaders to discuss how the business was working. At this meeting, the group discussed the significant disconnects that existed in the business as a result of melding the newly acquired companies and internal competition within DXC. FE-12 stated that Defendant Salvino was shown how the various acquisitions had retained their own rules and leadership styles. Following this meeting, the majority of entities that were acquired continued to act as individual organizations throughout FE-12's tenure, which ended in 2022. FE-7 further recalled that as of spring 2022, DXC was still fragmented and Defendant Salvino spoke of how "Team Green" (legacy HP) and "Team Red" (legacy CSC) needed to integrate into one DXC under "Team Purple." However, FE-7 likewise recalled, that despite the seemingly motivational message, there was no follow through to integrate the businesses and workflows remained siloed.

273.   *Fourth*, former-DXC employees have confirmed that Defendant Salvino had knowledge of operational issues that were affecting its ability to deliver on customer contracts. For instance, FE-12 stated that Defendant Salvino was very aware of issues arising out of DXC's client Boeing in March of 2021. At that time, DXC's migration of Boeing's data was several months behind on the promised timeline. FE-12 recalled that the penalty for non-performance of the contract was significant—the cost of a new data center—and that the issue was elevated to Defendant Salvino, who was forced to act in response. According to FE-12, the project fell behind because DXC had fired the majority of its skilled labor force. This meant that DXC's Delivery Centers were comprised of mostly unskilled workers who had issues delivering projects on time. FE-12 said that the lack of skilled workers was a direct result of Defendant Salvino's decision to

fire the group responsible for training new employees—DXC's Teachers of Corporate Learning—immediately upon his arrival.

274.   Likewise, FE-15 recalled that Defendant Salvino was knowledgeable of DXC's failure to perform under its contract to integrate British American Tobacco's ("BAT's") ERP system, SAP, in early 2021, which resulted in the loss of millions of dollars in revenue. In that case, DXC was unable to perform on the services sold because DXC did not have the skilled labor or even just the number of employees necessary to perform the work called for under the agreement. According to FE-15, Defendant Salvino himself was a project sponsor of the BAT integration, a member of the project's review board, and attended meetings with BAT's Chief Information Officer regarding the failed project.

275.   Multiple FEs confirmed that throughout the Class Period the DXC organization operated on a collection of legacy systems that were never integrated. This included back-end systems that existed prior to the merger of CSC and HP, as well as systems of Luxoft and Argodesign, which remained entirely separate from DXC. Fernandez publicly confirmed as much on May 16, 2024, when he admitted that DXC needed to "simplify our processes, . . . eliminate redundancies, reduce costs, improve resource management, and [] drive a more streamlined, agile and competitive organization" by "consolidating our five acquired enterprise business systems and optimizing our back-end office functions."

276.   Multiple FEs also confirmed that DXC sales were suffering as a result of the Company's siloed organizations. For example, customers were left frustrated after receiving competing proposals from different DXC business units for the same project. Moreover, DXC's reputation for being a company that maintained servers resulted in its new, high-tech acquisitions like Argodesign and Luxoft resisting any integration with DXC and, consequently, many

95

synergies were left on the table. That is, rather than cross-selling Argodesign and Luxoft solutions to DXC customers, Argodesign and Luxoft disassociated from DXC, keeping their systems and solutions segregated from and inaccessible by DXC employees.

277.   *Fifth*, Defendants Salvino, Sharp, and Del Bene—DXC's senior-most executives— spoke publicly about DXC's TSI and restructuring efforts and related costs and publicly acknowledged their focus on these issues by: (i) repeatedly telling the market that one of the key initiatives to drive cash flow during the Class Period was the reduction of DXC's restructuring and TSI costs (*see, e.g.*, ¶¶195, 199, 213, 221-21, 240-41); (ii) assuring the market that they had "go[ne] through and evaluat[ed]" DXC's integration and restructuring projects, "shutting them down, getting them completed, and getting . . . the right results" (*see, e.g.*, ¶¶200, 214-15, 231- 32); and (iii) publicly stating that Defendants were making decisions that would better position the Company in the long term and create sustainable cash flows for DXC (*see, e.g.*, ¶¶210, 220, 222).

278.   *Sixth*, by virtue of their high-level positions as the most senior officers of the Company, participation in and awareness of DXC's day-to-day operations, and control over the issuance of the false or misleading statements alleged above in Part V, the knowledge or severe recklessness of Defendants concerning their materially false and/or misleading statements and omission is imputed to DXC. In addition, the knowledge or severe recklessness of other senior employees and managers concerning the Company's integration efforts during the Class Period also is imputed to DXC. Accordingly, throughout the Class Period, DXC knew about or deliberately recklessly disregarded the information alleged in Part IV above.

279.   *Seventh*, prior to the start of the Class Period, DXC excluded restructuring and TSI costs from its non-GAAP earnings metrics. As noted above, analysts were concerned about the

"wide variance" between DXC's GAAP and non-GAAP earnings, including the fact that DXC continued to present non-GAAP FCF "over an extended period of time," especially given the fact that DXC "has very wide variance between traditional GAAP and non-GAAP FCF, even after completing years of restructuring."

280.   On the first day of the Class Period, Defendant Sharp acknowledged that the Company's "cash flow is hard to understand" and explained that DXC would change the presentation of its metrics, "adopt[ing] a traditional free cash flow definition." Thereafter, on March 14, 2023, the SEC announced that it had charged DXC "with making misleading disclosures about its non-GAAP financial performance in multiple reporting periods from 2018 until early 2020." In the related Consent Order, the SEC asserted that "on a quarterly basis, DXC [had] materially increased its non-GAAP earnings by negligently misclassifying tens of millions of dollars of expenses as TSI costs and improperly excluding them in its reporting of non-GAAP measures." For its part, DXC agreed to pay an $8 million penalty and take appropriate remedial steps to address the issue identified by the SEC's investigation.

281.   In commenting on the Company's decision to disclose in November 2022 an $8 million reserve to address this "longstanding historical matter with the" SEC, Defendant Sharp "not[ed] that under [Defendants'] leadership, we have substantially driven down the TSI expense, while increasing the related disclosures of these expenses." In other words, Defendants claimed to have already learned their lesson and purportedly made increased disclosures regarding restructuring and TSI expenses during the Class Period. Additionally, the fact that the SEC's investigation of DXC was a "longstanding historical matter" meant that in addition to engaging in the remedial steps necessary to avoid making false and/or misleading statements regarding restructuring and TSI expenses going forward, Defendants were well aware of the SEC's belief

that DXC's prior management had repeatedly misrepresented the extent of these costs and their impact on earnings.

282. *Finally*, that Defendants made many of the false or misleading public statements in response to direct questions from analysts about how DXC planned to improve its free cash flow through reductions in the Company's TSI and restructuring further supports a strong inference of scienter. For example, Defendants' false and/or misleading statements followed analysts' questions seeking detail on how the Company was implementing its planned TSI and restructuring cost reductions (*see* ¶200) and seeking assurance from Defendants that they were not sacrificing the benefits of integration for short-term FCF performance (*see* ¶252).

283. Defendants' statements and roles at the Company strongly suggest that each had detailed knowledge of or access to information concerning the Company's integration efforts and the corresponding TSI and restructuring costs. If Defendants issued their statements without such knowledge, Defendants were reckless in failing to investigate the subject matter of their statements.

## VII.   LOSS CAUSATION

284. Class members were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the Class Period, Defendants' materially false and/or misleading statements alleged above in Part V created and/or maintained artificial inflation in the price of DXC common stock. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of DXC Common stock, by failing to disclose and misrepresenting the adverse facts detailed herein relating to, among other things, DXC's completion of necessary restructuring and TSI-related activities, and in turn, the positive effects on the Company's cash flows that related to the winding down and completion of its restructuring and TSI efforts, and its revenue growth.

285.   As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, DXC's common stock traded at artificially inflated prices throughout the Class Period.

286.   Unknowingly, and in reliance upon Defendants' materially false and/or misleading statements and omissions, Class members purchased or otherwise acquired DXC's common stock at artificially inflated prices on the NYSE exchange. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased or otherwise acquired DXC's common stock at the artificially inflated prices at which it traded during the Class Period.

287.   When the facts misrepresented and concealed by Defendants' prior materially false and/or misleading statements gradually became apparent to the market, the price of DXC's common stock fell precipitously, as the prior artificial inflation created and/or maintained by Defendants' materially false and/or misleading statements dissipated.

288.   The relevant truth was partially revealed beginning on August 2, 2023, when DXC reported disappointing first quarter results, including cuts to the Company's FY24 organic revenue growth range and free cash flow. Specifically, DXC cut its free cash flow guidance for FY24 from $900 million to $800 million, and its organic revenue growth from a range of negative 0.5% to positive 0.5% to range of negative 4% to negative 3%. In response to the news of DXC's poor financial performance, the price of DXC's common stock fell by 29.44%, from a close of $27.07 per share on August 2, 2023, to a close of $19.10 per share on August 3, 2023.

289.   Market analysts and commentators identified the reduced guidance as the reason they were downgrading their price targets for DXC's common stock as they remained

unconvinced that DXC's turnaround story was on the right path. For example, an August 3, 2023 report from TD Cowen stated:

> DOWNGRADE: HARD TO SUGARCOAT THIS AS ALL LEGS OF THE THESIS ARE UNDERCUT…A 1Q miss across nearly all KPIs (rev/EPS below by -3%/-22%) & a notable cut to FY24 revenue, margin & FCF (by -4%/-17%/-11%) is apt to pressure shares & leave investors lacking reasons for optimism. All legs to our thesis were undercut & while valuation is deeply discounted, the catalyst for that to appreciate is now more distant. We reduce ests, downgrade to Market Perform & lower PT to $25. . . . Over the last 2-3 years, DXC has made material strides in putting the business on a cleaner path, fixing the balance sheet, trimming non-core assets, cutting the decline in service lines that face secular challenges, driving strong improvement in FCF conversion, and refreshing culture across the organization. But, spotty fundamental performance has persisted and that's largely left investors awaiting more consistent progress before gaining conviction in the turnaround. While we viewed its prior progress as underappreciated, the magnitude of the downside surprise in 1Q results and reduced FY24 outlook leave us with little to support for our thesis, which had been predicated on revenue growth inflecting into positive territory in the coming quarters, a cleaner path to improved profitability, and continued FCF momentum.

290.   DXC's disclosures on August 2, 2023 partially revealed the relevant truth that Defendants' false statements had concealed from investors. In particular, DXC's reductions in earnings and cash flow guidance began to reveal to the market that, contrary to their representations, Defendants had not transformed DXC's businesses or set it up for sustained organic growth. Indeed, while Defendants' false and/or misleading statements led the market to believe that DXC's prior restructuring and integration efforts had, among other things, "put[] the business on a cleaner path . . . to improved profitability, and continued FCF momentum," their August 2, 2023 disclosures left investors "awaiting more consistent progress before gaining conviction in [DXC's] turnaround."

291.   Yet, despite these disclosures, Defendants continued to misrepresent DXC's transformation and successful reduction in restructuring and TSI costs. For example, analysts expressed surprise that given the significant cut to revenue guidance, that free cash flow guidance was not reduced by even more than $100 million. But Defendants remained resolute, with Defendant Del Bene assuring the market that they were "confident that [DXC] could achieve this

100

adjusted level of $800 million." Further, Defendant Salvino assured investors that "[w]e are managing areas that we can control very well, like free cash flow and restructuring [and] TSI, and the financial analytics that Rob and his team are focused on building will allow us to deliver more predictable and repeatable results."

292. Then, on December 20, 2023, before the market closed, DXC announced the sudden departure of Defendant Salvino as CEO and Chairman of the Company's board of directors, effective two days prior on December 18, 2023. In addition, the Form 8-K announcing Defendant Salvino's departure reaffirmed DXC's FY24 guidance but ***only*** with respect to FCF.

293. In response to this news, the price of DXC's common stock declined 12.15%, from $25.03 per share to $21.99 per share at the close of markets on December 20, 2023.

294. Analysts expressed surprise at Salvino's sudden departure, with TD Cowen analysts noting that "[t]he surprise move is apt to raise Street concerns & comes ~7 months after a CFO departure." TD Cowen also noted that this disclosure raised significant concerns regarding DXC's FY24 financial results, pointing out that DXC "only affirmed the FCF component of FY24 outlook" in its Form 8-K announcing Defendant Salvino's departure and noting that this move "suggest[s] other aspects of the full-year guide (Mar-24) may be at risk."

295. Analysts also connected news of Defendant Salvino's departure to the same-day decline in DXC's stock. For example, Wolfe Research reported on December 20, 2023, that as of the time of its report, "[s]hares are down ~9%, which we attribute to the abrupt nature of Defendant Salvino's departure." Similarly, TD Cowen tied Defendant Salvino's departure to the "more recently, mixed performance reflecting challenges in [DXC's] transformation," which "drove an adverse change in Street sentiment around shares."

296.   DXC's December 20, 2023 disclosures—including that the champion of DXC's "transformational journey" had abruptly left the Company—further revealed to investors that, contrary to Defendants' prior representations, DXC's purported restructuring and integration efforts had not set the company up for sustained long-term growth. However, investors still did not know the full truth, and they would not appreciate the true scope of the problems created by DXC's lack of integration until DXC's new CEO laid them bare several months later.

297.   On May 16, 2024, the market finally learned the true state of DXC's restructuring and integration efforts—or lack thereof—during the Class Period. That is, Fernandez shocked analysts and investors during the call when he announced that DXC was planning on "*undertaking a restructuring initiative aimed at simplifying and enhancing our operational efficiency*" and admitted that DXC had to "*dedupe, streamline and do some work that should have been done before that wasn't*."

298.   Fernandez explained:

We will simplify our processes, increase visibility to eliminate redundancies, reduce costs, improve resource management, and ultimately drive a more streamlined, agile and competitive organization. One specific example of this enterprise initiative is consolidating our five acquired enterprise business systems and optimizing our back-end office functions. We anticipate not only a material reduction in our operating costs but also improvements in our service delivery and responsiveness to our customers. We are also aligning our organizational structure to support streamlined operations with improved and faster decision-making. This realignment will make us more competitive.

299.   Further, Fernandez finally revealed what Defendants' prior misstatements had concealed from the market: that despite DXC's "previous restructurings," it was "clear to [Fernandez] *that the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth*," due to the "*number of systems still in place that were acquired over time, never integrated, never deduped*; *number of business processes that got stacked on top of each other*; number of legal entities." Fernandez disclosed that "*a real reset . . . is*

***absolutely needed because otherwise, [DXC will] just continue to carry a really not fully***
***functional organization***."

300.   The market reaction to this news was swift. On May 17, 2024, the price of DXC's common stock fell almost 17%, from a close of $19.88 on May 16, 2024 to a close of $16.52 on May 17, 2024.

301.   Analysts focused on these negative disclosures in coverage of DXC after the 4Q and FY24 earnings call. For example, reporting on this news of a much-needed "real reset," TD Cowen noted in its coverage of the earnings call, that "[c]learly a heavy lift is required, and that requires further patience from an investor standpoint — which has already been thin, and thus a sharp stock sell-off is implied, as prior turnaround efforts have been elusive." J.P. Morgan likewise reported its surprise at "yet another transition year," noting that the "stock tolerance for yet another restructuring effort that consumes near-term FCF . . . is likely low."

302.   In response to the news, Guggenheim analysts entirely removed their price target for DXC, awaiting progress on what Guggenheim described as a "material undertaking" to properly turnaround the Company. Similarly, in lowering their price target for DXC common stock from $24 to $18, RBC analysts questioned "if this business can be fixed," following the news of "yet again another restructuring to streamline the business, which suggests that FY25 will be another transition year."

303.   DXC's disclosures on August 2, 2023 December 20, 2023, and May 16, 2024, partially corrected or reflected the materialization of risks concealed by Defendants' material misstatements and omissions of material facts alleged herein.

304.   The decline in the price of DXC common stock at the close of market on August 3, 2023, December 20, 2023, and May 17, 2024, is directly attributable to the market absorbing

information that corrected, or reflected the materialization of risks concealed by, Defendants' material misrepresentations or omissions.

305.   Lead Plaintiff and other Class members suffered economic losses as the price of DXC common stock fell in response to the disclosure of new information concealed by Defendants' misstatements and omissions on these dates. These stock price declines were a direct result of the materially false and/or misleading statements and omissions alleged herein. It was foreseeable that these disclosures would cause the price of DXC common stock to decline. Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.

## VIII.   A PRESUMPTION OF RELIANCE APPLIES

306.   At all relevant times, the market for DXC common stock was efficient for the following reasons, among others:

  a.   DXC's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

  b.   As a regulated issuer, DXC filed periodic reports with the SEC;

  c.   DXC regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

  d.   DXC was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

307.   As a result of the foregoing, the market for DXC common stock reasonably and promptly digested current information regarding DXC from all publicly available sources and reflected such information in the price of DXC common stock. Purchasers and acquirers of DXC common stock during the Class Period suffered similar injury through their purchases and acquisitions of DXC common stock at artificially inflated prices, and a presumption of reliance applies.

308.   Further, at all relevant times, Lead Plaintiff and other Class members relied on Defendants to timely disclose material information as required by law. Lead Plaintiff and other Class members would not have purchased or otherwise acquired DXC common stock at artificially inflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning DXC and its business, Lead Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DOES NOT APPLY

309.   The statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and/or misleading statements alleged herein. None of the statements complained of herein was a forward-looking statement. Rather, these statements were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; or (ii) omitted to state material, current or historical facts necessary to make the statements not misleading.

310.    To the extent that any of the materially false and/or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by DXC were not sufficient to insulate Defendants from liability for their materially false and/or misleading statements.

311.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false and/or misleading forward-looking statements because at the time each of those statements was made, Defendants did not actually believe the statements, had no reasonable basis for the statements, or were aware of undisclosed facts tending to seriously undermine the accuracy of the statements.

## X.      CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I

**Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against DXC and the Executive Defendants**

312.    Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This Count is brought against Defendants DXC, Salvino, Sharp, and Del Bene pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class.

313.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and the Class; and (ii) cause Lead Plaintiff and the Class to

106

purchase or otherwise acquire DXC common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

314.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of DXC common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a-c).

315.   During the Class Period, Defendants made the false statements specified above, which they knew to be or were severely reckless in disregarding the fact that they were false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

316.   Defendants had actual knowledge of the misrepresentations and omissions of material fact as set forth herein, or were severely reckless in disregarding the true facts that were available to them. Defendants engaged in this misconduct to conceal DXC's true condition from the investing public and to support the artificially inflated prices of DXC common stock.

317.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired DXC common stock at inflated prices. Lead Plaintiff and the Class would not have purchased or otherwise acquired DXC common stock at such prices, or at all, had they been aware that the market prices for DXC common stock had been artificially inflated by Defendants' fraudulent course of conduct.

318.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases or acquisitions of DXC common stock during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**
**Against the Executive Defendants**

319.   Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This Count is asserted against Defendants Salvino, Sharp, and Del Bene pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class.

320.   The Executive Defendants acted as controlling persons of DXC within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations, and/or intimate knowledge of the false and/or misleading statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Lead Plaintiff to be false and/or misleading prior to and/or shortly after these statements were issued or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

321.   In particular, each of the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have

108

had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

322.   As described above, the Company and the Executive Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Executive Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Lead Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of the Company's common stock during the Class Period.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff respectfully prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

B.    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.    Awarding compensatory damages and equitable relief in favor of Lead Plaintiff and other members of the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

D.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.    Granting such other and further relief as the Court may deem just and proper.

## XII.    JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: December 23, 2024

Respectfully submitted,

*/s/ Susan R. Podolsky*
Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone: (571) 366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

*Liaison Counsel for the Proposed Class*

Jennifer L. Joost (admitted *pro hac vice*)
Richard A. Russo, Jr. (admitted *pro hac vice*)
Austin W. Manning (admitted *pro hac vice*)
Lyndsey B. Campbell (admitted *pro hac vice*)
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jjoost@ktmc.com
rrusso@ktmc.com
amanning@ktmc.com
lcampbell@ktmc.com

*Counsel for Lead Plaintiff Sparinvest S.A.
and Lead Counsel for the Proposed Class*