# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| **In re DXC Technology Company Securities Litigation** | **No. 1:24-cv-01351-AJT-WEF** |
| | <u>**CLASS ACTION**</u> |
| **THIS DOCUMENT RELATES TO:** <br> **ALL ACTIONS** | |

# MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CORRECTED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF <u>THE FEDERAL SECURITIES LAWS</u>

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

    A.    Factual Background ...............................................................................................3

    B.    Procedural History ................................................................................................9

LEGAL STANDARD.............................................................................................................9

ARGUMENT .......................................................................................................................10

I.    PLAINTIFF FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT .....................11

    A.    The Challenged Statements Are Too Vague To Be Actionable ............................11

    B.    The PSRLA Safe Harbor Protects Defendants' Forward-Looking
        Statements ..........................................................................................................14

    C.    Defendants' Opinions Are Not Actionable...........................................................17

    D.    Plaintiff Fails To Plead Particularized Facts Showing Falsity..............................18

II.    PLAINTIFF FAILS TO PLEAD PARTICULARIZED FACTS RAISING A
     STRONG INFERENCE OF SCIENTER ...................................................................23

    A.    Plaintiff's Scienter Theory Makes No Sense .......................................................23

    B.    Plaintiff's Scattershot Scienter Allegations Fail ..................................................25

    C.    Competing Inferences Are Far More Compelling .................................................27

III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ...................................................28

IV.    THIS CASE SHOULD BE DISMISSED WITH PREJUDICE .......................................30

CONCLUSION....................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amorosa v. Ernst & Young LLP*,
   672 F. Supp. 2d 493 (S.D.N.Y. 2009), *aff'd sub nom. Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412 (2d Cir. 2011) .........................................................30

*Anastasio v. Internap Network Servs. Corp.*,
   2011 WL 13124500 (N.D. Ga. Sept. 30, 2011) ........................................................14

*Ash v. PowerSecure Int'l, Inc.*,
   2015 WL 5444741 (E.D.N.C. Sept. 15, 2015)...........................................................16

*Bldg. Trades Pension Fund of W. Penn. v. Insperity, Inc.*,
   2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) .............................................................24

*Boykin v. K12, Inc.*,
   54 F.4th 175 (4th Cir. 2022) ........................................................................15, 24, 25

*Chandler v. Ulta Beauty, Inc.*,
   2022 WL 952441 (N.D. Ill. Mar. 30, 2022).............................................................12

*Chapman v. Fennec Pharms. Inc.*,
   2021 WL 7209981 (M.D.N.C. Dec. 16, 2021) .........................................................12

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ....................................................................................13

*Cozzarelli v. Inspire Pharms. Inc.*,
   549 F.3d 618 (4th Cir. 2008) ............................................................................. *passim*

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)....................................................................................... 3, 28, 29

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)......................................................................................25

*Elec. Workers Pension Tr. Fund of IBEW Loc. Union No. 58 v. CommScope, Inc.*,
   2013 WL 4014978 (W.D.N.C. Aug. 6, 2013).............................................................16

*Emps. Ret. Sys. of the City of Baton Rouge and Parish of East Baton Rouge v. MacroGenics*,
   61 F.4th 369 (4th Cir. 2023) .....................................................................................14

*Fogel v. Wal-Mart de Mexico SAB de CV*,
   2017 WL 751155 (S.D.N.Y. Feb. 27, 2017)..............................................................11

*Francisco v. Abengoa, S.A.*,
 481 F. Supp. 3d 179 (S.D.N.Y. 2020) .................................................................................12

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
 336 F. Supp. 3d 196 (S.D.N.Y. 2018) .................................................................................24

*Greenberg v. Sunrun Inc.*,
 233 F. Supp. 3d 764 (N.D. Cal. 2017) .................................................................................14

*Heck v. Orion Grp. Holdings, Inc.*,
 468 F. Supp. 3d 828 (S.D. Tex. 2020) .................................................................................30

*High Income Sec. Fund v. Cedar Realty Tr., Inc.*,
 2023 WL 6214237 (E.D.N.Y. Sept. 25, 2023) .....................................................................14

*Howard v. Haddad*,
 962 F.2d 328 (4th Cir. 1992) .................................................................................................13

*IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*,
 660 F. App'x 850 (11th Cir. 2016) .......................................................................................13

*In re 2U, Inc. Sec. Class Action*,
 2021 WL 3418841 (D. Md. Aug. 5, 2021) ...........................................................................17

*In re Biogen Inc. Sec. Litig.*,
 193 F. Supp. 3d 5 (D. Mass. 2016) .......................................................................................24

*In re Cable & Wireless, PLC, Sec. Litig.*,
 321 F. Supp. 2d 749 (E.D. Va. 2004) ...................................................................................13

*In re Cisco Sys. Inc. Sec. Litig.*,
 2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ......................................................................24

*In re Comput. Scis. Corp. Sec. Litig.*,
 890 F. Supp. 2d 650 (E.D. Va. 2012) ...................................................................................13

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
 738 F. Supp. 2d 614 (D. Md. 2010) ......................................................................................13

*In re DXC Tech. Co. Sec. Litig.*,
 2020 WL 3456129 (E.D. Va. June 2, 2020) (Trenga, J.), *aff'd sub nom. KBC
 Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021) ................................... *passim*

*In re E.Spire Commc'ns, Inc. Sec. Litig.*,
 127 F. Supp. 2d 734 (D. Md. 2001) ......................................................................................25

*In re Extreme Networks, Inc. Sec. Litig.*,
 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ......................................................................22

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) ...............................................................17, 22

*In re Franklin Bank Corp. Sec. Litig.*,
782 F. Supp. 2d 364 (S.D. Tex. 2011) ......................................................................12

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .......................................................................29

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ....................................................................................16

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) .................................................................................12

*In re Loewen Grp. Inc.*,
2003 WL 22436233 (E.D. Pa. July 16, 2003).........................................................13

*In re Medimmune, Inc. Sec. Litig.*,
873 F. Supp. 953 (D. Md. 1995)................................................................................30

*In re Neustar Sec. Litig.*,
83 F. Supp. 3d 671 (E.D. Va. 2015) ...................................................................12, 14

*In re NVE Corp. Sec. Litig.*,
551 F. Supp. 2d 871 (D. Minn. 2007)........................................................................13

*In re PEC Sols., Inc. Sec. Litig.*,
418 F.3d 379 (4th Cir. 2005) .....................................................................................28

*In Re PEC Solutions Sec. Litig.*,
2004 WL 1854202 (E.D. Va. May 25, 2004) ...........................................................11

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011)........................................................................29

*In re Trex Co., Inc. Sec. Litig.*,
454 F. Supp. 2d 560 (W.D. Va. 2006) .......................................................................15

*In re Triangle Cap. Corp. Sec. Lit.*,
988 F.3d 743 (4th Cir. 2021) .........................................................................22, 24, 27

*Inst. Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009).......................................................................................17

*Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
432 F. Supp. 2d 571 (E.D. Va. 2006) ..................................................................20, 30

iv

*Kas v. First Union Corp.*,
   857 F. Supp. 481 (E.D. Va. 1994) ...................................................................11

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ................................................................. *passim*

*Knurr v. Orbital ATK Inc.*,
   272 F. Supp. 3d 784 (E.D. Va. 2017) ................................................................26

*Kurtzman v. Compaq Comput. Corp.*,
   2002 WL 32442832 (S.D. Tex. Mar. 30, 2002)...........................................22, 26

*Lomingkit v. Apollo Educ. Grp. Inc.*,
   2017 WL 633148 (D. Ariz. Feb. 16, 2017)........................................................13

*Longman v. Food Lion, Inc.*,
   197 F.3d 675 (4th Cir. 1999) ......................................................................13, 21

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ............................................................................29

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
   876 F.3d 541 (4th Cir. 2017) ..................................................................9, 10, 26

*Martin v. GNC Holdings, Inc.*,
   2017 WL 3974002 (W.D. Pa. Sept. 8, 2017).....................................................29

*Matrix Cap. Mgmt. Fund, L.P. v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) .........................................................................9, 23

*McNamara v. Pre-Paid Legal Servs., Inc.*,
   189 F. App'x 702 (10th Cir. 2006) ...................................................................25

*Miller v. Asensio & Co.*,
   364 F.3d 223 (4th Cir. 2004) ............................................................................28

*Monk v. Johnson & Johnson*,
   2011 WL 6339824 (D.N.J. Dec. 19, 2011).......................................................13

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp.*,
   720 F. Supp. 2d 517 (D. N.J. 2010) ..................................................................29

*Next Century Commc'ns Corp. v. Ellis*,
   318 F.3d 1023 (11th Cir. 2003) ........................................................................13

*Nolte v. Cap. One Fin. Corp.*,
   390 F.3d 311 (4th Cir. 2004) ......................................................................12, 26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)........................................................................................17, 18

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
353 F.3d 338 (4th Cir. 2003) ...............................................................11, 19, 23, 24

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
918 F.3d 312 (4th Cir. 2019) .......................................................................15, 16

*Phila. Fin. Mgmt. of S.F. v. DJSP Enters.*,
572 F. App'x 713 (11th Cir. 2014) ....................................................................13

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999) ............................................................................23

*Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec*,
2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ...............................................12, 26

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) ...............................................................................11

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*,
966 F. Supp. 2d 525 (M.D.N.C. 2013) ........................................................16, 19, 21

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
2021 WL 1439680 (E.D. Va. Mar. 24, 2021) .....................................................12

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
645 F. Supp. 2d 210 (S.D.N.Y. 2009).................................................................30

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) ..........................................................................25

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ............................................................................29

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ...............................................................................12

*Ret. Ass'n. of Colo. v. Deloitte & Touche LLP*,
551 F.3d 305 (4th Cir. 2009) ..........................................................................9, 27

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)..........................................................................14, 21

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
75 F.4th 232 (4th Cir. 2023) .......................................................................23, 25, 26

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)..............................................................................................................20

*Scott v. Gen. Motors Co.*,
    605 F. App'x 52 (2d Cir. 2015) ...........................................................................................13

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ...............................................................................................10

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)................................................................................................15

*Smith v. Circuit City Stores*,
    286 F. Supp. 2d 707 (E.D. Va. 2003) ..................................................................................20

*Teachers' Ret. Sys. Of LA v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) .............................................................................10, 20, 21, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................2, 10, 23

*TransEnterix Inv. Grp. v. TransEnterix, Inc.*,
    272 F. Supp. 3d 740 (E.D.N.C. 2017)..................................................................................15

*Trs. of Welfare & Pension Funds of Loc. 464A v. Medtronic PLC*,
    726 F. Supp. 3d 938 (D. Minn. 2024)..................................................................................14

*United States ex rel. Ahumada v. NISH*,
    756 F.3d 268 (4th Cir. 2014) ...............................................................................................10

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)......................................................................12

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .........................................................................................14, 15

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ...............................................................................12

*Xia Bi v. McAuliffe*,
    927 F.3d 177 (4th Cir. 2019) ........................................................................................3, 9, 11

*Yates v. Mun. Mortg. & Equity*,
    LLC, 744 F.3d 874 (4th Cir. 2014)............................................................................. *passim*

## STATUTES

15 U.S.C.

    § 78u-4(b)(1)(B)..............................................................................................10, 19

    § 78u-4(b)(2)(A) ............................................................................................10, 23

    § 78u-4(e)(1) ........................................................................................................29

    § 78u-5(i)(1)(D) ...................................................................................................14

    § 78u-5(i)(l)(B) ....................................................................................................14

    § 78u-5(c)..............................................................................................................15

    § 78u-5(c)(1) .........................................................................................................15

    § 78u-5(c)(1)(B)....................................................................................................16

## RULES

Fed. R. Civ. P. 9(b) ....................................................................................................10

## OTHER AUTHORITIES

H.R. Rep. No. 104-369 (1995)....................................................................................10

**INTRODUCTION**

This is a securities fraud case without a hint of fraud. Defendant DXC Technology Company ("DXC" or the "Company") was formed in 2017, following the merger of two information-technology giants, Computer Sciences Corporation ("CSC") and the Enterprise Services business of Hewlett-Packard Enterprise Company ("HPES"). Together, CSC and HPES served some 5,000 clients globally, with more than $26 billion in combined revenue. And today, DXC employs 130,000 people across more than 70 countries. Integrating the two companies posed a herculean task, one made even more challenging by over a dozen subsequent business acquisitions and divestures in DXC's early years. Indeed, the Company was initially spending almost $1 billion annually to facilitate those integration and restructuring efforts, in the face of a declining revenue base and other business headwinds. Given those challenges, DXC management repeatedly cautioned that they "may not achieve some or all of the expected benefits of our restructuring plans and our restructuring may adversely affect our business." *E.g.*, Ex. 1 (2021 10-K) at 11.[1] Over time, however, management gradually reduced DXC's annual restructuring spend by two-thirds, while guiding DXC to four consecutive quarters of stable revenue.

Against that backdrop, Plaintiff claims that Defendants defrauded investors over a three-year span by (1) remarking generally that DXC was "focus[ed]" on reducing integration and restructuring costs, (2) describing this effort as "tightly manage[d]," and (3) praising the "progress" of DXC's "transformation journey"—among other similar comments. Pl.'s Corrected Consol. Compl. for Violations of the Federal Securities Laws (Dkt. 65) ("AC") ¶¶ 220-21, 236. As support, Plaintiff points to after-the-fact criticisms from former low-level DXC employees, as well as a

---

[1] Exhibits ("Ex.") to the Declaration of Stephen P. Barry are incorporated into the AC or subject to judicial notice, such as SEC filings and earnings call transcripts. *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011).

later announcement of continued restructuring initiatives by DXC's new CEO. This, Plaintiff insists, shows Defendants "had no interest in meaningfully integrating" DXC's operations and instead were fraudulently trying only "to temporarily boost DXC's earnings and cash flows." *Id.* ¶ 198. But the Amended Complaint is devoid of facts supporting that perplexing assertion, and—under the heightened pleading standards applicable here—the AC comes nowhere close to stating a securities fraud claim under the Securities Exchange Act of 1934 (the "Exchange Act").

This case should be dismissed—with prejudice—for three independent reasons. *First*, Plaintiff fails to plead particularized facts demonstrating that anything Defendants said was false or misleading. Plaintiff challenges vague puffery, subjective opinions, and forward-looking statements that are non-actionable *as a matter of law* under settled legal doctrines. Plaintiff also has not alleged a single contemporaneous fact contradicting any challenged statement.

*Second*, Plaintiff's allegations do not establish the requisite "strong inference" that any Defendant acted with scienter—that is, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 321 (2007). Lacking allegations of insider stock sales or any other plausible motive to commit fraud, Plaintiff offers no cogent reason *why* Defendants would secretly cast aside DXC's longstanding goal of integrating its component businesses just to boost financial metrics in the short run. The innocent inference is far more compelling: Defendants took over a sprawling company in the wake of numerous complex M&A transactions, and did their best to restructure it while simultaneously limiting related expenses. That some former employees, or even DXC's new CEO, may have offered subjective, hindsight critiques of these efforts scarcely suggests an intent to defraud investors.

*Third*, Plaintiff fails to plead loss causation. Plaintiff seeks to recover losses from three declines in DXC's stock price, but there is no viable corrective disclosure that links Plaintiff's

2

alleged financial harm with any challenged statement. The stock price declines at issue allegedly coincide with DXC's release of generally disappointing earnings data, the announced departure of the Company's CEO, and post-hoc observations from DXC's new CEO. But those announcements do not constitute corrective disclosures, as a matter of law, because none of them revealed any information demonstrating the supposed falsity of Defendants' earlier remarks.

The Exchange Act does not give investors "broad insurance against market losses," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005), and a disappointing or even "failed investment" is insufficient for "a meritorious [claim]," *Xia Bi v. McAuliffe*, 927 F.3d 177, 187 (4th Cir. 2019). Instead, Section 10(b) guards only against "plot[s] to defraud the investing public." *Yates v. Mun. Mortg. & Equity*, LLC, 744 F.3d 874, 887 (4th Cir. 2014). No such "plot" is or could be alleged here under any standard, let alone the heightened pleading rubric that governs Plaintiff's claims. Accordingly, the AC should be dismissed with prejudice.

## BACKGROUND

### A.    Factual Background

In April 2017, CSC and HPES "merged to form DXC." AC ¶ 1. The newly-formed DXC "boasted combined revenues of $26 billion" and served some "5,000 clients" globally. *Id.* ¶ 68. Today, DXC has "over 130,000 employees" across "more than 70 countries." *Id.* ¶ 56. In addition to DXC, the AC names as Defendants: (1) Michael J. Salvino, who served as CEO from September 12, 2019 to December 18, 2023; (2) Kenneth P. Sharp, DXC's CFO from November 30, 2020 through June 1, 2023; and (3) Robert F. Del Bene, DXC's CFO since June 2023. *Id.* ¶¶ 31, 34-36. The alleged Class Period spans three years, from May 26, 2021 through May 16, 2024. *Id.* at 3.

### 1.    DXC's Integration Challenge

At the time of DXC's creation, one of its predecessor companies, CSC, had been "suffering from an ongoing brand crisis," while experiencing "upheaval" at the "leadership" level. AC ¶ 67.

3

As DXC disclosed to investors at the time of the merger, the Company's "revenue base" was "already 'declining,'" as "competitors" gained market share. *Id.* ¶ 69.  The merger with HPES also created "dis-synergies associated with bringing the two companies together," which DXC warned investors could make it "more expensive to run the merged company than to run the two stand-alone businesses." *Id.* ¶ 70.  DXC further cautioned that it might "not achieve some or all of the expected benefits of [its] restructuring plans," and that restructuring could ultimately "adversely affect [the] business," despite management's best efforts. *E.g.*, Ex. 1 (2021 10-K) at 11. The merger, in short, "had created a multibillion-dollar company facing serious obstacles to becoming a profitable, competitive leader in the industry," particularly given the immense undertaking of fully integrating "the newly merged businesses."  AC ¶¶ 70-71.

DXC's integration challenges became even more daunting after the merger.  "[B]etween 2017 and 2019"—well before the Class Period—"DXC acquired more than thirteen companies," including "six companies in 2018" alone. *Id.* ¶¶ 32, 81.  Among them was Luxoft, a $2-billion tech titan in its own right. *Id.* ¶ 90.  Although these moves had many potential benefits—including helping DXC "expand into new markets, remove competitors from its existing markets, fill gaps in its product portfolio," and "add[] to its revenue"—they also required DXC to incur "significant" expenses in order to integrate the newly acquired businesses. *Id.* ¶¶ 75, 77.  DXC also incurred substantial restructuring costs as part of its related effort to right-size the Company's workforce and streamline its growing portfolio of real-estate holdings.[2]

In September 2019, amidst continued "poor performance," DXC's then-CEO Mike Lawrie resigned. *Id.* ¶¶ 91-92.  Salvino took the reins soon afterwards, amidst "increasing[] concern[]"

---

[2]  For simplicity, this brief refers to the related concepts of integration and restructuring expenses as "TSI" costs—a term DXC management used to cover "transaction, separation, and integration" expenses associated with M&A activity and post-transaction integration efforts.  AC ¶¶ 6, 78.

about DXC's future. *Id.* ¶¶ 92, 97. Facing "stiff headwinds" as Salvino worked "to revive the business," DXC confronted "performance" challenges, *id.* ¶ 91—including continuing to incur "approximately $900 million in [TSI] expense per year," Ex. 2 (May 26, 2021 Tr.) at 7.

### 2.    DXC's Successful Efforts To Grow Revenue And Reduce TSI Expenses

By spring 2021, market analysts saw "a major improvement" in DXC's results and applauded a positive "track record building up . . . steadily" under Salvino's leadership. Ex. 2 (May 26, 2021 Tr.) at 9, 12. DXC's revenues in the fourth quarter of fiscal year 2021 (4Q21) hit "$4.39 billion, approximately $85 million above the top end of [its earlier] guidance." *Id.* at 4.[3] And DXC announced a goal to reduce TSI expenses "to approximately $550 million in FY '22," *id.* at 6, down from "$900 million in expense per year on average" in DXC's first four years of operation, *id.* at 7. Going forward, CFO Kenneth Sharp projected that DXC would continue "to wind down restructuring and TSI costs" as one of its "key initiatives . . . to drive cash flow and improve earnings power." AC ¶ 196. A month later, at DXC's June 2021 investor day, Salvino reiterated management's "focus" on "making sure" that "integration" be "done [i]n the appropriate way" while also reducing TSI expenses over time. *Id.* ¶ 201. Salvino added, "we've been drilling into [TSI costs]" and "I do think we'll have a good outcome with [them]." *Id.*

DXC reported 1Q22 revenues that were again "higher than the top end of [its] guidance range," and indicated that "Restructuring and TSI expenses" were "down 58% from [the] prior year." Ex. 3 (Aug. 4, 2021 Tr.) at 6. Given this progress and an opportunity to "tak[e] advantage of what [management] believe[d] was an attractive valuation in the market," DXC announced that it would repurchase some of its own stock—with "$67 million of stock buybacks" during 1Q22 alone. *Id.* at 8. Looking ahead, DXC reiterated its "expect[ation] to reduce [TSI costs]" to "$550

---

[3] DXC's fiscal year runs from April 1 through March 31. *See* AC ¶ 6. The Company's 2021 fiscal year, for example, started April 1, 2020 and ended on March 31, 2021.

million in FY 2022," as compared to an annual average of $900 million in costs "over the last four years." *Id.* at 7; *see* AC ¶ 205. Sharp added that "we will continue to make decisions to better position the company for the longer-term, creating a sustainable business." Ex. 3 (Aug. 4, 2021 Tr.) at 7. And he reaffirmed that the ongoing effort to "wind down restructuring in TSI costs" would remain a "key initiative[]." *Id.*; *see* AC ¶ 206. Analysts praised "the current management team" for "achiev[ing] a lot in a couple of years." Ex. 4 (Sept. 14, 2021 Tr.) at 5. Nevertheless, Salvino cautioned that DXC remained "in the early innings" with "more to do." *Id.* at 8.

During the following quarter (2Q22), DXC reported " particularly strong progress on," among other things, "reducing restructuring and TSI expense." Ex. 5 (Nov. 3, 2021 Tr.) at 6; *see* AC ¶ 221. The Company also announced that it remained "on track to reduce" those costs to its longstanding goal of "$550 million" for FY22, thanks to—as Sharp put it—DXC's "very disciplined" and "thoughtful[]" approach. Ex. 5 (Nov. 3, 2021 Tr.) at 8, 13; *see* AC ¶ 215. Other metrics were more mixed, as DXC reported Q2 revenue of $4.03 billion, which fell slightly below projections of "between $4.08 billion and $4.13 billion." *Compare* Ex. 5 (Nov. 3, 2021 Tr.) at 4, *with* Ex. 3 (Aug. 4, 2021 Tr.) at 8. Nevertheless, management reiterated their continued belief that DXC was "undervalued"—and thus planned further stock "buyback[s]" over at least "the short term." Ex. 5 (Nov. 3, 2021 Tr.) at 17; *see id.* at 8 (similar).

DXC saw more "strong progress" on reining in TSI expenses during 3Q22, prompting a forecast of "just $400 million in [TSI] costs" for FY22—even less than management's original $550-million target. AC ¶ 133. And after 4Q22, "DXC reported just $300 million in restructuring and TSI expenses" for the year—"$100 million less than its [recently] revised guidance." *Id.* ¶ 134. Sharp thus "believe[d]" DXC had "taken significant strides" in managing TSI costs. Ex. 6 (Feb. 2, 2022 Tr.) at 8-9; Ex. 7 (May 25, 2022 Tr.) at 7; *see* AC ¶¶ 133, 227. Nonetheless,

6

management made clear that DXC was still in the process of "driving the business together" after the CSC-HPES merger and its subsequent "series of acquisitions." Ex. 8 (June 2, 2022 Tr.) at 5.

"Over the next few quarters, DXC continued to 'significantly reduc[e]' and 'tightly manage' its restructuring and TSI expenses." AC ¶ 137. As FY23 ended, management conveyed that they were "pleased with [DXC's] performance" of "4 consecutive quarters of similar revenue," which they believed positioned the Company "to continue improving . . . revenue performance." Ex. 9 (May 18, 2023 Tr.) at 4-5. On May 18, 2023, Sharp announced he was stepping away from DXC for "personal reasons," with Del Bene taking over as CFO. *Id.* at 8. The next day, DXC's stock price increased from $23.84 to $24.44.

### 3.    Unexpected Demand Shifts Hit DXC And Other Industry Players

Unfortunately, macroeconomic challenges hit the IT industry hard in FY24. As Salvino explained on an August 2, 2023 earnings call, DXC had seen "resiliency in [its] business" and "delivered 4 quarters of revenue stability" in the FY23. Ex. 10 (Aug. 2, 2023 Tr.) at 4. On the heels of that consistent performance, management "thought customer demand for [DXC's] work would stay at [similar] buying levels" in FY24, particularly since DXC's services are often "essential to [its] customers' operation." *Id.* But as 1Q24 played out, DXC reported that "customer demand for hardware PCs and network devices, along with some project work, either stopped or delayed to the second half of the year at a higher rate than . . . anticipated." *Id.* "As a result," Salvino explained, management proactively reduced its full-year revenue guidance to account for "the continued difficult economic environment." *Id.* at 7. "[O]ther big players in the industry" similarly "lower[ed] their guidance for the year because of cyclical challenges" to customer demand. *Id.* at 11. Analysts thus agreed it had been a "challenging quarter on the macro" level. *Id.* at 11. The next day, DXC's stock price declined from $27.07 to $19.10. AC ¶ 176.

On DXC's November 1, 2023 earnings call for 2Q24, management noted this "weaker

demand environment" would likely persist. Ex. 11 (Nov. 1, 2023 Tr.) at 7-8. Analysts, too, recognized challenges "for the industry at large." *Id.* at 11. But they emphasized that DXC "had some impressive accomplishments" despite those conditions—"especially the free cash flow," which Del Bene attributed to DXC "achieving [its] cost reduction goals." *Id.* at 11; *see* AC ¶ 186. Then, on December 20, 2023, DXC announced a mutual decision for Salvino to transition from DXC, with Raul Fernandez taking his place as CEO. Ex. 12 (Dec. 20, 2023 8-K) at 4; AC ¶ 187. DXC praised Salvino's "leadership" in "guiding DXC through its transformation journey" and "help[ing] stabilize the business," and indicated he would stay on for several months "in an advisory role." Ex. 12 (Dec. 20, 2023 8-K) at 4. The next day, DXC's stock price—which had recovered to $25.03—declined to $21.99. AC ¶ 187.

Five months later, during a May 16, 2024 year-end earnings call, DXC reported better-than-expected earnings. Ex. 13 (May 16, 2024 Tr.) at 4, 11. Even so, Fernandez announced that, "to strengthen [its] market position," DXC was launching a new "restructuring initiative aimed at simplifying and enhancing [the Company's] operational efficiency." *Id.* at 6. Citing what he saw as certain "missed opportunities in the past to rationalize systems, processes," and other aspects of the business, Fernandez outlined plans that he believed would "simplify our processes, increase visibility to eliminate redundancies, reduce costs, improve resource management, and ultimately drive a more streamlined, agile and competitive organization." *Id.* In Fernandez's estimation, "previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth," and more was needed for DXC to become a "fully functional organization that can take advantage of the opportunities" available. *Id.* at 10. The next day, May 17, DXC's stock price fell from $19.88 to $16.52. AC ¶ 300. But by the end of June, the stock price rebounded to $19.08—and in late July, it reached $20.50.

### B.        Procedural History

This lawsuit was filed on August 2, 2024.  Dkt. 1.  After being appointed to litigate on behalf of a putative class of DXC investors, Sparinvest S.A. ("Plaintiff") filed an amended consolidated complaint on December 6, 2024, Dkt. 64—and then filed a corrected complaint on December 23, 2024, to remove allegations attributed to a former DXC employee, Dkt. 65.  While the AC nominally targets 16 excerpts from DXC earnings calls and other public statements, it actually assails some three-dozen discrete remarks.  AC ¶¶ 196-262 (delineating challenged statements in **bolded italics**).  Nowhere, however, does the AC allege that Defendants had any cognizable motive to mislead investors.  Defendants now move to dismiss this case with prejudice.

## LEGAL STANDARD

To separate people "who were wrongly misled" (and who may deserve relief) from those merely "making post hoc attempts to recoup market losses" (who do not), Section 10(b) of the Exchange Act requires a stringent showing.  *Xia Bi*, 927 F.3d at 187.  A plaintiff must demonstrate: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017).

Securities-fraud plaintiffs carry a far heavier pleading burden than the average civil plaintiff.  Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") "impose[] heightened pleading requirements for private securities fraud actions."  *Pub. Emps.' Ret. Ass'n. of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 310-11 (4th Cir. 2009).  A securities-fraud complaint that does not "clear the[se] hurdle[s]" cannot "survive a motion to dismiss."  *Matrix Cap. Mgmt. Fund, L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

Specifically, Rule 9(b) requires Plaintiff to "state with particularity the circumstances

9

constituting fraud"—including as to falsity, scienter, and loss causation. Fed. R. Civ. P. 9(b); *see Maguire*, 876 F.3d at 546; *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018). That requires detailed allegations of "the who, what, when, where and how of the alleged [scheme]." *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014).

The PSLRA raises the bar even further. To allege falsity, Plaintiff must "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Plaintiff must also "state with particularity facts giving rise to a *strong inference* that the defendant acted with [scienter]"—that is, a fraudulent state of mind. *Id.* § 78u-4(b)(2)(A) (emphasis added). This latter requirement is especially demanding: The inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Congress established these stringent standards to "sort out the meritorious claims from the abusive ones early in litigation." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 624 (4th Cir. 2008). The PSLRA is meant to curb "the routine filing" of lawsuits after stock-price declines "with only faint hope that the discovery process might lead eventually to some plausible cause of action." *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 171 (4th Cir. 2007) (quoting H.R. Rep. No. 104-369, at 41 (1995)). Accordingly, this Court may accept as true only "well-pleaded factual allegations," and it "owe[s] no allegiance to 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Katyle*, 637 F.3d at 466 (citation omitted). The Court should also consider not just "the complaint," but also "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322.

## ARGUMENT

This lawsuit fails for three distinct reasons. The AC does not allege particularized facts (1) showing an actionable misstatement of material fact, (2) raising a strong inference of scienter,

10

or (3) establishing loss causation.  Any one of these separate pleading failures requires dismissal.

## I.   PLAINTIFF FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT

To allege a misstatement or omission of material fact, Plaintiff "must point to a factual statement or omission—that is, one that is demonstrable as being true or false." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 342-43 (4th Cir. 2003).  Next, Plaintiff "must establish that the statement was false when made."  *Kas v. First Union Corp.*, 857 F. Supp. 481, 489 (E.D. Va. 1994).  Finally, the statement "must also be material."  *In Re PEC Solutions Sec. Litig.*, 2004 WL 1854202, at \*5 (E.D. Va. May 25, 2004).  The AC fails to meet these requirements.

Plaintiff launches a kitchen-sink attack on some three-dozen statements made between May 2021 and November 2023.  Attached as Appendix A ("App. A") is a chart delineating those statements,[4] which fall into three general categories: (1) statements explaining DXC's "focus" or and management's plans, goals, and activities; (2) statements describing DXC's efforts to reduce TSI costs as "tightly manage[d]" or otherwise characterizing those efforts; and (3) statements praising DXC's cost-reduction progress.  All of the statements are non-actionable *as a matter of law* because they are mere puffery, forward-looking statements protected by the PSLRA's safe harbor, subjective opinions, or a combination of the three.  And regardless, Plaintiff fails to plead particularized facts showing any challenged statement was false or misleading when made.

### A.   The Challenged Statements Are Too Vague To Be Actionable

Courts have "long accepted" that "puffery" statements—i.e., "superlatives" and similar "expressions of enthusiasm" by management—are non-actionable as a matter of law.  *Xia Bi*, 927 F.3d at 183.  "Generalized declarations about the importance" of a business goal or activity are likewise non-actionable, "especially when expressed in aspirational terms."  *Plumber &*

---

[4]  *See Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at \*18 (S.D.N.Y. Feb. 27, 2017) (approving such "organizational tools").

*Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021); *accord In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at \*10  (E.D. Va. June 2, 2020) (Trenga, J.), *aff'd sub nom. KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021).  That is because such statements are not "demonstrable as being true or false."  *Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004).  They also are immaterial on their face, as investors "rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen."  *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 & n.1 (4th Cir. 1993).  Under these established principles, all three categories of challenged statements at issue here are simply too vague and imprecise to support a securities fraud claim.  *See* App. A.

*First*, statements referencing DXC's general "focus" on reducing TSI expenses are plainly not actionable.  *E.g.*, AC ¶¶ 201, 222, 241, 252.[5]  So too for mentions of DXC's "key initiatives."  *E.g.*, AC ¶¶ 196, 206.[6]  Similarly, statements that "we will continue to make decisions to better position the company for the longer-term, creating a sustainable business," AC ¶ 205, "[w]e're running a very structured playbook," *id.* ¶ 210, "everything we do this year will help us grow," *id.*, and "we were trying to sort our way through" the integration cost challenge while "continuing driving the business together," *id.* ¶ 231-32, are all textbook puffery.[7]

---

[5]  *See, e.g.*, *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) ("focused on" protecting its "excellent reputation"); *Chapman v. Fennec Pharms. Inc.*, 2021 WL 7209981, at \*10 (M.D.N.C. Dec. 16, 2021) ("focused on building the necessary team"); *Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec*, 2013 WL 1192004, at \*8 (E.D.N.C. Mar. 22, 2013) ("our focus on the development of a competitive, highly scalable system").

[6]  *See, e.g.*, *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("key strategic initiatives"); *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 212 (S.D.N.Y. 2020) ("key priorit[ies]").

[7]  *See, e.g.*, *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at \*12 (N.D. Ill. Mar. 30, 2022) ("better . . . decisions"); *In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 681 (E.D. Va. 2015) ("well positioned"); *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at \*13-14 (S.D.N.Y. Sept. 21, 2021) ("sustainable growth"); *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 385-86 (S.D. Tex. 2011) ("shepherd this institution through this cycle"); *Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at \*24 (E.D. Va. Mar. 24, 2021) ("drive . . . efficiency").

*Second*, Defendants' loosely optimistic characterization of TSI-related efforts as "tightly manage[d]," "highly focused," "prudent," "very disciplined," and "thoughtful[]," AC ¶¶ 213, 215, 236, 240, 256, likewise constitute non-actionable "puffery and generalizations," *Longman v. Food Lion, Inc.*, 197 F.3d 675, 685 (4th Cir. 1999).[8]  Buzzy adjectives like these are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005); *see, e.g.*, *Phila. Fin. Mgmt. of S.F. v. DJSP Enters.*, 572 F. App'x 713, 716 (11th Cir. 2014) (dismissing claim based on company's boasts about "the 'rigor' of [its] processes, the 'efficiency' and 'accuracy' of its operations").

*Third*, Defendants' positive commentary on DXC's integration and cost efforts constitutes precisely the kind of "rosy affirmation" that is "commonly heard from corporate managers"—and is legally non-actionable.  *In re Cable & Wireless, PLC, Sec. Litig.*, 321 F. Supp. 2d 749, 766 (E.D. Va. 2004).  References to DXC making "strong progress," AC ¶ 221, taking "significant strides," *id.* ¶ 222, "achiev[ing] a lot," *id.* ¶ 227, "significantly improving," *id.*, doing "good work," *id.* ¶ 241, being "very successful," *id.* ¶ 257, and "really starting to deliver," *id.* ¶ 258, are the *definition* of puffery.[9]  So too for boasts of becoming "more competitive," AC ¶ 250, poised "to

---

[8]  *See, e.g.*, *In re Loewen Grp. Inc.*, 2003 WL 22436233, at *14, *16 (E.D. Pa. July 16, 2003) ("acquisition strategy was being undertaken on a 'focused and disciplined basis' and was being successfully integrated"); *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *5 (D. Ariz. Feb. 16, 2017) ("focused effort"); *Monk v. Johnson & Johnson*, 2011 WL 6339824, at *23 (D.N.J. Dec. 19, 2011) ("prudent"); *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 631 (D. Md. 2010) ("highly disciplined"); *IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir. 2016) ("thoughtful").

[9]  *See, e.g.*, *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1026 (11th Cir. 2003) ("strong"); *In re Comput. Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 668 (E.D. Va. 2012) ("steadily made progress"); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 899 (D. Minn. 2007) ("significant strides"); *In re Cable*, 321 F. Supp. 2d at 768 ("achieving our objectives"); *Scott v. Gen. Motors Co.*, 605 F. App'x 52, 54 (2d Cir. 2015) ("improved inventory management"); *Howard v. Haddad*, 962 F.2d 328, 330-31 (4th Cir. 1992) ("good"); *In re DXC*, 2020 WL 3456129,

deliver more predictable and repeatable results," *id.*, and a "catalyst" for the market, *id.* ¶ 258.[10]

The bottom line is this: Even in difficult circumstances, the "people in charge of an enterprise are not required to take a gloomy, fearful or defeatist view" of the business they run. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Defendants were "permitted to operate with a hopeful outlook" without fear of "giv[ing] rise to securities violations." *Id.* "Indeed, if [they] were to refrain from such statements of confidence, or take a pessimistic outlook on the company's future, stockholders might well question the company's prospects under current leadership." *Neustar*, 83 F. Supp. 3d at 680-81. The vaguely optimistic, puffing statements challenged here are non-actionable as a matter of law across the board. That alone is reason to dismiss this case.

### B.    The PSRLA Safe Harbor Protects Defendants' Forward-Looking Statements

Besides being puffery, many challenged statements are also statutorily protected forward-looking statements. *See generally* App. A. With limited exceptions, the PSLRA's safe harbor insulates from liability any "projection of revenues" or "future economic performance," as well as statements about "the plans and objectives of management for future operations." 15 U.S.C. § 78u-5(i)(l)(B). It likewise covers "any statement of the assumptions underlying or relating to any [forward-looking] statement," *id.* § 78u-5(i)(1)(D), even though such assumptions "necessarily reflect[] an implicit assertion" about "current circumstances," *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191-92 (9th Cir. 2021); *see Emps. Ret. Sys. of the City of Baton Rouge and Parish of East Baton Rouge v. MacroGenics*, 61 F.4th 369, 389 (4th Cir. 2023).

A slew of the AC's challenged statements are forward-looking. Many, for example,

---

at *10 ("successful"); *High Income Sec. Fund v. Cedar Realty Tr., Inc.*, 2023 WL 6214237, at *7 (E.D.N.Y. Sept. 25, 2023) ("work[ing] to deliver").

[10]  *See, e.g.*, *Anastasio v. Internap Network Servs. Corp.*, 2011 WL 13124500, at *21 (N.D. Ga. Sept. 30, 2011) ("more competitive"); *Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 775 (N.D. Cal. 2017) ("predictable"); *Trs. of Welfare & Pension Funds of Loc. 464A v. Medtronic PLC*, 726 F. Supp. 3d 938, 969 (D. Minn. 2024) ("important catalyst").

14

expressly forecast DXC's future performance. *E.g.*, AC ¶ 201 ("I do think we'll have a good outcome."); *id.* ¶ 210 ("[E]verything we do this year will help us grow."); *id.* ¶ 231 ("[W]e've got about $300 million or more cash improvement that will come out of that."); *id.* ¶ 250 (predicting certain measures "will allow us to deliver more predictable and repeatable results). Others lay out DXC management's future goals. *E.g.*, *id.* ¶¶ 196, 205 (describing reducing TSI costs as "[o]ne of our key initiatives"); *id.* ¶¶ 201, 222, 252 (emphasizing going-forward "focus" on reducing expenses); *id.* ¶ 251 (describing "plans" to "get to" cost-reduction goal); *id.* ¶ 205 ("[W]e will continue to make decisions to better position the company."). And others forecast that DXC was "'on track' to achieve an announced objective"—i.e., that a "goal" was "achievable based on current circumstances." *Wochos*, 985 F.3d at 1192; *accord Boykin v. K12, Inc.*, 54 F.4th 175, 184 (4th Cir. 2022); *see, e.g.*, AC ¶ 257 ("We're on track with our cost reduction goals, and that will continue."). These statements are categorically non-actionable unless Plaintiff can show *both* (1) a lack of "meaningful cautionary" language, *and* (2) the speaker's "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c); *see Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 757 (E.D.N.C. 2017). The AC does neither.

As to the first prong, Defendants' forward-looking statements were "not worded as guarantees," *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 321 (4th Cir. 2019), but instead couched in "cautionary" terms, 15 U.S.C. § 78u-5(c)(1); *see, e.g.*, *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 576-77 (W.D. Va. 2006) (CEO's statement "that he 'expect[ed]' 20-25% revenue and earnings growth" was not actionable because "expectations are not guarantees"). For starters, DXC's SEC filings explicitly disclaimed any "assurance" that Defendants' predictions, plans, and goals would play out as hoped, given the speculative "assumptions, risks, uncertainties, and other factors" underlying them. *E.g.*, Ex. 14 (Aug. 5, 2021

15

10-Q) at 43-44; Ex. 15 (Nov. 4, 2022 10-Q) at 34; Ex. 16 (Nov. 2, 2023 10-Q) at 32.[11] Defendants

thus urged investors "not to place undue reliance on" any such forward-looking statements.  Ex.

14 (Aug. 5, 2021 10-Q) at 44.

DXC also issued "extensive, specific and tailored" warnings addressing Plaintiff's "very

complaints" about the Company's restructuring efforts and management of related expenses.

*Paradise Wire*, 918 F.3d at 319; *accord In re DXC*, 2020 WL 3456129, at *8.  For example,

Defendants warned that DXC might be unable "to achieve the expected benefits of our

restructuring plans."  Ex. 14 (Aug. 5, 2021 10-Q) at 43; *see, e.g.*, Ex. 17 (2021 10-K) at 27 ("[O]ur

restructuring may adversely affect our business.").  Defendants further cautioned, "We may not be

able to obtain the costs savings" that "were initially anticipated in connection with our

restructuring plans."  Ex. 17 (2022 10-K) at 27; *see* Ex. 1 (2021 10-K) at 26; Ex. 18 (2023 10-K)

at 26.  "Additionally," Defendants continued, restructuring might cause "inefficiency," while

requiring "significant costs" that "can have a significant impact on our earnings and cash flow."

*Id.*  These extensive risk disclosures put an investor "sufficiently on notice of the danger of the

investment [in DXC] to make an intelligent decision about it according to her own preferences for

risk and reward."  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 103 (D.C. Cir. 2015);

*accord Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *8 (E.D.N.C. Sept. 15, 2015).  That

is enough to trigger statutory protection.

The safe harbor's "actual knowledge" prong separately protects Defendants'

forward-looking statements.  *See* 15 U.S.C. § 78u-5(c)(1)(B); *Plymouth Cnty. Ret. Ass'n v. Primo*

---

[11] "Cautionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as the forward-looking statements."  *Elec. Workers Pension Tr. Fund of IBEW Loc. Union No. 58 v. CommScope, Inc.*, 2013 WL 4014978, at *13 (W.D.N.C. Aug. 6, 2013).  Such is the case here.  *E.g.*, Ex. 2 (May 26, 2021 Tr.) at 4 (incorporating by reference risk disclosures in DXC's SEC filings); Ex. 3 (Aug. 4, 2021 Tr.) at 4 (same).

*Water Corp.*, 966 F. Supp. 2d 525, 549 (M.D.N.C. 2013) ("[E]ven if a forward-looking statement is not accompanied by cautionary language, liability only attaches if the speaker had actual knowledge that it was false when made."). To void the safe harbor's protection, Plaintiff has the "heavy burden" of alleging particularized facts "show[ing] that each of the Defendants actually knew that each statement for which he is being charged was false." *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 895 (W.D.N.C. 2001). Allegations of negligence or even deliberate recklessness are insufficient. *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009); *accord In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *9 (D. Md. Aug. 5, 2021).

Here, as discussed below, Plaintiff fails to plead facts showing that any challenged statement was untrue—much less that Defendants *knew* as much. *See infra* at 18-28. Indeed, the AC is silent as to what specific facts were actually known by Defendants before their respective statements. Instead, Plaintiff relies primarily on perfunctory anecdotes from low-level former DXC employees, who were in no position to have any actual insights into DXC's global integration and restructuring efforts or Defendants' mental states. *See id.* Neither those allegations nor anything else in the AC "make plausible that Defendants had actual knowledge that their [forward-looking statements] were false or misleading." *In re DXC*, 2020 WL 3456129, at *7 (Trenga, J.).

## C.    Defendants' Opinions Are Not Actionable

Numerous challenged statements are also non-actionable opinions. For example, Plaintiff attacks remarks like "*I do think* we'll have a good outcome," "*we believe* [restructuring efforts] are a prudent investment," "*[we] believe* we have taken significant strides," "*we think* we've got a lot of opportunity," and "*to me*, that's the catalyst that we're giving to the market." AC ¶¶ 201, 213, 222, 232, 258 (emphasis altered); *see Omnicare*, *Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187 (2015) (noting that "words like 'I think' or 'I believe'" indicate an opinion). But Defendants' "opinion[s]" are "subjective and uncertain assessments" and thus

17

non-actionable, unless (1) "the speaker did not hold the belief she professed," (2) the asserted opinion "contain[s] embedded statements of fact" that themselves are false or misleading, or (3) an "excluded fact shows that [they] lacked the basis for [their opinions] that a reasonable investor would expect." *Omnicare*, 575 U.S. at 185-86, 196.

Plaintiff cannot satisfy the *Omnicare* framework. No particularized facts suggest that these opinions were not "sincerely held" or misleadingly "omit[ted] material facts about [Defendants'] inquiry into" the relevant subject. *Id.* at 187, 189. Nor do these opinion statements contain any embedded statement of fact, as *Omnicare* itself demonstrates. To use the Supreme Court's example, if a TV company's CEO said, "'I *believe*' (or 'I think') 'the TVs we manufacture have the highest resolution available on the market,'" that statement would "remain true" even if the CEO "got the facts wrong." *Omnicare*, 575 U.S. at 183-84. An embedded statement of fact requires asserting a specific factual basis for the opinion—*e.g.*, if the CEO said "I believe our TVs have the highest resolution available *because we use a patented technology to which our competitors do not have access*." *Id.* at 185 (emphasis added).

The only opinion statement that even arguably fits that bill is Sharp's June 2, 2022 remark that "I think we've got about $300 million or more cash improvement that will come out of [reducing the $900 million annual average TSI spend], which I think is a positive." AC ¶ 231. But the arguable embedded factual assertion—regarding $300 million in potential future cash flow improvements—is *also* prefaced by "I think." *Id.* And regardless, it is undisputed that DXC *did* reduce its TSI expenses by even more than Sharp projected. *Id.* ¶¶ 133-34. This statement is no more actionable under *Omnicare* than the rest of Defendants' opinions.

### D.    Plaintiff Fails To Plead Particularized Facts Showing Falsity

Little remains of Plaintiff's falsity theory once the puffery, safe-harbor, and opinion doctrines are applied. The AC is short on bona fide "factual statement[s]" "demonstrable as being

18

true or false" when made. *Ottmann*, 353 F.3d at 342-43. But even if one could be discerned among the three categories of statements challenged here, Plaintiff has not pled particularized facts demonstrating "why [any such] statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B).

*First*, Plaintiff attacks statements noting that reducing TSI expenses was a "key initiative[]" and "focus" for DXC, *e.g.*, AC ¶¶ 196, 201, 206, or otherwise explaining that DXC was "working through," "drilling into," "tackling," and "sort[ing] our way through" significant restructuring challenges, *e.g.*, *id.* ¶¶ 201, 231, with "cost reduction plans" in place, *id.* ¶ 251. Nothing in the AC suggests that Defendants were *not* focused on reducing costs or continuing to work on integrating and restructuring the Company. *Second*, Plaintiff assails remarks describing DXC's efforts to reduce expenses as "tightly manage[d]," *id.* ¶¶ 236, 240, 246, 256, "highly focused," *id.* ¶ 213, "very disciplined," *id.* ¶ 215, and "thoughtful[]," *id.* Those characterizations were not false; they were demonstrably true given the fact that DXC *undisputedly* cut TSI expenses by hundreds of millions of dollars. *E.g.*, *id.* ¶¶ 133-34. *Third*, Plaintiff faults DXC for noting "significant strides" and "progress on reducing Restructuring and TSI expenses," *id.* ¶¶ 221-22, "a lot of work" towards achieving "positive cash flow," *id.* 241, "success[] in achieving [DXC's] cost reduction goals," *id.* ¶ 257, and so on, *e.g.*, *id.* ¶¶ 214, 220, 227, 250. But again, DXC *did* succeed in significantly reducing TSI expenses over time, as the AC itself admits. AC ¶¶ 133-34. In FY22, DXC reported $300 million in restructuring costs (versus $550 million originally projected) and $232 million in such costs in FY23 (versus $300 million originally projected). *Id.*; *compare* Ex. 19 (FY22 earnings press release) at 4, *with* Ex. 20 (FY23 earnings press release) at 3.

Lacking facts that "actually contradict" the challenged statements, *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 545 (M.D.N.C. 2013), Plaintiff resorts to subjective criticisms of management's efforts—asserting there was not sufficiently "significant

19

progress in integrating and restructuring DXC's acquisitions and lines of business." AC ¶ 198; *see, e.g.*, *id.* ¶¶ 199, 203-04, 208-09, 211-12. But such "hindsight" critiques cannot demonstrate that anything Defendants said was false at the time the statements were made. *Hunter*, 477 F.3d at 183, 189 (requiring well-pled facts establishing "actual fraud"); *see Smith v. Circuit City Stores*, 286 F. Supp. 2d 707, 715 (E.D. Va. 2003) ("Monday morning quarterbacking of this sort[] is insufficient pleading under the [PSLRA]."). And a securities fraud claim cannot be "based simply on market risks" that come to pass, especially the materialization of *expressly disclosed* risks associated with DXC's difficult and highly uncertain restructuring efforts. *Hunter*, 477 F.3d at 189. Because the "securities laws provide no cause of action" even for properly pled "'internal corporate mismanagement,'" Plaintiff's post hoc criticism is entirely beside the point. *Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 586-87 (E.D. Va. 2006) (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977)).

It is also deeply flawed on its own terms. Plaintiff cites unnamed former employees to suggest that DXC was "a hodgepodge of duplicative, overlapping systems and competing business units." AC ¶ 144; *see id.* ¶¶ 144-74. Even taken at face value, these anecdotal accounts about isolated issues have little to do with DXC's overall integration and restructuring effort. *See id.* The former employee allegations are also strikingly vague—and often do nothing more than parrot Plaintiff's subjective characterizations. For example, FE-1 allegedly "*[c]onfirmed*" Plaintiff's own broad-brushed claim that "DXC kept the 'house of cards' afloat through layoffs while at the same time talking up successful integration and lower TSI costs." *Id.* ¶ 146 (emphasis added). FE-2 supposedly "*confirmed* that DXC's failure to integrate impacted" unspecified "customer relationships." *Id.* ¶ 149 (emphasis added). And FE-3 allegedly "*confirmed* that after its acquisition by DXC, Luxoft remained quasi-separate." *Id.* ¶ 151 (emphasis added).

This Court rightly rejected similar "generalized subjective assessments from employees who disagree with managers' courses of conduct" in another meritless securities fraud lawsuit against DXC. *In re DXC*, 2020 WL 3456129, at *11. The same result should obtain here. Mere "disagreement" among former employees "as to the quality and execution" of DXC's integration and restructuring effort cannot establish falsity. *Plymouth*, 966 F. Supp. 2d at 545. Nor can one-off, non-specific critiques about supposedly "inexperience[d]" hires, AC ¶ 149, duplicative "systems," *id.* ¶ 150, "disparate" workflows, *id.* ¶ 157, customer "complaints," *id.* ¶ 173, and the like. Such issues are "unremarkable" for a large company operating internationally and undergoing a lengthy and extremely complicated restructuring process in the wake of multiple major business acquisitions. *Rombach*, 355 F.3d at 173; *see Longman*, 197 F.3d at 686 (rejecting allegations of "isolated instances of workplace errors"). In short, none of these former-employee allegations "actually contradict[s]" anything Defendants said. *Plymouth*, 966 F. Supp. 2d at 545.

Furthermore, "the position[s] occupied" by these anonymous witnesses only underscores the irrelevance of their personal opinions to Plaintiff's sweeping claims about the state of DXC's company-wide efforts. *Hunter*, 477 F.3d at 174. For example, the AC describes FE-1 as merely a "manager in DXC's Security division," FE-2 as a "member of DXC's Cloud and ITO division," and FE-3 as having "various roles within DXC's Modern Workplace division." AC ¶¶ 39-41. None of Plaintiff's seventeen alleged confidential witnesses reported to an individual defendant in this case—or was privy to high-level executive decision-making about DXC's restructuring efforts. *See* AC ¶¶ 39-55. And one of them—FE-5—has since retracted their alleged statements altogether, forcing Plaintiff to strike any related allegations entirely and amend the AC accordingly. *Compare* Dkt. 64 ¶¶ 43, 153, *with* Dkt. 65 ¶¶ 43, 153.

Plaintiff's reliance on retrospective comments made by DXC's incoming CEO, Raul Fernandez, well after the challenged statements fares no better. For one, "[t]his practice of alleging 'fraud by hindsight'—claiming that defendants knew of facts at an earlier time based on subsequent disclosures—has been categorically rejected by numerous courts" in the Fourth Circuit. *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 888 (W.D.N.C. 2001) (citations omitted); *see In re Triangle Cap. Corp. Sec. Lit.*, 988 F.3d 743, 753 (4th Cir. 2021) (rejecting attempt to "plead[] fraud by hindsight"). These post-hoc statements were "made with the benefit of" not just "weeks or months," but *years*, "of hindsight." *Kurtzman v. Compaq Comput. Corp.*, 2002 WL 32442832, at \*7 (S.D. Tex. Mar. 30, 2002). And they evince nothing more than the typical effort by a "new CEO" to "distance himself from" prior leadership, which "does not speak to whether [Defendants' prior] statements were false at the time [they] made them." *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at \*22 (N.D. Cal. Mar. 21, 2018).

Regardless, Fernandez did not in any way deny his predecessor's substantial efforts to manage the Company's integration process and (successfully) limit related costs. *See* AC ¶¶ 189-91. On the contrary, he explicitly acknowledged DXC's "previous restructuring[]" initiatives. *Id.* ¶ 190. He just believed another "reset" was needed to establish a better "baseline for profitable growth" and make DXC a "fully functional organization" going forward. *Id.* That opinion in no way contradicted Defendants' statements, which—contrary to Plaintiff's baseless characterization—never asserted that "DXC's integration efforts" had been or would be "completed" by a time certain. *Id.* ¶ 193. To the contrary, DXC explained that the transformation process was uneven and that "every transformation hit[s] some bumps." Ex. 11 (Nov. 1, 2023 Tr.) at 13. The AC does not plead a false or misleading statement, and that alone warrants dismissal.

22

## II.    PLAINTIFF FAILS TO PLEAD PARTICULARIZED FACTS RAISING A STRONG INFERENCE OF SCIENTER

Dismissal is independently required because Plaintiff has not alleged "with particularity facts giving rise to a strong inference" of scienter—i.e., that Defendants "acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'"  15 U.S.C. § 78u-4(b)(2)(A); *Yates*, 744 F.3d at 884 (quoting *Tellabs*, 551 U.S. at 319).  This demanding standard focuses on intent vis-à-vis the market:  The defendant must have acted "intentionally or with 'severe recklessness' regarding the danger of deceiving the plaintiff." *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007); *accord San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 243 (4th Cir. 2023).  "Mere negligence"—even ordinary recklessness—about a statement's truth or completeness does not suffice. *Ottmann*, 353 F.3d at 343-44.  And the plaintiff must plead facts demonstrating scienter as to *each* defendant and *each* alleged misstatement. *Matrix*, 576 F.3d at 182.  Ultimately, this Court must conduct a holistic "comparative inquiry," aided by "context and common sense," to decide if "the more compelling inference is that the Defendants merely acted negligently or non-fraudulently." *DXC*, 19 F.4th at 607-08.

### A.    Plaintiff's Scienter Theory Makes No Sense

Plaintiff's scienter theory is "without logical basis." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 623 (4th Cir. 1999).  Plaintiff baldly asserts that DXC "had no real interest in meaningfully integrating the businesses it acquired"—and that its undisputed "reduction in restructuring and TSI costs" was really just "an attempt to temporarily boost DXC's earnings and cash flows." AC ¶ 145, 198.  "[T]hat argument ignores reality." *Cozzarelli*, 549 F.3d at 626.

At the outset, the AC does not suggest a single compelling *reason* for Defendants to commit fraud.  "In order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged."

23

*Ottmann*, 353 F.3d at 352.  Whether a defendant "had some particular motive to defraud investors," as opposed to the universal desire to "keep share prices and dividends high," "'weigh[s] heavily'" in the scienter inquiry.  *In re Triangle*, 988 F.3d at 752.  That is because without a motive, it is generally implausible to infer that executives will "undermine their long-term credibility—and risk considerable bad press—just to pump up [a] share price."  *K12*, 54 F.4th at 186..  Here, for example, "[w]hile [D]efendants could have unloaded [DXC] shares at prices that [Plaintiff] contend[s] were fraudulently elevated," the AC does not allege any purportedly "'suspicious' insider selling or other kinds of self-dealing" by any Defendant.  *Id.*  "Nor do[es] [it] suggest that [Defendants] would personally benefit from a special bonus," "impending performance review," or the like.  *Id.*  The notion that DXC officers would secretly jettison the Company's disclosed goal of integrating its component businesses—merely to boost financial metrics temporarily, but without trying to enrich themselves along the way—is "not even plausible, much less convincing." *Cozzarelli*, 549 F.3d at 627.  And an alleged "unvarnished wish to increase" DXC's reported financial results is "the kind of 'generalized motive[]'" that is "insufficient to plead scienter."  *Id.* (citation omitted).  That alone "is enough to doom" Plaintiff's claims.  *DXC*, 19 F.4th at 607.

The fact that DXC bought back $1 billion of its own stock during the alleged Class Period only further "undercuts any inference of scienter."  *Bldg. Trades Pension Fund of W. Penn. v. Insperity, Inc.*, 2022 WL 784017, at *15 (S.D.N.Y. Mar. 15, 2022); *see, e.g.*, Ex. 6 (Feb. 2, 2022 Tr.) at 8; Ex. 5 (Nov. 3, 2021 Tr.) at 8, 16-17; Ex. 3 (Aug. 4, 2021 Tr.) at 8 (confirming "self-fund[ed] stock repurchases" of over $1 billion during the Class Period).[12]  Indeed, it would not be "economically logical" for DXC to execute such a substantial "repurchase of its own stock

---

[12]  *Accord Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018); *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013).

at allegedly inflated prices." *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 718 (10th Cir. 2006). Yet that is what Plaintiff speculates Defendants risked their jobs and reputations to do, with zero indication they stood to gain anything by it. That does not add up.

## B. Plaintiff's Scattershot Scienter Allegations Fail

Having failed to plead "a plausible motive for the allegedly fraudulent action," Plaintiff faces a "substantial hurdle in establishing scienter," *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1103 (9th Cir. 2021), and the strength of their "circumstantial allegations" of intent "must be correspondingly greater," *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009); *In re E.Spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 744 (D. Md. 2001) ("[W]hen a defendant's motive to commit securities fraud is not readily apparent from a complaint, the plaintiff faces a more stringent standard for establishing fraudulent intent and must state with particularity facts giving rise to a strong inference of fraud based on conscious behavior or severe recklessness."); *accord Syneos Health*, 75 F.4th at 242. Plaintiff's recycling of boilerplate allegations from the playbook used in nearly every securities fraud case comes nowhere close to clearing that hurdle. The Fourth Circuit has consistently rejected similar allegations—including in a published decision affirming this Court's prior dismissal of other baseless claims against DXC. *See DXC*, 19 F.4th at 609-12.

Most of Plaintiff's haphazard scienter allegations boil down to a generic contention that Defendants' "roles at the Company" and "intimate[] involve[ment] with [DXC's] operations" meant they *must* have known about purported "integration issues." AC ¶¶ 265, 283. "The first strike against" that argument is Plaintiff's "inability, recounted above, to point to a statement of clear falsity." *K12*, 54 F.4th at 186; *see supra* at 11-22. Regardless, merely alleging that Defendants "were senior executives" who spoke on a subject that purportedly "represented a core business" focus does not move the needle. *Yates*, 744 F.3d at 890. And the allegation that

Defendants were hands-on managers reflects "diligence rather than evidence of a nefarious purpose." *Id.* at 889; *see* AC ¶¶ 265-71. "Monitoring company operations," "discussing company business on conference calls," and so on are "part and parcel of the role of a senior executive." *Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784, 800 (E.D. Va. 2017). Scienter cannot be inferred "merely based on [Defendants'] professional position." *Syneos Health*, 75 F.4th at 242.

Plaintiff's former-employee allegations are equally futile. "Even if someone at [DXC] believed" the Company's integration efforts were inadequate, "no fact alleged suggests that [Salvino, Sharp, or Del Bene] was this person"—much less that they fraudulently misled the market. *Maguire*, 876 F.3d at 550. Internal (and especially after-the-fact) "disagreement" with management among low-level employees has no bearing on *Defendants'* mental states, regardless of whether "those employees were ultimately correct that Defendants made unwise business decisions." *DXC*, 19 F.4th at 610. Indeed, these "former employees, for the most part, do not allege that they [even] passed their concerns on to" management. *Id.* at 609. Only FE-12 ever claims to have even *met* a named defendant—when Salvino briefly "toured" the "operational center[]" where FE-12 worked *in 2019*, two years before the Class Period began. AC ¶ 272; *see Nolte*, 390 F.3d at 316 (rejecting statements by former employees where plaintiff failed to show that "management was ever informed" of their alleged concerns); *Tekelec*, 2013 WL 1192004, at *12 (similar).

Fernandez's post-hoc comments are also beside the point. *See* AC ¶ 264. No allegations suggest he had insight into Defendants' specific state of mind when the challenged statements were made. *See Kurtzman*, 2002 WL 32442832, at *7 (rejecting reliance on comments from a "successor" who was not "involved in any way with the actions at issue," as opposed to "the speaker, himself"). Recognizing as much, Plaintiff counters that "Salvino, Sharp, and Del Bene"

26

*must* have been "aware of the same [alleged] facts that Fernandez discovered" upon "assuming the role of CEO." But that just doubles down on the dispositive flaw discussed above: Plaintiff is distorting Fernandez's subjective reflections to allege "fraud by hindsight"—a pleading tactic the Fourth Circuit has repeatedly rejected. *See, e.g.*, *Triangle*, 988 F.3d at 753.

Finally, Plaintiff notes in passing that DXC reached a voluntary settlement with the SEC as to allegations that the Company "negligently misclassif[ied]" certain "expenses as TSI costs" for non-GAAP accounting and reporting purposes from "2018 until early 2020." AC ¶ 280. But an unverified allegation of "negligent[]" *accounting* practices *before* the start of the Class Period has no bearing whatsoever on whether DXC management misrepresented their *actual* integration and restructuring efforts *during* the Class Period. Ex. 21 (March 14, 2023 SEC Press Release) at 1-2. Plaintiff nowhere disputes that DXC's Class Period financial reporting was accurate. And far from suggesting anything close to bad intent, the SEC itself lauded "DXC's cooperation" and "remedial actions." *Id.* at 2. Accordingly, Plaintiff's reliance on an unrelated SEC investigation is "too speculative to add much, if anything, to an inference of scienter." *Cozzarelli*, 549 F.3d at 628 n.2. If anything, the SEC settlement cuts *against* a finding of scienter, as the bizarre scheme Plaintiff alleges would have been even more foolish following SEC scrutiny.

## C.  Competing Inferences Are Far More Compelling

The "inference that [D]efendants acted innocently" is far "more compelling than [any] inference that they acted with the requisite scienter." *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche*, 551 F.3d 305, 313 (4th Cir. 2009). The "nonculpable explanation[]" leaps off the page. *Id.* at 12. Defendants took over a "fragmented and complex company that had difficulty operating" and a "declining" revenue base. AC ¶¶ 2, 5. They faced the daunting task of integrating two corporate giants and a dozen-plus other acquired businesses, while striving to manage hundreds of millions of dollars in related annual expenses. *See id.* ¶ 3; *supra* at 3-8. Defendants did their best

27

to navigate that challenge, successfully cutting annual TSI costs by two-thirds.  *Id.* ¶¶ 133-34.

As those efforts unfolded, Defendants "endeavor[ed] in good faith to inform" investors, while (understandably) remaining upbeat about DXC's prospects.  *Yates*, 744 F.3d at 888.  And they put their money where their mouth was:  DXC spent more than *$1 billion* buying back its own stock, "taking advantage of what [it] believe[d] was an attractive valuation" of the Company.  Ex. 3 (Aug. 4, 2021 Tr.) at 8; *see* Ex. 6 (Feb. 2, 2022 Tr.) at 8; Ex. 5 (Nov. 3, 2021 Tr.) at 8, 16-17.

Later stock-price declines and Fernandez's personal assessment many months (or years) later scarcely undermine that obvious, innocent explanation for the conduct alleged here.  The stock drops coincided with a "difficult economic environment" that affected "other big players in the industry," not just DXC.  Ex. 10 (Aug. 2, 2023 Tr.) at 8, 12; *see, e.g.*, Ex. 11 (Nov. 1, 2023 Tr.) at 7-11.  And a new CEO highlighting areas for continued improvement is a tale as old as time.  Any new chief executive will reassess the status quo and bring new priorities, emphasis, and direction.  There is no strong inference of scienter.

## III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Plaintiff's claims also fail for the independent reason that the AC does not plead loss causation, which requires a specific showing that the defendant company's "share price fell significantly *after the truth became known*" as a result of later disclosures.  *Katyle*, 637 F.3d at 470 (quoting *Dura*, 544 U.S. at 347) (emphasis added); *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005) (requiring "a direct or proximate relationship between the loss and the misrepresentation" (quoting *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004)).

This lawsuit seeks to recover losses allegedly stemming from three declines in DXC's stock price: (1) a $7.97 per-share drop on August 3, 2023; (2) a $3.04 per-share drop on December 20, 2023; and (3) $3.36 per-share drop on May 17, 2024.  But a "decline in [share] price" alone is insufficient to establish loss causation.  *Katyle*, 637 F.3d at 472 (confirming a complaint "does not

28

sufficiently allege loss causation simply by stating that the security price was artificially inflated at the time of purchase, because 'an inflated purchase price will not itself constitute or proximately cause the relevant economic loss'" (quoting *Dura*, 544 U.S. at 342)). Rather, Plaintiff must allege particularized facts showing "that corrective *information* was revealed" publicly, *id.*—i.e., that "information correcting the misstatement or omission that is the basis for the action [wa]s disseminated to the market" and caused DXC's stock price to decline, 15 U.S.C. § 78u-4(e)(1). Here, Plaintiff fails to plead the revelation of any new information that "*relate[d] back to the [alleged] misrepresentation[s]*." *Katyle*, 637 F.3d at 472-73.

Start with the August 3, 2023 stock drop. The *only* corresponding disclosure alleged is that, a day prior, "DXC reported disappointing first quarter results" on "revenue growth" and "free cash flow." AC ¶ 288. But "[t]he mere announcement of disappointing earnings cannot serve as a corrective disclosure." *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 909 (D. Minn. 2011). Unaccompanied by any actual new, concrete information, DXC's "disappointing earnings" for 1Q24 were, at worst, "indicative of poor financial health"—not "fraud." *Loos v. Immersion Corp.*, 762 F.3d 880, 888 (9th Cir. 2014).[13]

Plaintiff's theory for the December 20, 2023 price decline encounters similar problems. AC ¶ 292. The "announcement of [Salvino's] resignation" cannot "in and of itself constitute a corrective disclosure." *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014).[14] It likewise revealed no concrete information

---

[13] *See, e.g.*, *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *19 (W.D. Pa. Sept. 8, 2017); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 388-9 (E.D.N.Y. 2013); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp.*, 720 F. Supp. 2d 517, 561 (D. N.J. 2010). Also, this financial data obviously cannot serve as a corrective disclosure for challenged statements made on the August 2, 2023 earnings call (or any point thereafter).

[14] *See, e.g.*, *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 861 (S.D. Tex. 2020); *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 512 (S.D.N.Y. 2009), *aff'd sub nom.*

29

contradicting any challenged statement, and thus could not have "corrected" anything Defendants previously said. *Katyle*, 637 F.3d at 478.

Finally, Plaintiff points to Fernandez's May 16, 2024 discussion of a so-called "reset" restructuring campaign under DXC's new administration. AC ¶ 297. But as explained, his subjective assessment of DXC's historical and future business strategies did not "reveal to the market" any contradictory *facts* demonstrating the supposedly "fraudulent nature of the [remarks] about which [Plaintiff] complains." *Katyle*, 637 F.3d at 473; *see supra* at 26-27. Fernandez's comments therefore cannot constitute a cognizable corrective disclosure.

## IV.     THIS CASE SHOULD BE DISMISSED WITH PREJUDICE

This case should be dismissed in its entirety—and with prejudice. Because Plaintiff has not pled a primary Section 10(b) violation, the derivative Section 20(a) claim for control-person liability fails too. *See Yates*, 744 F.3d at 894 n.8. It is also "clear that amendment would be futile in light of the fundamental deficiencies in [Plaintiff's] theory of liability." *Cozzarelli*, 549 F.3d at 630. Plaintiff *already* "amended the[] complaint[] once in the course of consolidating the various actions"—with four months after this lawsuit started to investigate their claims further— and still fell far short of pleading a viable cause of action. *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 969 (D. Md. 1995); *see Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 595 (E.D. Va. 2006). There is no need for a third bite at the apple. *See Cozzarelli*, 549 F.3d at 624 (observing Congress enacted the PSLRA to help weed out meritless securities fraud suits "early in the litigation").

## CONCLUSION

Defendants respectfully request that this case be dismissed with prejudice.

---

*Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412 (2d Cir. 2011); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009).

30

Date: January 10, 2025

Respectfully submitted,

*/s/ Stephen P. Barry*

Stephen P. Barry (Va. Bar No. 81839)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20005
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
stephen.barry@lw.com

Jamie L. Wine (admitted *pro hac vice*)
Kevin M. McDonough (admitted *pro hac vice*)
Melange T. Gavin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
jamie.wine@lw.com
kevin.mcdonough@lw.com
melange.gavin@lw.com

Nicholas Rosellini (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
nick.rosellini@lw.com

*Counsel for Defendants DXC Technology Company, Michael J. Salvino, Kenneth P. Sharp, and Robert F. Del Bene*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of January, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all registered users.

/s/ Stephen P. Barry
Stephen P. Barry