# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| In re DXC Technology Company Securities Litigation | Case No. 1:24-cv-1351-AJT-WEF<br><br>**<u>CLASS ACTION</u>** |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CORRECTED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................................1

II.   STATEMENT OF FACTS .....................................................................................3

    A.    Prior to the Class Period, DXC Faced Stagnant Growth and the Need to Integrate Numerous Acquisitions ................................................................3

    B.    Defendants Embark on DXC's Purported "Transformation Journey" ....................4

    C.    Defendants' False Assurances Regarding the Integration of DXC's Businesses .............................................................................................4

    D.    Contrary to Defendants' Statements, DXC Had Not Integrated Its Operations ..............................................................................................7

    E.    The Relevant Truth Is Gradually Revealed to the Market ....................................9

III.  LEGAL STANDARD ..........................................................................................11

IV.   ARGUMENT ......................................................................................................11

    A.    Plaintiff Adequately Alleges Material Misstatements ...........................................11

        1.    Defendants' Challenges to the Complaint's Falsity Allegations Fail ........13

        2.    The Safe Harbor Does Not Protect Defendants' Misstatements ................16

        3.    Defendants' Misstatements Are Not Mere Puffery ..................................18

        4.    Defendants' Misstatements Are Not Inactionable Opinions .....................20

    B.    Plaintiff Adequately Alleges a Strong Inference of Scienter ...............................22

        1.    Fernandez's Admissions Establish Defendants' Scienter .........................22

        2.    Numerous Additional Facts Support an Inference of Scienter ..................23

        3.    Defendants Fail to Identify Any Plausible Non-Fraudulent Inferences ...............................................................................................27

    C.    Plaintiff Adequately Pleads Loss Causation .........................................................28

V.    CONCLUSION AND LEAVE TO AMEND .................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2U, Inc. Sec. Class Action*,
  2021 WL 3418841 (D. Md. Aug. 5, 2021) ...................................................................14, 15, 17

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ..............................................................................13, 17

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) .....................................................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................................11

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ..................................................................................................15

*In re Biogen Inc. Sec. Litig.*,
  193 F. Supp. 3d 5 (D. Mass. 2016) .........................................................................................28

*Black v. Martek Biosciences Corp.*,
  2006 WL 8435572 (D. Md. June 14, 2006)............................................................................14

*Bldg. Trades Pension Fund of W. Penn. v. Insperity, Inc.*,
  2022 WL 784017 (S.D.N.Y. Mar. 15, 2022)..........................................................................28

*Boykin v. K12, Inc.*,
  54 F.4th 175 (4th Cir. 2022) ...................................................................................................17

*In re Cable & Wireless, PLC*,
  321 F. Supp. 2d 749 (E.D. Va. 2004) ................................................................................ 18-19

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
  496 F. Supp. 3d 952 (E.D. Va. 2020) .................................................................19, 22, 27, 29

*In re Cisco Sys. Inc. Sec. Litig.*,
  2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)........................................................................28

*City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*,
  552 F. Supp. 3d 406 (E.D.N.Y. 2021) ................................................................ 12, 13, 19-20

*In re Comput. Scis. Corp. Sec. Litig.*,
  890 F. Supp. 2d 650 (E.D. Va. 2012) .....................................................................................16

*Cozzarelli v. Inspire Pharms. Inc.*,
   549 F.3d 618 (4th Cir. 2008) ................................................................................26

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ..............................................................................................28

*In re DXC Technology Co. Securities Litigation*,
   2020 WL 3456129 (E.D. Va. June 2, 2020), *aff'd sub nom KBC Asset Mgmt.
   NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021) ..................................... 15-16, 23

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023), *cert. granted sub nom. NVIDIA Corp. v.
   Ohman J*, 144 S. Ct. 2655 (2024), *and cert. dismissed as improvidently
   granted*, 604 U.S. 20 (2024) ................................................................................12, 13

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) ................................................................................11

*In re Emergent BioSols. Inc. Sec. Litig.*,
   2023 WL 5671608 (D. Md. Sept. 1, 2023) .........................................................23, 27

*Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v.
   MacroGenics, Inc.*,
   61 F.4th 369 (4th Cir. 2023) ................................................................................17

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016).....................................................................27, 29

*In re EQT Corp. Sec. Litig.*,
   504 F. Supp. 3d 474 (W.D. Pa. 2020)..................................................................13

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)......................................................14

*In re First Union Corp. Sec. Litig.*,
   128 F. Supp. 2d 871 (W.D.N.C. 2001) ................................................................14

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018)..................................................................28

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)..................................................................13, 24

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................29

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) ..................................................................18, 25

iii

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019)..................................................................21

*Hedick v. Kraft Heinz Co.*,
   2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ...................................................19, 21

*Inst'l Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)..............................................................................15, 25

*Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
   432 F. Supp. 2d 571 (E.D. Va. 2006) .....................................................................16

*In re Ironnet, Inc. Sec. Litig.*,
   2023 WL 5110932 (E.D. Va. Aug. 9, 2023)........................................................17, 18

*In re James River Grp. Holdings, Ltd. Sec. Litig.*,
   2023 WL 5538218 (E.D. Va. Aug. 28, 2023).................................................. *passim*

*Jenkins v. LogicMark, LLC*,
   2017 WL 376154 (E.D. Va. Jan. 25, 2017) ............................................................11

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
   2016 WL 3981236 (D.S.C. July 25, 2016) .............................................................26

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
   19 F.4th 601 (4th Cir. 2021) ...........................................................................25, 27

*Kiken v. Lumber Liquidators Holdings, Inc.*,
   155 F. Supp. 3d 593 (E.D. Va. 2015) ..............................................24, 26, 28, 29

*Klein v. Altria Grp., Inc.*,
   525 F. Supp. 3d 638 (E.D. Va. 2021) ...............................................................22, 28

*Kurtzman v. Compaq Comput. Corp.*,
   2002 WL 32442832 (S.D. Tex. Mar. 30, 2002)......................................................23

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ................................................................... 14, 22-23

*Martin v. GNC Holdings, Inc.*,
   2017 WL 3974002 (W.D. Pa. Sept. 8, 2017)..........................................................29

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013)...................................................................................30

*McNamara v. Pre-Paid Legal Servs., Inc.*,
   189 F. App'x 702 (10th Cir. 2006) .........................................................................28

iv

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ...................................................................29

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) .............................................................23

*Ollila v. Babcock & Wilson Enters., Inc.*,
  2018 WL 792069 (W.D.N.C. Feb. 8, 2018) .................................................. *passim*

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)......................................................................................20

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
  353 F.3d 338 (4th Cir. 2003) ..........................................................................13

*Pirani v. Netflix, Inc.*,
  710 F. Supp. 3d 756 (N.D. Cal. 2024) ..............................................................28

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
  2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ........................................................19

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018).........................................................13

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)......................................................25

*In re SCANA Corp. Sec. Litig.*,
  2019 WL 1427443 (D.S.C. Mar. 29, 2019) ........................................................20

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001).......................................................................14, 23

*Schwartz v. Wellin*,
  2014 WL 12637912 (D.S.C. Aug. 14, 2014)...................................................16, 18

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) .............................................................22, 28, 30

*Sinnathurai v. Novavax, Inc.*,
  645 F. Supp. 3d 495 (D. Md. 2022).................................................................25

*Smith v. Cir. City Stores, Inc.*,
  286 F. Supp. 2d 707 (E.D. Va. 2003) ...............................................................16

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) .........................................................................26

*SS Richmond LLC v. Harrison*,
  640 F. Supp. 3d 453 (E.D. Va. 2022) ...................................................................19

*In re St. Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011)...................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................22, 26

*In re Triangle Cap. Corp. Sec. Litig.*,
  988 F.3d 743 (4th Cir. 2021) .........................................................................14, 22

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
  2017 WL 3097184 (N.D. Cal. June 22, 2017)......................................................20

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)..............................................................14, 23

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
  780 F.3d 597 (4th Cir. 2015) .....................................................................22, 27-28

## Other Authorities

Fed. R. Civ. P. 15(a)(2).............................................................................................30

## I.    PRELIMINARY STATEMENT

After years of restructuring, management changes, and stagnant growth, Defendants told DXC's frustrated investors that the worst was behind them. The Company's new CEO, Defendant Michael J. Salvino, and new CFO, Defendant Kenneth Sharp, claimed that DXC had moved through the worst of its efforts to integrate its patchwork of acquisitions and was finally ready to "***wind down restructuring***." After Sharp's departure, the new CFO, Defendant Robert Del Bene, echoed these sentiments, claiming that DXC was "tightly managing restructuring" costs.[1]

The takeaway from these statements was clear: DXC was "winding down" its restructuring and integration efforts, and it planned to reduce its restructuring-related expenses from $900 million per year in FY21 to just $100 million per year in FY24. This "winding down" would purportedly lead to positive free cash flow—a key metric for DXC—as DXC could begin to operate as one integrated company. Investors took Defendants at their word, believing that after multiple phases of restructuring, DXC finally was turning a corner and would deliver stable profits.

In truth, far from having completed its integration efforts, DXC had failed to fully integrate even its earliest acquisitions. As investors learned from DXC's new CEO Raul Fernandez on May 16, 2024, DXC still had a "***number of systems still in place that were acquired over time***" that were "***never integrated, never deduped***." In fact, contrary to Defendants' repeated representations to investors that DXC's integration and restructuring efforts had positioned the Company for sustained growth, Fernandez bluntly conceded that "***the previous restructurings did not set a . . . fully integrated baseline for profitable growth***." Further, DXC still needed a substantial "***reset***"

---

[1] Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted. Citations to "¶__" refer to the Corrected Consolidated Complaint for Violations of the Federal Securities Laws (Dkt. 65) ("Complaint"). Citations to "MTD" refer to Defendants' brief (Dkt. 67). Capitalized terms have the same meaning as in the Complaint.

from the "***bottoms up***," as it was "***really not [a] fully functional organization***." In response, analysts questioned "if this business can be fixed," and remarked that they "had seen this movie before [and] patience is thin."

Fernandez's 2024 statements on behalf of DXC admitted what was known internally at the Company throughout the Class Period. The accounts of *sixteen* former DXC employees reveal that DXC had failed to integrate its many acquisitions or legacy groups, and that the lack of integration had resulted in duplicative back-end systems, internal competition, opaque data reporting, and "mothballed" technology. Together with Fernandez's admissions, these accounts establish that Defendants knowingly or recklessly misled investors about the true state of DXC's integration, causing substantial investor losses when the relevant truth was revealed.

Defendants' arguments in favor of dismissal are unavailing. Defendants take statements of fact out of context, isolate specific words, and claim the statements are immaterial puffery. However, Defendants' misstatements were concrete claims about core aspects of DXC's business—often in direct response to pointed questions from analysts—that were closely watched by investors. Defendants' argument that the PSLRA safe harbor shields them from liability similarly fails, as each challenged statement consists of present or historical representations. Defendants' claim that several misrepresentations are subjective opinions also is unpersuasive, as each included embedded factual statements or misleadingly omitted material facts. In short, none of Defendants' challenges overcome the fact that they misrepresented and concealed material, objective facts about DXC's lack of integration, as recounted by multiple FEs and publicly confirmed by the Company's current CEO at the end of the Class Period.

Defendants' attack on scienter fares no better. Considered holistically, the Complaint raises a strong inference of scienter based on, among other allegations: (i) the consistent accounts of

2

former DXC employees who describe DXC's failure to integrate and (ii) the speed with which Fernandez recognized and admitted the glaring issues with integration and restructuring after becoming CEO—facts that would have been obvious to Defendants during the Class Period.

Finally, the Complaint sufficiently alleges loss causation through a series of corrective disclosures that gradually revealed that DXC had failed to integrate or position itself for stable revenue growth—the very facts concealed by Defendants' misstatements—as confirmed by the market's reaction to the disclosures, including contemporaneous analyst commentary.

This Court should deny Defendants' motion.

## II.    STATEMENT OF FACTS

### A. Prior to the Class Period, DXC Faced Stagnant Growth and the Need to Integrate Numerous Acquisitions

DXC provides IT and professional services worldwide. ¶¶56-57. DXC was formed in 2017 through a merger between Computer Sciences Corporation ("CSC") and HP Enterprises Services ("HP"). ¶56. From inception, DXC suffered from declining revenue and low growth, as well as "dis-synergies associated with bringing the two companies together." ¶¶67-70. In particular, DXC faced restructuring and transition, separation and integration ("TSI") expenses that negatively affected its revenues, margins, and free cash flow ("FCF"). ¶¶77-80. In response, DXC sought to expand earnings margins by: (i) integrating CSC and HP; (ii) cutting costs; and (iii) achieving growth through acquisitions. ¶¶72-75.

Between 2017 and 2018, DXC acquired eight companies. ¶81. While analysts expected these acquisitions to improve revenues, by the end of 2018, DXC's revenues continued to languish. ¶¶82-84. Then-CEO John Lawrie acknowledged that DXC had gone too far with its cost-cutting efforts and needed to prioritize revenue growth over cost reduction. ¶87. At the time, analysts were "dubious over [DXC's] long-term ability to patch together its many parts into a cohesive, single-

3

minded organization" and grow revenues. ¶¶86, 88. In 2019, DXC acquired six more companies, including the $2 billion acquisition of Luxoft. ¶90. DXC's revenue problems persisted, however, and by August 2019, analysts still questioned if DXC could "drive revenue longer term." ¶91.

### B. Defendants Embark on DXC's Purported "Transformation Journey"

In September 2019, Salvino replaced Lawrie as CEO. ¶92. Salvino stated that his focus would "be on . . . driv[ing] growth." ¶94. Analysts viewed this pivot towards growth as crucial for DXC, but remained skeptical. ¶¶96-98. For example, Wells Fargo questioned "whether DXC can actually revive organic growth without meaningfully reducing the [earnings] outlook." ¶97.

After assuming the CEO role, Salvino told investors that DXC needed to "simplify[]" its complex operating model and that "[g]oing forward, DXC will run as one company." ¶¶100-02. In November 2020, when asked for "an update" on these efforts, Salvino reported that restructuring and TSI costs "should be coming down"—an indication that DXC's longstanding integration efforts may soon be complete. ¶¶105-06. In February 2021, after Sharp took over as CFO, he similarly assured investors that DXC was focused on "stabilizing revenue, expanding margins and delivering free cash flow," as well as "reducing spend" on restructuring and TSI. ¶107. Importantly, Sharp stated that DXC would start to report "organic revenue," enabling "investors [to] better understand the underlying performance of the business." ¶108. On the same call, Salvino claimed: "[W]e're bringing the new DXC to the market and have demonstrated solid momentum in executing on our transformation journey." ¶¶109-10. Through such statements, Defendants led investors to believe that DXC had made significant strides integrating its acquisitions, generating increased organic revenue, and decreasing restructuring and TSI expenses. ¶111.

### C. Defendants' False Assurances Regarding the Integration of DXC's Businesses

Throughout the Class Period, Defendants claimed that DXC's integration efforts were progressing and that, as a result, its restructuring and TSI expenses were declining. On May 26,

2021, the first day of the Class Period, Defendants claimed that "*[o]ne of our key initiatives we are employing . . . is to wind down restructuring and TSI costs*" to $550 million in FY22 and $100 million in FY24. ¶¶112, 196. Defendants claimed this "*wind down*" would generate positive FCF of $500 million in FY22 (compared to negative $652 million in FY21), and positive FCF of $1.5 billion in FY24. ¶¶113, 196. Based on these statements, analysts believed that DXC was moving past its prior troubles and progressing on its integration efforts. ¶¶114-15. For example, Wells Fargo commented that DXC "has moved through the worst" and that resolutions of "historical issues" were "now well under way." ¶115.

During DXC's June 17, 2021 Investor Day presentation, Salvino and Sharp represented that DXC *already* had spent the necessary funds to integrate its businesses. ¶¶123-24. Specifically, Salvino stated that his management team was focused on "making sure *that any integration that we've done*" is "*done [i]n the appropriate way and move on from there*." ¶¶123, 201. Sharp agreed, explaining that DXC had "*[gone] through and evaluat[ed] and end[ed] those projects . . . shutting them down, getting them completed, and getting the right results*." *Id.*

On August 4, 2021, Defendants again affirmed that DXC was "*wind[ing] down restructuring [and] TSI costs*." ¶¶125-26, 206. On November 3, 2021, Sharp assured investors that DXC was "*on track*" to reduce restructuring and TSI expenses to $100 million by FY24 and that "*shrinking restructuring and TSI costs . . . and stronger free cash flow are all sustainable and a result of the operational work we are doing*." ¶¶129, 214. In February 2022, following purportedly "*particularly strong progress with . . . continued reduction of [r]estructuring and TSI expense[s]*," DXC revised its restructuring and TSI expenses guidance to just $400 million for FY22. ¶¶133, 221. Sharp again confirmed that DXC had "*taken significant strides*" to shift its focus to "*the normal performance of the business*," i.e., post-integration operations. ¶¶133, 222.

Analysts noted that the resulting rise in FCF was "well ahead of expectations." ¶133.

Subsequently, in May 2022, DXC reported $300 million in restructuring and TSI expenses for FY22 ($100 million less than its revised guidance) and $743 million in FCF (compared to guidance of $500 million). ¶134. When asked how DXC planned on creating $1.5 billion in FCF, Sharp stated that "a couple hundred million dollars" would come from removing *further* "restructuring and TSI expense that [was] impact[ing] cash flow." *Id.*

On June 2, 2022, Sharp stated that DXC was trying to "***sort our way through***" the restructuring and TSI expenses, "***tackling that***" and "***shutting it down***." ¶¶135, 231. Sharp touted "***a lot of opportunity in . . . continuing [to] driv[e] the business together, drive . . . a unified face to the customer and make sure we're leveraging our accounts***." ¶¶136, 232. On November 3, 2022, Sharp stated that DXC continued to "***tightly manage***" its restructuring and TSI expenses— a claim that Defendants repeated in subsequent earnings calls. ¶¶137, 236.[2]

Notably, on February 1, 2023, Salvino claimed DXC had reached an "inflection point" in its transformation. ¶138. Sharp stated that Defendants had to "***do[] a lot of work . . . . across the entire business***" and had reduced restructuring and TSI costs to generate "***2 years in a row of positive cash flow over $600 million***." ¶¶139, 241. According to Sharp, "***[t]he biggest driver***" of DXC's improved cash flows "***has been the focus on driving down the restructuring [and] TSI [costs]***." *Id.* Based on these statements, analysts commented that "there is continued evidence of progress on [DXC's] transformation plan." ¶141. Defendants repeated these assurances in subsequent earnings calls, leading analysts to believe the Company had finally overcome its prior challenges and was positioned for growth. *See, e.g.*, ¶¶142, 246 (on May 18, 2023, Defendants claimed they "***continue to tightly manage restructuring and TSI expense***" and had "fixed many

---

[2] *See* ¶240 (February 1, 2023 Call); ¶256 (November 1, 2023 Call).

of the challenges at DXC"); ¶143 (analysts commenting that "forward progress on the turnaround continues" and that "DXC has made **substantial progress** repositioning the business to grow").

### D.  Contrary to Defendants' Statements, DXC Had Not Integrated Its Operations

As detailed by sixteen former employees[3] and admitted by the current CEO in May 2024, DXC's statements were untrue: DXC had not integrated its operations and instead remained a "hodgepodge" of duplicative and internally competitive systems throughout the Class Period. ¶¶39-55, 144-74, 189-92; *see, e.g.*, ¶145 (FE-1: lack of integration plan was common knowledge, including among upper management); ¶148 (FE-2: DXC did not want to integrate because it was expensive); ¶150 (FE-3: DXC unwilling to spend to consolidate financial tools); ¶155 (FE-6: describing lack of integration investment); ¶174 (FE-8: DXC was a "hodgepodge" of acquisitions).

In fact, throughout the Class Period, the remnants of CSC and HP were still running as two separate entities. *See, e.g.*, ¶145 (FE-1: DXC had not integrated CSC and HP); ¶157 (FE-7: following 2017 merger, CSC and HP employees operated as distinct teams with disparate workflows); ¶163 (FE-10: in 2021, HP and CSC utilized different payroll systems); *see also* ¶164 (FE-15: HR activities segmented). Even **five years** after the 2017 merger, CSC and HP were referred to internally as "Team Green" and "Team Red"—as Salvino himself referred to the two unintegrated factions during an internal conference in spring 2022. ¶157.

The lack of integration led to segregated workflows and inefficiencies, among other problems. *See, e.g.*, ¶¶145, 157. For example, DXC never unified its CRM system, Salesforce, to track and forecast sales. FE-7 reported that HP and CSC used Salesforce in completely different ways. ¶157; *see also* ¶161 (FE-9: as of August 2023, no integration of back-end systems from original merger). According to FE-15 and FE-16, this lack of integration resulted in an inefficient

---

[3] FE-5, whose account occupied two paragraphs, ¶¶43, 153, did not "retract" his account. MTD at 21. Plaintiff removed these allegations because FE-5 did not want to participate in this action.

and inaccurate process of manually inputting sales data to report to executives monthly. ¶¶158-59. Salvino was well aware of these issues, as he had weekly standing meetings to discuss the manually reported metrics such as portfolio tracking, in-year sales, and revenue per account. ¶158.

The FEs also detailed the lack of integration of significant acquisitions, including Luxoft, Argodesign, and Virtual Clarity, which each operated as separate entities. *See* ¶¶155, 165-66. For example, Luxoft employees had their own systems, non-DXC email addresses, sales teams, clients, and HR departments, and maintained their own resource and cost planning, payroll, and revenue reporting systems (that DXC employees could not access). *See* ¶¶151-55 (accounts of FE-3, FE-4, FE-6, and FE-17). Luxoft even had different "rate cards," leading to customers being quoted different rates when hiring DXC versus Luxoft developers. ¶152. This lack of integration slowed down operational tasks, like sharing sales data. ¶¶154, 165. Further, cross-selling Luxoft solutions to existing customers was challenging as Luxoft refused to be associated with DXC. ¶165.

The same held true for Argodesign, acquired by DXC in 2018, which kept its brand identity and clients separate, fearing that association with DXC would negatively impact its brand. *See, e.g.*, ¶¶155-56. The lack of integration was so prominent that Argodesign employees eventually stopped attending DXC-led meetings. ¶156. Argodesign even refused to participate in DXC-led deals unless Argodesign directly received the revenue plus half of a $250,000 consulting fee. ¶166.

DXC's lack of integration led it to "mothball" acquired technology, quietly letting it fade (by no longer servicing it) to the detriment of its clients. *See* ¶¶169-71. FE-12 described how this practice impacted two significant clients—American Airlines and Boeing—resulting in a significant loss of revenue. *Id.* FE-2 similarly described how DXC closed certain data sites with limited customer notice. ¶149. The lack of integration was so extreme that there were instances of internal competition between DXC business units for the same accounts. *See* ¶148.

Compounding the Company's failure to integrate, DXC engaged in indiscriminate cost-cutting at acquired companies, including aggressive workforce reductions. *See* ¶174 (FE-13: DXC implemented 2,000 workforce reductions in 2021, generating $100 million in cost-savings); ¶¶146-47 (FE-1: DXC kept "house of cards" afloat through layoffs, and in mid-2023, frequent layoffs took place to get into the "black" financially, leaving no qualified personnel); ¶149 (FE-2: DXC fired experienced sales personnel with established customer relationships). As part of this process, DXC outsourced jobs to overseas employees to cut costs. ¶174; *see also* ¶162. In 2021-2022, DXC implemented a "Green to Yellow Strategy," which entailed allowing client service to fall just short of failure and resulted in constant customer complaints. *See* ¶¶172-73. As part of this strategy, Salvino received monthly key performance indicator reports, showing which accounts were green (agreements being met), yellow (at risk), and pink (failure to meet contract terms); thus, he was well aware of the negative impact of these cost-cutting measures. ¶172.

### E.  The Relevant Truth Is Gradually Revealed to the Market

DXC's lack of integration and need for continued spending on restructuring and TSI was gradually revealed to investors beginning in May 2023. On May 18, 2023, DXC announced that Sharp was resigning as CFO, raising "incremental concern" among analysts about DXC's status. ¶175. Shortly after, on August 2, 2023, DXC reported a decline in organic revenue from one of its two main segments and negative FCF of $75 million for 1Q24, and significantly reduced its FY24 organic revenue and FCF guidance. ¶176. DXC's common stock fell 29.44% as a result of this disclosure. ¶¶176, 288. Analysts reacted with shock, calling the disclosure a "[s]urprising [s]tep [b]ack" and noting that "*all legs of the [investment] thesis are undercut*." ¶¶178, 289.

Despite these disclosures, Salvino and Defendant Del Bene, the new CFO, reassured investors, claiming that they "*have made improvements in both leadership and our operating model to grow our company*" and were "*managing areas that we can control very well, like free*

*cash flow and restructuring [and] TSI*." ¶¶180-82, 250-52. Defendants issued similar reassurances on November 1, 2023. *See* ¶¶184-86, 256-58 (Del Bene: "*We are tightly managing restructuring, and we'll continue to evaluate opportunities to streamline our operations*").

On the heels of these assurances, on December 20, 2023, DXC announced that Salvino was stepping down as CEO, effective immediately, and reaffirmed its FY24 guidance, but *only* as to FCF, signaling that its revenue guidance now was unattainable. ¶¶187, 292. On this news, DXC's common stock dropped 12.15%. ¶¶187, 293. Again, analysts sounded the alarm. *See* ¶¶188, 294 (TD Cowen: "[t]he surprise move is apt to raise Street concerns & comes ~7 months after a CFO departure" and "suggest[s] other aspects of the full-year guide (Mar-24) may be at risk").

In February 2024, DXC announced that Fernandez would succeed Salvino as CEO. ¶188. Then, on May 16, 2024, DXC disclosed that revenues declined 5.3% in FY24, reported a disappointing $756 million in FCF, and announced lower-than-expected guidance for FY25, including FCF of only $400 million. ¶189. Further, DXC announced it was "*undertaking a restructuring initiative aimed at simplifying and enhancing our operational efficiency*." ¶297.

During the May 16, 2024 earnings call, Fernandez admitted what Defendants had concealed throughout the Class Period: "*the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth*," due to the "*number of systems still in place that were acquired over time, never integrated, never deduped*; *number of business processes that got stacked on top of each other*." ¶¶189-90, 299. Fernandez admitted that a "*bottoms up*" "*real reset*" was "absolutely needed" because "*we just continue to carry a really not fully functional organization*." *Id.* Fernandez further admitted that "[w]e've got [to] *dedupe, streamline and do some work that should have been done before that wasn't*." ¶¶191, 297.

Following these disclosures, the price of DXC's common stock declined 16.90%. ¶192.

The market was shocked by these revelations, including the fact that DXC needed yet another "reset." *See, e.g.*, ¶195 (Guggenheim: DXC's FY25 outlook "represents the [C]ompany's third attempt at steering this ship in the proper direction"); *id.* (RBC: "one has to ask the question as to if this business can be fixed."); *see also* ¶190 (Deutsche Bank: "[i]t seems like every five years or so, a CEO comes in, looks at the business and restructures it.").

## III.  LEGAL STANDARD

In resolving a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). The court many not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Jenkins v. LogicMark, LLC*, 2017 WL 376154, at *2 (E.D. Va. Jan. 25, 2017). To withstand a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## IV.  ARGUMENT

### A.  Plaintiff Adequately Alleges Material Misstatements

Throughout the Class Period, Defendants repeatedly touted DXC's purported progress integrating its acquisitions, claiming they were "wind[ing] down restructuring and TSI costs," "shutting . . . down" and "complet[ing]" integration projects, resulting in increased FCF. ¶¶113, 123, 196, 201, 206. Investors reasonably took from these statements that DXC was lowering its restructuring and TSI costs and increasing FCF *because* it had successfully integrated its acquisitions, and was ready to operate as one DXC. *See* ¶¶113-15, 118-22, 128, 133, 141, 143.

In truth, as Fernandez later publicly admitted, DXC still needed a "bottoms up" "***reset***," was not a "***fully functional organization***," and had a "number of systems still in place that were acquired over time, ***never integrated***, ***never deduped***." ¶190. These admissions directly contradict

11

Defendants' statements during the Class Period that the "stabilization phase" was "over" and DXC was positioned for "sustainable" FCF growth. ¶¶190, 210, 214, 252. *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 942 (9th Cir. 2023), *cert. granted sub nom. NVIDIA Corp. v. Ohman J*, 144 S. Ct. 2655 (2024), *and cert. dismissed as improvidently granted*, 604 U.S. 20 (2024) (falsity pled based on defendant's admissions) (citing *Reese v. Malone*, 747 F.3d 557, 573 (9th Cir. 2014) ("admissions that [are] inconsistent with previous public statements [are] sufficient to support allegations of falsity")); *City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*, 552 F. Supp. 3d 406, 415-17 (E.D.N.Y. 2021) (falsity pled where "[CEO] repeatedly assured investors that these critical integration processes had been successfully completed, while his successor, months later, acknowledged that no integration had taken place").

Consistent with Fernandez's admissions, the accounts of **sixteen** FEs with direct knowledge of DXC's operations establish that DXC failed to meaningfully integrate its acquisitions, including the 2017 CSC and HP merger. ¶¶145-74; *supra* at 7-9. This lack of integration was compounded by DXC's aggressive cost-cutting, leading to internal competition, inefficient manual processes, customer complaints, and revenue losses from "mothballed" technology. *Id.* The FEs' contemporaneous accounts likewise describe "then-existing material facts that contradicted" Defendants' statements. *Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *4 (W.D.N.C. Feb. 8, 2018). Together with Fernandez's admissions, these facts show that, contrary to Defendants' statements, DXC's reductions in restructuring and TSI expenses were not the result of successful integration, but rather a deliberate decision not to integrate. ¶214. Defendants' suggestion that DXC's supposed success in reducing TSI expenses proves the truth of their statements (MTD at 19) impermissibly disregards Plaintiff's allegations.

12

Numerous courts have sustained similar allegations. *See, e.g.*, *City of Hollywood*, 552 F. Supp. 3d at 415-17 (statement that company "successfully completed integration" false where former employee accounts and new CEO's admissions established that integration was in a "woeful state"); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 488-500 (W.D. Pa. 2020) (statements about "synergies" false where acquisition led to "significant operational and financial issues"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 292, 298-300 (S.D.N.Y. 2018) (statements about "meaningful progress" on integration false based on undisclosed "negative impact stemming from the integration activities"); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at \*13-14 (D.N.J. July 27, 2018) (statements about integration "milestones" false where company omitted "known impediments to successful integration"); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 816-17 (N.D. Ill. 2017) (statement that company was "on track with our plans to fully integrate" false based on undisclosed integration problems); *see also Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) ("positive comments" regarding integration were misleading where defendants failed to disclose negative effects of acquisition).

The market's reaction when DXC disclosed that it needed to "reset" its restructuring efforts further confirms that investors were misled. ¶301 (TD Cowen: "clearly a heavy lift is required"; JPMorgan: "stock tolerance for yet another restructuring effort . . . is likely low."); ¶302 (RBC: questioning "if this business can be fixed"); *see In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("market reaction . . . support[ed] the materiality of the misleading omission"); *NVIDIA*, 81 F.4th at 937 ("The response of investors and analysts . . . make clear that [defendants'] statements . . . were materially false and misleading").

### 1.    Defendants' Challenges to the Complaint's Falsity Allegations Fail

Defendants' arguments fail to overcome the Complaint's well-pled allegations. Defendants mischaracterize Fernandez's admissions as "fraud by hindsight." MTD at 22. However, Fernandez

13

did not reveal a newly emerging lack of integration; he revealed the true state of affairs that existed *during* the Class Period by admitting that the businesses Defendants claimed to have integrated were, in fact, "*never integrated*." ¶190; *see Ollila*, 2018 WL 792069, at *4 (no "fraud by hindsight" where defendants misrepresented "then-existing material facts"); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 180-81 (S.D.N.Y. 2003) (post-class period revelations established an "existing liquidity problem" during the class period); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (post-class period allegations "identified specific facts known to the defendants that had been omitted"); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) ("post-class period data" can show "what a defendant knew or should have known during the class period"). The contemporaneous accounts of the FEs further establish that Defendants' claim of fraud by hindsight is baseless. *See Lormand*, 565 F.3d at 254 (no fraud by hindsight where "contemporaneous documents and post-period admissions both consistently tell the same story").[4]

Defendants' attacks on the FE allegations are similarly misguided. The *sixteen* FEs do not speak to "isolated issues." MTD at 20. They consistently describe a company-wide internal reality that contradicted Defendants' public statements. *See In re 2U, Inc. Sec. Class Action,* 2021 WL 3418841, at *12 (D. Md. Aug. 5, 2021) (crediting FE accounts that "reinforce[d] one another"); *see also Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *5 n.13 (D. Md. June 14, 2006) ("interlocking and corroborating accounts add support to the reliability of the statements"). Further, the FE accounts are not merely "subjective criticisms" (MTD at 19-20). The FEs relay

---

[4] Defendants' cases (MTD at 22) are inapposite. *See In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 753 (4th Cir. 2021) (post-class period statements reflected mere "buyer's remorse"); *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *22 (N.D. Cal. Mar. 21, 2018) (new CEO's statements did "not speak to whether [defendant's] statements were false"); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 888 (W.D.N.C. 2001) (post-class period statements "contain no suggestion" that earlier statements were false).

*objective* facts based on their first-hand experience with DXC's lack of integration. *See, e.g.*, ¶¶163-64 (FE-10 and FE-15: HP and CSC back-end systems and HR functions not integrated); ¶152 (FE-4: customers quoted different rates for DXC versus Luxoft developers); ¶¶156, 165 (FE-16, FE-10: Argodesign and Luxoft employees did not attend DXC-led meetings).[5]

Defendants' suggestion that the Court should ignore the FE accounts because none were close enough to the Individual Defendants (MTD at 21) is incorrect. Even "relatively low-level former employees" can provide facts that establish falsity. *Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 265 (3d Cir. 2009); *see Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (falsity pled based on accounts of non-managerial employees because "any number of company employees would be in a position" to observe "the very obvious effect[s]" of the fraud). In any event, several FEs provided information directly implicating Defendants. *See* ¶157 (FE-7 described 2022 meeting where Salvino discussed continued need to integrate legacy HP and CSC employees); ¶272 (FE-12 attended meeting with Salvino where lack of integration was discussed); ¶168 (FE-11 described budgets for acquired companies set by Salvino and Sharp); *2U*, 2021 WL 3418841, at *12 (falsity pled where former employees "had specific knowledge that [defendants] were aware of [undisclosed facts] and had concerns about them").

Finally, the Complaint's allegations cannot be reduced to mere "internal corporate mismanagement" (MTD at 20), as in Defendants' cases. For example, in *In re DXC Technology Co. Securities Litigation*, the former employees merely critiqued "[c]haotic" and "[s]ub-[o]ptimal" termination decisions and relayed "disagree[ments] with managers' courses of conduct." 2020 WL

---

[5] Defendants also claim that "[n]othing in the [Complaint] suggests that Defendants were not focused on reducing costs or continuing to work on integrating and restructuring the Company" MTD at 19. But once again, this ignores the Complaint's core allegation that, contrary to Defendants' statements, DXC did not take any meaningful steps to integrate its acquired businesses during the Class Period. ¶¶144-74, 189-92; *supra* at 7-11.

3456129, at *11 & n.8 (E.D. Va. June 2, 2020), *aff'd sub nom. KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021). Here, the Complaint details specific, undisclosed facts demonstrating that Defendants' statements about integration and restructuring were objectively false, as confirmed by the consistent FE accounts and by DXC's own admissions (via its new CEO) about the true state of DXC's integration efforts at the end of the Class Period.[6]

### 2.    The Safe Harbor Does Not Protect Defendants' Misstatements

Defendants claim that a "slew" of misstatements alleged in the Complaint are "forward-looking" and thus protected by the PSLRA safe harbor. MTD at 14-15.[7] But they are wrong because each alleged false statement consists of present or historical facts, and the law is clear that the safe harbor "does not extend to assertions of present fact." *In re James River Grp. Holdings, Ltd. Sec. Litig.*, 2023 WL 5538218, at *14 (E.D. Va. Aug. 28, 2023); *see In re Comput. Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 668 n. 21 (E.D. Va. 2012) ("mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present").

For example, Sharp's statement, "***we've been going through and evaluating and ending***

---

[6] Defendants' other cases (MTD 20) are similarly distinguishable. *See Smith v. Cir. City Stores, Inc.*, 286 F. Supp. 2d 707, 715 (E.D. Va. 2003) (optimistic projections proved incorrect); *Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 585-86 (E.D. Va. 2006) (company not required to "accuse itself of wrongdoing"). Unlike these cases, Plaintiff alleges that what Defendants **said** about the **current** state of DXC's integration efforts was untrue.

[7] Defendants argue ten statements are forward-looking, *see* ¶¶196, 201, 205, 210, 222, 231, 250-52, 257, and reference six additional statements in their Appendix A. Dkt. 67-1; *see* ¶¶206, 213, 215, 220-21, 256. Defendants' conclusory Appendix-based arguments should be disregarded. *See Schwartz v. Wellin*, 2014 WL 12637912, at *3 (D.S.C. Aug. 14, 2014) ("perfunctory and undeveloped arguments . . . are waived"). Even if considered, these arguments challenge language that is not alleged as false, *see* Dkt. 67-1 at 9, 11 ("on track" and "second half of the year" (¶¶213, 215)), or that is plainly retrospective, *id.* at 12 ("***This quarter, we made particularly strong progress with cash generation and continued reduction of Restructuring and TSI expense.***" (¶221)). Further, Defendants' "Theory of Falsity" consistently omits the complete reasons for falsity alleged in the Complaint. *See* Dkt. 67-1 (omitting allegations in ¶¶199, 204, 209, 212, 218, 225, 230, 234, 239, 244, 249, 254, 260). Defendants concede that eight statements are not forward-looking. *See* ¶¶214, 227, 232, 236, 240-41, 246, 258.

*those [restructuring] projects and shutting them down, getting them completed*" describes steps DXC had purportedly taken to complete restructuring projects. ¶201. Salvino's statement that "***First phase is over, that's the stabilization phase*** . . . . *[s]o now we're building the foundation for growth*" misrepresents that DXC had stabilized its many acquisitions, integrated effectively, and was now positioned for sustainable growth. ¶210. The other statements contain similar present or historical representations. *See, e.g.*, ¶196 ("***[o]ne of our key initiatives we are employing*** . . . ***is to wind down restructuring and TSI costs***"); ¶201 ("***the focus there is around making sure that any integration that we've done*** . . . ***it's done [i]n the appropriate way and move on from there***"); ¶252 ("***We're more focused on just operational discipline and getting to the right levels*** . . . ."). Such statements are not forward-looking. *See 2U*, 2021 WL 3418841, at *14, *18 (statement that "we now have high visibility into how we believe the 2018 cohort will scale" was present statement of fact); *Akorn*, 240 F. Supp. 3d at 818 (statement that "[w]e have some residual integration left on one of the acquisitions" "plainly made representations about current facts").[8]

Even if any of Defendants' misstatements could be considered forward-looking, they are actionable because: (i) they were not accompanied by meaningful cautionary language and (ii) as discussed below (*infra* at 22-28), Defendants had actual knowledge their statements were false or misleading. *See In re Ironnet, Inc. Sec. Litig.*, 2023 WL 5110932, at *7 (E.D. Va. Aug. 9, 2023). ‼

---

[8] Defendants' cases (MTD at 14-15) involved statements that were forward-looking when "read as a whole." *Boykin v. K12, Inc.*, 54 F.4th 175, 180, 184 (4th Cir. 2022) (statement that "'core competency' in online learning . . . 'positions us well given how the education market is likely to change'" forward-looking); *accord Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 389 (4th Cir. 2023) (statement used "anticipate," which "has a forward-looking definition"). "[T]he challenged statements here do not merely concern present-tense phrasing of solely future-focused projections." *James River*, 2023 WL 5538218, at *15 (distinguishing *Boykin*, 54 F.4th at 184); *see, e.g.*, ¶257 ("***And last year, they were very successful in achieving the cost reduction goals this year. We're on track with our cost reduction goals*** . . . ."); ¶222 ("***we have taken significant strides***" to "***embed these types of [restructuring and TSI] expenses over time into the normal performance of the business***").

17

Warning investors about "potential risks" while "contemporaneously concealing that those serious risks were dangerously close to materializing" is not "meaningful cautionary language." *Id.* at *8. Here, in 2021, Defendants warned that they "***might*** be unable to achieve the expected benefits of our restructuring plans" and that their "restructuring ***may*** adversely affect [DXC's] business" (MTD at 16), while, at the same time, concealing that those risks already had come to pass. *See, e.g.*, ¶155 (in 2021, Luxoft still using former brand name); ¶¶163-64 (in 2021, CSC and HP back-end systems unintegrated). In the May 26, 2022 10-K, Defendants similarly warned that restructuring ***might*** cause inefficiencies and significant costs (MTD at 16), when restructuring already had led to significant inefficiency and the need for significantly increased integration spending. *See, e.g.*, ¶145, 157-58.[9] These undisclosed facts rendered Defendants' purported cautions—which they repeated year after year (MTD at 16)—meaningless. *See Ironnet*, 2023 WL 5110932, at *8; *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 789-90 (E.D. Va. 2015) (cautionary language based on "stale" data not meaningful where risks have already materialized). At a minimum, there is "a question of fact about whether [Defendants'] cautionary language qualified as meaningful." *James River*, 2023 WL 5538218, at *17.

### 3.    Defendants' Misstatements Are Not Mere Puffery

Defendants argue that certain words and phrases plucked from Defendants' misstatements are immaterial "puffery" (MTD at 11-14).[10] A statement of puffery is one which is "so vague . . . that no reasonable investor could find [it] important to the total mix of information available." *In*

---

[9] As Defendants concede (MTD at 16 n.11), their other statements simply incorporated these generic risk disclosures by reference and did not provide any more specific cautionary language.

[10] Defendants challenge twenty statements as puffery, *see* ¶¶196, 201, 205-06, 210, 213, 215, 221-22, 227, 231-32, 236, 240-41, 250, 252, 256-58, and cite three other statements in their Appendix A. *See* ¶¶214, 220, 246. The Court should not consider any undeveloped arguments. *Schwartz*, 2014 WL 12637912, at *3. Defendants do not challenge ¶251 as puffery.

*re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 766-67 (E.D. Va. 2004). This inquiry cannot be decided in a vacuum and requires analyzing context. *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 964 (E.D. Va. 2020); *SS Richmond LLC v. Harrison*, 640 F. Supp. 3d 453, 475-76 (E.D. Va. 2022) (statement that project was "shovel-ready" not puffery in context).

Defendants isolate particular words and say they are immaterial. *See, e.g.*, MTD at 12 (challenging "focus," but omitting context: "the focus there is around making sure that any integration that we've done . . . it's done [i]n the appropriate way and move on from there" (¶201)); MTD at 12 (challenging, "[w]e're running a very structured playbook," without context: "First phase is over, that's the stabilization phase." (¶210)). In context, Defendants' statements were "concrete, present-tense" claims about aspects of DXC's business—integrating acquisitions and increasing FCF—that were critical to analyst assessments. *SS Richmond*, 640 F. Supp. 3d at 476; *see, e.g.*, ¶80 (Cowen: "[e]xecution on cash flow generation is a key pillar of the investment thesis and a metric that is clearly moving in the right direction"); ¶141 (RBC: "[t]ransformation journey continues with stability . . . coming to fruition."). These "analyst reports show that sophisticated investors did in fact consider these representations significant." *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *2 (N.D. Ill. Feb. 12, 2018) (statements that integration was "good," "great," and had made "great progress" not puffery).[11]

Moreover, each of the challenged statements misrepresented a "provable fact," *i.e.*, the purported progress of integration and restructuring and reasons for DXC's improved FCF. *SS Richmond*, 640 F. Supp. 3d at 476; *see City of Hollywood*, 552 F. Supp. 3d at 416 (statements that

---

[11] Many statements were in direct response to analyst questions, demonstrating their materiality. *See* ¶¶201, 210, 215, 231, 241, 251-52, 257-58; *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *10 (N.D. Ill. Aug. 11, 2021) (statements not puffery when "in response to questions from analysts"); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (same).

"suggest that the company had successfully completed integration of the sales force . . . represent concrete, factual representations . . . that the integration of the sales force had been completed"). For example, Sharp described Defendants' "good work" increasing FCF while claiming that "[t]he biggest driver . . . has been the focus on driving down the restructuring [and] TSI." ¶241. In 2023, Del Bene attributed DXC's FCF performance to "significant cost reduction activities" and "operational discipline." ¶¶252, 257. Such "objectively verifiable statements of fact" are not puffery. *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019).

Additionally, as discussed above (*supra* at 7-11), Defendants' statements concealed known problems with DXC's integration, rendering them misleading in context. *See Ollila*, 2018 WL 792069, at *5 (statements on "isolated issue[s]" not puffery where defendants failed to disclose broader issues); *Union Asset Mgmt. Holding AG v. SanDisk LLC*, 2017 WL 3097184, at *1-2 (N.D. Cal. June 22, 2017) (statements that integration was "going quite well" and had made "strong progress" created misleading impression because company had "difficulty integrating").

#### 4. Defendants' Misstatements Are Not Inactionable Opinions

Defendants challenge six statements as inactionable opinions. MTD at 17-18; *see* ¶¶201, 213, 222, 231-32, 258.[12] However, each statement is actionable because it: (i) contains untrue "embedded statements of fact[s]"; (ii) "omits material facts" that "conflict with what a reasonable investor . . . would take from the statement"; or (iii) was not "sincerely held." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-85, 189 (2015).

Defendants concede (MTD 18) that at least one challenged statement contains embedded facts. *See* ¶231 (claiming that Defendants were "***sort[ing] our way through [restructuring and TSI] and certainly shutting it down***" and that "***we've got about $300 million or more cash***

---

[12] Defendants challenge three other statements in Appendix A. *See* ¶¶215, 251-52. For the reasons above, the Court should not consider these undeveloped arguments.

20

*improvement that will come out of that*"). As Fernandez admitted and multiple FEs relayed, DXC was not generating FCF by "shutting . . . down" integration steps, but by failing to do this work. Other statements similarly contain embedded factual statements that were belied by the internal reality. *See, e.g.*, ¶213 ("***A key driver of improving cash flow is to continue to reduce our restructuring and TSI spend***"); *Hedick*, 2021 WL 3566602, at *9 (statement that ability to grow earnings "driven by. . . integration savings" contains "embedded or implicit statements of fact").

Defendants' other statements all misleadingly omitted that DXC had "***never integrated, never deduped***." ¶¶189-91. These "omitted irreconcilable, material facts" render Defendants' supposed opinions actionable. *James River*, 2023 WL 5538218, at *8. For example, Sharp's statement "we've been drilling into [restructuring and TSI expenses]. I do think we'll have a good outcome" (¶201), omitted that DXC's reported reduction of restructuring and TSI expenses was illusory, as Fernandez admitted. Sharp's statement that Defendants were "***continuing driving the business together, drive kind of a unified face to the customer and make sure we're leveraging our accounts***," ¶232, omitted that DXC had failed to unify duplicative systems and suffered from internal competition. ¶¶145-74. Further, Salvino's statement that FCF performance was the "catalyst that we're giving to the market," ¶258, omitted that FCF growth was not sustainable due to the failure to integrate. *See Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 844 (S.D.N.Y. 2019) (statement that integration was "running very smoothly" misleading where company underinvested in integration). Analyst commentary confirms that such factual misrepresentations misled investors. *See* ¶202 (J.P. Morgan: "DXC never better positioned"); *id.* (BMO: "greater confidence in DXC realizing its plan").[13]

---

[13] As discussed below (*infra* at 22-28), Defendants' purported "opinions could not have been sincerely held given [D]efendants' contemporaneous knowledge of problems" surrounding DXC's integration efforts. *Ollila*, 2018 WL 792069, at *6.

### B.    Plaintiff Adequately Alleges a Strong Inference of Scienter

In assessing scienter, the court must consider "all of the facts alleged, taken collectively . . . not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "The inference . . . need not be irrefutable." *Id*. at 324. "Allegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss." *Singer v. Reali*, 883 F.3d 425, 443 (4th Cir. 2018). Contrary to Defendants' arguments (MTD at 23-24), a financial motive is not required. *See Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 666 (E.D. Va. 2021) ("absence of a motive allegation is not fatal"); *see Jeld-Wen*, 496 F. Supp. 3d at 966 (motive "not required"); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("unusual stock sales are not required").[14]

Considered holistically, the Complaint pleads a strong inference of scienter. Contrary to Defendants' statements that DXC had successfully integrated its acquisitions, they knew the Company remained a fragmented collection of competing business units operating on duplicative systems—a fact so apparent that DXC's incoming CEO was forced to publicly admit it soon after taking the helm. The consistent accounts of sixteen FEs with first-hand knowledge of DXC's failure to integrate, Defendants' direct involvement in DXC's operations and repeated statements regarding the purported progress of integration, and the abrupt departures of both Salvino and Sharp just before the truth emerged (among other allegations) further strengthen this inference.

### 1.    Fernandez's Admissions Establish Defendants' Scienter

The dramatic inconsistency between Defendants' repeated statements and Fernandez's sudden admissions readily establishes Defendants' scienter. *See Lormand*, 565 F.3d at 254 (scienter pled where post-class period admissions "directly and cogently tend to prove

---

[14] Defendants' cited cases (MTD 24) merely hold that if motive is pled, it must be sufficiently pled. *See, e.g.*, *Triangle Cap.*, 988 F.3d at 752 ("absence of a motive allegation is not fatal").

22

[defendants'] state-of-mind at the time of their misleading statements and omissions"); *In re Emergent BioSols. Inc. Sec. Litig.*, 2023 WL 5671608, at *24 (D. Md. Sept. 1, 2023) ("later admission" by CEO supported scienter); *Scholastic*, 252 F.3d at 73 (post-class period data may show "what a defendant knew or should have known during the class period"). Defendants dismiss these admissions as "subjective reflections" about "areas for continued improvement." MTD at 26-28. Not so. Fernandez spoke on behalf of DXC and disclosed the objective fact that DXC had "***never integrated, never deduped***" its acquisitions. ¶¶189-92.[15]

The speed with which Fernandez made these admissions—within just ***three months*** of assuming the role—also is highly probative, as it demonstrates the obviousness of the undisclosed lack of integration Defendants concealed during the Class Period. ¶264; *see In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("the fact that the new CEO . . . discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious"). The notion that Defendants, who led the Company for years, did not know about DXC's failure to integrate is implausible when Fernandez discerned it in a few months. To hold otherwise would improperly reward Defendants for concealing their fraud. *See Vivendi*, 381 F. Supp. 2d at 181 (declining to "reward [defendants] for their successful concealment of their wrongdoing" which "did not come to light until those in control of Vivendi resigned").

### 2.    Numerous Additional Facts Support an Inference of Scienter

The Complaint alleges numerous additional facts showing that Defendants knew or "had access to information" contradicting their public statements, further supporting a strong inference

---

[15] The "vague" post class period statements about the company's "mistakes" in *Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *7 (S.D. Tex. Mar. 30, 2002), are not comparable to the specific admissions here, which directly contradict Defendants' statements. *See* MTD at 26. For this reason, they are also unlike the "conclusory allegations" about defendants' admissions the court found insufficient in *DXC*, 2020 WL 3456129, at *7.

23

of scienter. *Ollila*, 2018 WL 792069, at \*3. *First*, the accounts of sixteen FEs describe DXC's company-wide failure to integrate its acquisitions and detail Defendants' personal knowledge of this reality. ¶¶144-74; 272-76. For example, FE-7 recalled that during a 2022 conference, Salvino stated that Team Green (HP) and Team Red (CSC) needed to integrate into Team Purple (DXC). ¶¶157, 272; *see also* ¶272 (FE-12 attended a meeting in 2019 with Salvino where employees discussed integration problems such as internal competition). Courts have inferred scienter based on similar allegations. *See Galestan*, 348 F. Supp. 3d at 301 (scienter pled where complaint described defendants' attendance at "meetings . . . during which integration-related issues were discussed"). The FE accounts also demonstrate that Defendants personally visited DXC's acquisitions, met with acquired companies' management, received disjointed reports, and accessed a jumble of legacy databases to analyze sales data. ¶¶150, 152-54, 157-61, 163-64, 168, 172, 265-76; *see James River*, 2023 WL 5538218, at \*19 ("Executives' 'personal involvement' in the review of a relevant business unit can support an inference of scienter.").

In addition to first-hand observations, Defendants learned of the lack of integration from DXC's largest customers. *See* ¶¶273-74 (Salvino personally involved in responding to integration-related issues affecting Boeing and British American Tobacco). These facts bolster scienter. *See Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 605 (E.D. Va. 2015) ("numerous customer complaints" supported inference of defendants' knowledge of product deficiencies).

The FE allegations demonstrate that, contrary to their statements, Defendants knew or recklessly disregarded (i) that DXC's acquisitions were operating independently and in competition with each other, and suffered from significant redundancies; (ii) that DXC would need to significantly ramp up—not decrease—its spending on TSI and restructuring efforts, and (iii) that initiatives to drive cash flow were severely hampered by the need to spend more on integration.

24

Defendants again argue that the FEs did not have sufficient personal contact with Defendants to support scienter (MTD at 26). However, direct interaction with Defendants is not a prerequisite. *James River*, 2023 WL 5538218, at *25 (rejecting argument that FEs "do not assert any direct involvement with the [defendants]"); *Avaya*, 564 F.3d at 268 (rejecting argument that "none of the CWs claimed to have had any connection to or communication with [defendants]"). Nor do the FEs need to allege that they "personally provided specific problematic information" directly to Defendants as "allegations of scienter need not provide smoking-gun evidence." *Sinnathurai v. Novavax*, *Inc*., 645 F. Supp. 3d 495, 526 (D. Md. 2022); *Ollila*, 2018 WL 792069, at *3 (former employee accounts were not "smoking gun documentation" but "sufficiently alleged" that defendants had "access to information" contrary to their statements).[16]

*Second*, Defendants touted their hands-on interactions with clients and in-depth knowledge of DXC's business, including the state of DXC's integration efforts. *See, e.g.*, ¶134 (Salvino: "There's literally eight things that we look at . . . on a quarterly basis, starting with restructuring and TSI [costs]."); *Genworth*, 103 F. Supp. 3d at 785 (inferring scienter based on defendants' "self-proclaimed 'personal involvement'" in business); *In re Salix Pharms., Ltd*., 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (claims of "accurate knowledge" about inventory levels supported scienter). Salvino presented himself as "very customer focused," stating in 2019 that he would be "meeting with many of our top clients," and taking a "fresh look" at the business. ¶¶265-66, 270. By May 2020, Salvino boasted that he personally met with 200 of DXC's largest clients. ¶269. Salvino also toured DXC facilities, held town halls, and conducted an employee survey that

---

[16] Defendants' reliance on *DXC* (MTD at 26) is misplaced. There, none of the FEs could link the defendants' knowledge to the specific cost-cutting measures at issue. *DXC*, 19 F.4th at 609 & n.2. Here, the Complaint includes multiple FEs who describe with particularity the ways in which Defendants "were . . . aware of the problems alleged" caused by a lack of integration, *id.*, including inefficiencies in operations and sales tracking and competition amongst acquired companies.

resulted in 140,000 comments. ¶¶265-272. Defendants' "personal involvement" in day-to-day operations, their public statements evincing a "careful[] review" of DXC's business, and client interactions further bolster scienter. *James River*, 2023 WL 5538218, at *19 (brackets in original).

*Third*, the fact that Defendants repeatedly touted the supposed progress of DXC's integration efforts—in many cases in response to analyst questions—supports an inference of scienter. ¶¶277, 282. It would have been extremely reckless for Defendants to repeatedly discuss the state of DXC's integration, especially in response to direct questions, without knowing the true state of affairs. *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016) (inferring scienter in part based on "the content and context of [defendants'] statements themselves," including that they were "specifically asked, directly and repeatedly about these core operations"); *Lumber Liquidators*, 155 F. Supp. 3d at 606–07 (inferring knowledge from defendants' "repeated public discussion" of operations in China).

*Fourth*, during the Class Period, DXC entered into a Consent Order and paid an $8 million penalty for "misclassifying tens of millions of dollars of expenses as TSI costs." ¶280. As a result, Defendants were especially focused on DXC's integration-related disclosures, supporting an inference of scienter. *See* ¶281 (Sharp: "we have substantially driven down the TSI expense, while increasing the related disclosures of these expenses."). Defendants' assertion that they would not mislead investors **again** because of SEC "scrutiny" (MTD 27) is not a more compelling inference. Considering **all** the allegations, including the FE accounts and Fernandez's admissions, the inference of scienter is "at least as compelling." *Tellabs*, 551 U.S. at 324; *see Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014) ("a tie favors the plaintiff").[17]

---

[17] Unlike in *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008), Plaintiff does not allege the SEC investigation, standing alone, supports scienter. Rather, Defendants' purported remedial actions show they were scrutinizing restructuring disclosures. ¶¶280-81.

26

*Finally*, Defendants' sudden and suspiciously-timed resignations further support scienter. *Jeld-Wen*, 496 F. Supp. 3d at 967 (considering resignation of CFO on corrective disclosure date in scienter analysis); *Emergent*, 2023 WL 5671608, at *26 n.18 (executive resignations one day before negative announcement contributed to scienter). Sharp's resignation preceded the first corrective by less than three months, raising "incremental concern" among analysts. ¶¶175-76. Just months later, DXC announced Salvino's immediate resignation, coinciding with the second corrective disclosure. ¶187. Analysts highlighted the suspicious timing of these resignations. ¶188 (TD Cowen: "surprise move . . . comes ~7 months after a CFO departure"; Wolfe Research: "only months following the departure of former CFO").

### 3.    Defendants Fail to Identify Any Plausible Non-Fraudulent Inferences

Defendants fail to identify "the existence of a plausible—and largely uncontested—innocent narrative" to counter Plaintiff's scienter allegation. *DXC*, 19 F.4th at 613. Instead, Defendants assert that DXC "faced the daunting task of integrating two corporate giants and a dozen-plus other acquired businesses." MTD at 27. However, this does not explain why Defendants chose to repeatedly misrepresent DXC's integration efforts to investors, including as to CSC and HP, which merged in 2017. It is far more plausible that Defendants knowingly concealed DXC's lack of integration because after years of perpetual restructuring, billions of dollars spent, and multiple attempts at integration at DXC, they knew investor patience had worn thin, which is exactly how the market responded when Fernandez—DXC's third CEO in just over four years—admitted the truth. *See* ¶¶23, 194-95 (analysts stating "[i]nvestors have seen this movie before [and] patience is thin" and questioning "if this business can be fixed.").

Defendants' other unsubstantiated theories are improper attempts to "assert [their] own version of events," not based on the allegations and must be "disregarded." *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 670 (D.S.C. 2016); *see Zak*, 780 F.3d at 607 (judicially

27

noticed facts may not be treated as "evidence contradicting the complaint"). Defendants' claim that the stock price declines corresponded with a "difficult economic environment" (MTD at 28) is incompatible with the Complaint and irrelevant to scienter. Even if the Court considered it, a temporally vague economic downturn does not outweigh the Complaint's specific allegations of scienter. Defendants' argument regarding the Company's stock buybacks (MTD at 24-25, 28) similarly presents an extraneous fact issue that is inappropriate at this stage. *See Pirani v. Netflix, Inc.*, 710 F. Supp. 3d 756, 767 (N.D. Cal. 2024) ("disregard[ing] the facts about [company's] stock repurchases" because complaint did not allege that "a financial motive establishes scienter").[18]

### C.    Plaintiff Adequately Pleads Loss Causation

To plead loss causation, a complaint need only allege "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). This is satisfied by "alleging facts establishing that the defendant's misrepresentation or omission was one substantial cause of the investment's decline in value." *Singer*, 883 F.3d at 445. "[N]either a single complete disclosure nor a fact-for-fact disclosure of the relevant truth" is required. *Klein*, 525 F. Supp. 3d at 669. As long as Plaintiff's loss causation theory "is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings[.]" *Lumber Liquidators*, 155 F. Supp. 3d at 609. The Complaint adequately pleads three corrective disclosures that partially revealed the relevant truth concealed by Defendants' misstatements.

On August 2, 2023, DXC announced disappointing 1Q23 results and cut FY24 FCF

---

[18] Defendants' cases (MTD 24) considered buybacks because they were alleged to be indicative of motive, or otherwise refuted plaintiffs' affirmative motive allegations. *See In re Biogen Inc. Sec. Litig.,* 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016) (alleged repurchase to prop up stock price); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) (same); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013) (alleged buyback supported motive); *Bldg. Trades Pension Fund of W. Penn. v. Insperity, Inc.*, 2022 WL 784017, at *15 (S.D.N.Y. Mar. 15, 2022) (buyback weakened motive allegations); *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 717 (10th Cir. 2006) (same).

guidance, causing a 29.44% stock price decline. ¶288. The earnings announcements revealed that—contrary to Defendants' statements—DXC's transformation into one integrated company was far from complete. ¶290. Analysts downgraded their price targets based on the disclosure, expressing doubts about DXC's purported integration story. ¶289. As one analyst put it, "all legs of the thesis [were] undercut." ¶289. Defendants argue this disclosure did not contain "any actual new, concrete information" inconsistent with Defendants' statements (MTD at 29). However, DXC's disappointing earnings and cuts to guidance partially corrected Defendants' statements that their restructuring efforts had set up the Company for stable growth. *See Lumber Liquidators*, 155 F. Supp. 3d at 609 (negative earnings announcement adequately pled as a corrective disclosure where it revealed the consequences of concealed information).[19] Defendants may "contest the degree to which this press release presented new facts to the market," but the Court cannot make such "factual determinations" at this stage. *James River*, 2023 WL 5538218, at *26.

On December 20, 2023, Salvino unexpectedly resigned as CEO, and the Company failed to reaffirm its FY24 revenue guidance, causing a 12.15% price decline. ¶¶292-93. These disclosures partially corrected Defendants' statements by revealing that prior restructuring efforts were not yielding the sustainable revenue growth Defendants promised. ¶296. *See Jeld-Wen*, 496 F. Supp. 3d at 968 (loss causation pled where CFO resignation caused 19% price drop); *World Acceptance*, 203 F. Supp. 3d at 675 (loss causation pled based on executive resignations along with other disclosures). Defendants overlook (MTD at 29-30) that the resignation news was accompanied by DXC reaffirming only its FCF guidance, and that analysts tied the stock price

---

[19] Defendants' cases are distinguishable as the complaints alleged **no link** between the disclosure and the fraud. *See, e.g.*, *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *19 (W.D. Pa. Sept. 8, 2017) (lower earnings not linked to fraud); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 389 (E.D.N.Y. 2013) (same); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 561 (D.N.J. 2010) (guidance reduction due to previously-disclosed contract cancellations).

29

decline to both "the abrupt nature of Salvino's departure" and "mixed performance reflecting challenges in [DXC's] transformation." ¶¶188, 294-96.

Finally, Fernandez's admissions that DXC needed to undertake a renewed restructuring and that DXC "**never integrated**" its acquisitions, leading to a 16.9% price decline, directly contradicted Defendants' earlier statements regarding the state of DXC's integration. ¶¶192, 297-300. After the disclosure, analysts expressed surprise at "yet another restructuring effort" and questioned "if this business can be fixed." ¶¶301-02. These facts readily plead loss causation. *See Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240-41 (1st Cir. 2013) (analyst reactions made it "reasonable to infer that the market understood" that CEO's later statements corrected previous statements regarding integration). Defendants' argument that Fernandez's admission was a "subjective assessment" which did not reveal "contradictory *facts*" (MTD at 30) (emphasis in original) is incorrect because a corrective disclosure need only reveal "enough facts for the market to finally recognize what [defendants'] previous statements had materially omitted." *Singer*, 883 F.3d at 447. Fernandez's admissions clearly provided investors with sufficient information to make this connection. *See* ¶¶195, 301-02 (analysts expressing surprise at "yet another transition year" and concluding that "a proper turnaround of this scale is a material undertaking").

## V.    CONCLUSION AND LEAVE TO AMEND

For the reasons above, Defendants' motion should be denied. Plaintiff has sufficiently alleged a Section 10(b) violation, and so Plaintiff's Section 20(a) claim should be sustained. *See Singer*, 883 F. 3d at 438. Because the Complaint is Plaintiff's first substantive pleading, if the Court finds any allegations insufficient, it should grant leave to amend. Fed. R. Civ. P. 15(a)(2).[20]

---

[20] The initial complaint in this action was filed prior to the Court appointing Sparinvest S.A. as Lead Plaintiff. Dkt. 1, 48. The instant Complaint was not a substantive amendment. *See* Dkt. 64-65. Therefore, an amendment would not give Plaintiff a "third bite at the apple." MTD at 30.

Dated: February 17, 2025

Respectfully submitted,

/s/ Susan R. Podolsky
Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone: (571) 366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

*Liaison Counsel for the Proposed Class*

Jennifer L. Joost (admitted *pro hac vice*)
Richard A. Russo, Jr. (admitted *pro hac vice*)
Nathan A. Hasiuk (admitted *pro hac vice*)
Austin W. Manning (admitted *pro hac vice*)
Lyndsey B. Campbell (admitted *pro hac vice*)
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jjoost@ktmc.com
rrusso@ktmc.com
nhasiuk@ktmc.com
amanning@ktmc.com
lcampbell@ktmc.com

*Counsel for Lead Plaintiff Sparinvest S.A. and Lead Counsel for the Proposed Class*

31