**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| **In re DXC Technology Company Securities Litigation** | **No. 1:24-cv-01351-AJT-WEF** |
| | **CLASS ACTION** |
| **THIS DOCUMENT RELATES TO:** **ALL ACTIONS** | |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S**
**CORRECTED CONSOLIDATED COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

ARGUMENT .................................................................................................................2

I.     PLAINTIFF FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT .......................2

    A.     The Challenged Statements Are Too Vague To Be Actionable ..............................3

    B.     The PSRLA Safe Harbor Applies ........................................................................6

    C.     Defendants' Opinions Are Not Actionable............................................................8

    D.     No Particularized Allegations Contradict The Challenged Statements .................10

II.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER .................14

    A.     Plaintiff's Scienter Theory Is Illogical And Unsubstantiated ..............................15

    B.     The Innocent Inference Is Far More Compelling .................................................17

III.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION .....................................................18

IV.    THIS CASE SHOULD BE DISMISSED WITH PREJUDICE .......................................20

CONCLUSION..............................................................................................................20

i

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................2

*Berson v. Applied Signal Technology, Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...................................................................................14

*Boykin v. K12, Inc.*,
  54 F.4th 175 (4th Cir. 2022) ...........................................................................4, 7, 10

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
  496 F. Supp. 3d 952 (E.D. Va. 2020) ......................................................................19

*City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*,
  552 F. Supp. 3d 406 (E.D.N.Y. 2021) ................................................................5, 12

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ...................................................................................20

*Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v.
  MacroGenics, Inc.*,
  61 F.4th 369 (4th Cir. 2023) ......................................................................................7

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016)..........................................................................19

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018).......................................................................13

*Hedick v. Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ............................................................4

*In re 2U, Inc. Sec. Class Action*,
  2021 WL 3418841 (D. Md. Aug. 5, 2021) .................................................................8

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) .......................................................................12

*In re Comput. Scis. Corp. Sec. Litig.*,
  2012 WL 3779349 (E.D. Va. Aug. 29, 2012)............................................................4

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ........................................................12

*In re DXC Technology Company Securities Litigation*,
   2020 WL 3456129 (E.D. Va. June 2, 2020) ...................................................................14

*In re EQT Corp. Securities Litigation*,
   504 F. Supp. 3d 474 (W.D. Pa. 2020)...........................................................................12

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018).............................................................13

*In re Grab Holdings Ltd. Sec. Litig.*,
   2024 WL 1076277 (S.D.N.Y. Mar. 12, 2024) ...............................................................4

*In re Level 3 Communications, Inc. Securities Litigation*,
   667 F.3d 1331 (10th Cir. 2012) .....................................................................................3

*In re Neustar Sec. Litig.*,
   83 F. Supp. 3d 671 (E.D. Va. 2015) ..............................................................................6

*In re St. Jude Med., Inc. Sec. Litig.*,
   836 F. Supp. 2d 878 (D. Minn. 2011)............................................................................4

*In re Triangle Cap. Corp. Sec. Litig.*,
   988 F.3d 743 (4th Cir. 2021) .....................................................................................1, 15

*In re Vivendi Universal, S.A.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003).........................................................................14

*Inst. Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)......................................................................................8, 14

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ..............................................................................2, 18–19

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
   19 F.4th 601 (4th Cir. 2021) ...................................................................................14–17

*Kiken v. Lumber Liquidators Holdings, Inc.*,
   155 F. Supp. 3d 593 (E.D. Va. 2015) ..........................................................................19

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) .......................................................................................18

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .......................................................................................14

*Massachusetts Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013)........................................................................................20

*Mulvey Constr., Inc. v. BITCO Gen. Life Ins. Corp.*,
  2015 WL 6394521 (S.D. W. Va. Oct. 22, 2015) ...................................................6

*Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*,
  2021 WL 6101391 (9th Cir. Dec. 21, 2021) .......................................................6

*Ollila v. Babcock & Wilson Enterprises, Inc.*,
  2018 WL 792069 (W.D.N.C. Feb. 8, 2018) .........................................................5

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015) ..........................................................................................8–9

*Ottmann v. Hanger Orthopedic Group, Inc.*,
  353 F.3d 338 (4th Cir. 2003) ........................................................................12–13

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
  918 F.3d 312 (4th Cir. 2019) ...............................................................................8

*Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec*,
  2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ....................................................4

*Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
  551 F.3d 305 (4th Cir. 2009) ...............................................................................2

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) .............................................................................19

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .................................................................................6

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018) ........................................................13

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
  75 F.4th 232 (4th Cir. 2023) .............................................................................16

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) .............................................................................20

*Smith v. Cir. City Stores, Inc.*,
  286 F. Supp. 2d 707 (E.D. Va. 2003) ..................................................................7

*SS Richmond LLC v. Harrison*,
  640 F. Supp. 3d 453 (E.D. Va. 2022) ..............................................................4–5

*Suarez v. Advance Auto Parts, Inc.*,
  2025 WL 283690 (E.D.N.C. Jan. 23, 2025) ......................................................17

iv

*Teachers' Ret. Sys. Of LA v. Hunter*,
 477 F.3d 162 (4th Cir. 2007) ....................................................................................10, 16

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Hldgs., Inc.*,
 2022 WL 989240 (W.D. Tenn. Mar. 31, 2022) ..............................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)...............................................................................................2, 17–18

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
 2017 WL 3097184 (N.D. Cal. June 22, 2017)..................................................................5

*Yates v. Mun. Mortg. & Equity, LLC*,
 744 F.3d 874 (4th Cir. 2014) ..........................................................................................16

## STATUTES

15 U.S.C.
 § 78u-4 .............................................................................................................2, 14, 18, 20
 § 78u-5(i)(l)(B) ................................................................................................................7
 § 78u-5(i)(l)(D) ...............................................................................................................7
 § 78u-5(c)........................................................................................................................7

## RULES

Fed. R. Civ. P. 9(b) ...................................................................................................................2

**INTRODUCTION**

Plaintiff's Opposition underscores why the AC's allegations are insufficient. *See* Doc. No. 73 ("Opp.").[1] It recognizes the operational challenge Defendants faced in combining two IT giants and fourteen other business acquisitions, while also managing associated TSI costs. It concedes Defendants *did* reduce those expenses over time—from about $1 billion to $100 million in annual TSI costs during the Class Period. And it does not dispute that DXC enjoyed a significant period of stable revenues, before experiencing an industry-wide downturn. Nonetheless, Plaintiff distorts the law and Defendants' statements to suggest that subjective, after-the-fact criticisms of management's strategies are evidence of *fraud*. They are not. The Opposition tellingly fails even to mention—let alone grapple with—the uniquely stringent pleading standards governing these claims, while ignoring binding authority foreclosing this suit. And it mischaracterizes the statements challenged in the AC, while imploring this Court to disregard crucial context.

The Court should not be misled by any of this. First, every challenged statement is non-actionable *as a matter of law* because it is immaterial puffery, a subjective opinion, and/or a forward-looking projection protected by the PSLRA's safe harbor. Mot. at 11-18. Beyond that, Plaintiff's falsity theory rests on a fiction—that Defendants told investors (in Plaintiff's words) that DXC had "completed its integration efforts." Opp. at 1. Defendants said no such thing. Instead, they said the opposite, consistently cautioning that DXC's ongoing "transformation journey" was in the "early innings." Ex. 4 at 5; Ex. 5 at 14. Lacking particularized facts showing any challenged statement was false when made, Plaintiff tries to substitute after-the-fact comments by DXC's new CEO—exactly the kind of "fraud by hindsight" pleading the Fourth Circuit has roundly rejected. *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 753 (4th Cir. 2021).

---

[1] Capitalized terms are defined in Defendants' opening brief. Doc. No. 67 ("Motion" or "Mot.").

Second, the AC lacks particularized facts supporting a "strong inference" that Defendants acted with fraudulent intent. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Plaintiff concedes no Defendant had a motive to commit fraud. And the AC's confidential witnesses—all low-level former employees—offer only isolated anecdotes that do not contradict anything Defendants actually said, much less show any challenged statement was *knowingly* false or made with *severely reckless* disregard for the truth. So Plaintiff's accusation that Defendants, with no reason to commit fraud, secretly made "a deliberate decision not to integrate" DXC and then lie about it (Opp. at 12) is as unsupported as it is illogical. Instead, the far more compelling inference is that Defendants did their best to integrate while reducing costs over time—even if the Company's new CEO, like many incoming executives, identified room for improvement.

Finally, none of Plaintiff's proffered corrective disclosures "relate[s] back" to any challenged statement, *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472-73 (4th Cir. 2011), so loss causation is plainly lacking. The AC should be dismissed with prejudice.

## ARGUMENT

The Opposition is misguided from the start. It asserts that, to survive dismissal, the AC need only "allege 'enough facts to state a claim to relief that is plausible on its face.'" Opp. at 11 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That is not the standard. This securities-fraud suit is subject to "heightened pleading requirements" under the PSLRA and Federal Rule of Civil Procedure 9(b). *Pub. Emps.' Ret. Ass'n. of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 310-11 (4th Cir. 2009); *see* Mot. at 9. Viewed through this stringent legal lens, the AC comes nowhere close to adequately pleading falsity, scienter, or loss causation.

## I.     PLAINTIFF FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT

The Opposition fails to cure any—let alone all—of the many flaws in Plaintiff's falsity allegations. *See* Mot. at 11-22. As a matter of law, statements (1) outlining DXC's "focus" and

2

management's aspirational goals, plans, and activities, (2) describing DXC's cost-reduction efforts as "tightly manage[d]," and (3) praising DXC's progress are all non-actionable.  But even if Plaintiff had challenged a potentially actionable statement, the Opposition lays bare the AC's dearth of particularized facts contradicting anything Defendants actually said.

### A.   The Challenged Statements Are Too Vague To Be Actionable

Defendants' Motion cited dozens of cases holding that vague remarks virtually identical to the challenged statements are non-actionable "puffery."  Mot. at 11-14 & nn.5-9.  Plaintiff ignores that authority and instead makes four conclusory arguments.  None holds up.

First, Plaintiff accuses Defendants of "omitting context" that supposedly converts loosely optimistic statements "about aspects of DXC's business," including "integrating acquisitions," into "'concrete, present-tense' claims about aspects of DXC's business."  Opp. at 19.  But Plaintiff never explains how.  For example, Plaintiff accuses Defendants of zeroing in on Salvino's use of the word "focus," when his full statement said that "the focus there is around making sure that any integration that we've done" is "done [i]n the appropriate way."  *Id.* (quoting AC ¶ 201).  That full remark is still obvious puffery—just like the statement in *In re Level 3 Communications, Inc. Securities Litigation*, that the defendant was "really focused on integration and getting synergies from all those acquisitions."  667 F.3d 1331, 1340 (10th Cir. 2012); *see* Mot. at 12 & nn.5-6 (collecting cases).  Plaintiff similarly notes that, in another instance, Salvino said "[w]e're running a very structured playbook" with "3 phases," including a "stabilization phase" that "is over."  AC ¶ 210; *see* Opp. 19.  But Plaintiff does not dispute that "structured" and "stabilization" are too vague to be actionable—or that DXC *did* see stabilized revenues throughout FY21 and into FY22 (and again throughout FY23).  Mot. at 5, 12 n.7.  Plaintiff also points to comments touting DXC's "good work" and "operational discipline," without explaining how those general platitudes asserted any concrete, "provable fact"—which they plainly did not.  Opp. at 19-20.

3

Second, Plaintiff observes that several challenged statements were made "in direct response to analyst questions," and argues this "demonstrat[es] their materiality." Opp. at 19 n.11. That is incorrect. There is no "*per se* rule that every statement made in response to an analyst's question" is "actionable." *In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, at *24 (S.D.N.Y. Mar. 12, 2024). While an inquiry might suggest investors care generally about a given *topic*, that does not make every *statement* touching on that topic legally actionable. As Plaintiff's own cases confirm, responses to analyst questions can still "be too vague and general to be actionable," even if—as Plaintiff asserts—they interest investors. *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011); *compare Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *10 (N.D. Ill. Aug. 11, 2021) (statements not just made "in response to questions" but also "factual" and "specific"). For example, answering a question about what DXC was "doing" to reduce TSI costs, Sharp responded that "we've taken a very disciplined focus effort on every dollar of spend" to make sure "it's being deployed thoughtfully." AC ¶ 215. Little would be left of the puffery doctrine if the mere fact of answering a question exposed executives to liability for generalized statements like this.[2] On the contrary, courts routinely deem such responses non-actionable puffery. *See, e.g.*, *In re Comput. Scis. Corp. Sec. Litig.*, 2012 WL 3779349, at *12 (E.D. Va. Aug. 29, 2012) (dismissing as puffery response to analyst question saying company had "steadily made progress in delivering on our commitments"); *Pipefitters Loc. No. 636 Defined Ben. Plan v. Tekelec*, 2013 WL 1192004, at *8-9 (E.D.N.C. Mar. 22, 2013) (similar).

Third, Plaintiff unsuccessfully tries to analogize this case to a few district court decisions with very different facts. Opp. at 19-20. In *SS Richmond LLC v. Harrison*, for instance, the

---

[2] An alleged analyst reaction to a statement also does not negate the puffery doctrine. Opp. at 19. What matters is "the reasonable investor's view" of the challenged statements, "not any individual investor's reaction" to them. *Boykin v. K12, Inc.*, 54 F.4th 175, 185 (4th Cir. 2022).

4

defendant made a concrete representation that a project was "'shovel-ready'"—i.e., "ready for construction to begin immediately"—*three years* before financing was secured and construction could actually start. 640 F. Supp. 3d 453, 476 (E.D. Va. 2022). In *City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*, the defendants made similarly definite representations they allegedly knew were untrue, by stating that the company's "'prescription management and analytics capabilities' were already 'hardwired into practice management software,'" and suggesting "that the company had successfully completed integration of [its] sales force." 552 F. Supp. 3d 406, 412, 416 (E.D.N.Y. 2021). And in *Ollila v. Babcock & Wilson Enterprises, Inc.*, the defendants dismissed as "isolated" alleged problems at one "project site" that had necessitated "redesign of the entire piping system," despite knowing four other sites "suffered from similar piping issues." 2018 WL 792069, at *2, 5 (W.D.N.C. Feb. 8, 2018). This case involves no comparably specific or concrete assertions. *See* Mot. at 11-14; App. A.[3]

Fourth, Plaintiff confoundingly asserts that Defendants' arguments on puffery—and other issues—are "undeveloped." Opp. at 18 n.10; *see also id.* at 16 n.7 (same as to safe harbor); *id.* at 20 n.12 (opinions). Defendants cited myriad decisions holding non-actionable statements nearly identical to the broadly optimistic remarks attacked here. Mot. at 11-14 & nn.5-9. And Defendants included an appendix listing statement-by-statement grounds for dismissal because Plaintiff's shotgun pleading tactics made it impossible to discuss all three-dozen statements individually. *See id.* at 11 & n.4. By contrast, Plaintiff does not address *at all* the authority foreclosing this lawsuit.

---

[3] Plaintiff also cites *Union Asset Mgmt. Holding AG v. SanDisk LLC*, 2017 WL 3097184 (N.D. Cal. June 22, 2017). But there, the court *acknowledged* that saying things like "integration [i]s 'going quite well'" is almost always non-actionable "corporate puffery." *SanDisk*, 2017 WL 3097184 at *1. The claim survived only because "particular context" demonstrated that the defendants were misleadingly "trying to reassure the investing public that [the company] would bounce back from specific negative events," while concealing that it "had actually missed" internal revenue targets "by a wide margin." *Id.* at *1-2. Here, by contrast, DXC repeatedly met its earnings estimates and acknowledged that integration efforts were a work in progress. Mot. at 5-7.

Nor does Plaintiff offer "developed argumentation" as to the vast majority of puffing statements at issue.  *Mulvey Constr., Inc. v. BITCO Gen. Life Ins. Corp.*, 2015 WL 6394521, at *6 (S.D. W. Va. Oct. 22, 2015).  The Opposition discusses only a couple, while contending that "Defendants do not challenge ¶251 as puffery."  Opp. at 18 n.10.  But Defendants explicitly argued that *every* challenged statement is puffery—including the one in ¶ 251.  *See* Mot. at 11-14; App. A.[4]

Plaintiff's position would force companies to "take a pessimistic outlook" just to avoid securities-fraud liability.  *In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 680-81 (E.D. Va. 2015). The puffery doctrine guards against that chilling effect.  Here, Plaintiff acknowledges that, "[f]rom inception, DXC suffered from declining revenue and low growth, as well as 'dis-synergies associated" with integrating its two predecessor companies and additional acquisitions.  Opp. at 3-4 (quoting AC ¶¶ 67-70, 90).  Defendants were "not required to take a gloomy, fearful or defeatist view" of their stewardship of DXC through those well-known challenges.  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  That established principle demands dismissal.

### B.      The PSRLA Safe Harbor Applies

Defendants' Motion established that numerous challenged statements also find shelter in the PSLRA's safe harbor.  Mot. at 14-17.  Plaintiff does not dispute that statements explicitly forecasting DXC's future performance are forward-looking and thus subject to the statutory safe harbor.  *Id.* at 14-15 (citing AC ¶¶ 201, 210, 231, 250).  Instead, Plaintiff claims to be challenging only those statements that purportedly convey "present or historical facts," which the Opposition argues are categorically ineligible for protection.  Opp. at 16.  That is wrong.  As Defendants

---

[4]  Claiming a "line of sight to deliver" on a goal is obvious puffery—and also a statutorily protected forward-looking statement.   AC ¶ 251; *see, e.g.*, *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Hldgs., Inc.*, 2022 WL 989240, at *17-18 (W.D. Tenn. Mar. 31, 2022) ("line of sight" is "classic" puffery); *Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, 2021 WL 6101391, at *2 (9th Cir. Dec. 21, 2021) ("line of sight" was forward-looking).

explained, the safe harbor applies not just to "projection[s]" of "future economic performance," but also present-tense statements about "the plans and objectives of management for future operations" and "the assumptions underlying or relating to any [forward-looking] statement." 15 U.S.C. § 78u-5(i)(l)(B), (D); *see* Mot. at 14. Use of the "present tense" does "not prohibit the Safe-Harbor Protection from applying" when—as here—the challenged statements "cannot 'meaningfully [be] distinguished from' Defendants' goals." *Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 389 (4th Cir. 2023).

So contrary to Plaintiff's assertion (Opp. at 17), challenged statements laying out management's "focus," "plans," and "key initiatives" for the future, as well as remarks forecasting that DXC was "on track" to achieve an objective, are eligible for the safe harbor. Mot. at 15 (citing AC ¶¶ 196, 201, 205, 222, 251-52, 257); *see, e.g.*, *K12*, 54 F.4th at 184. Likewise, claiming that "we're building the foundation for growth" plainly referenced a foundation for *future* growth. AC ¶ 210; *see Smith v. Cir. City Stores, Inc.*, 286 F. Supp. 2d 707, 722 (E.D. Va. 2003) (any statement "whose truth or falsity is discernible only after it is made is necessarily forward-looking").

The only question, then, is whether the AC has shown *both* (1) a lack of "meaningful cautionary" language, *and* (2) "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c). It has not. On the first prong, Plaintiff cannot escape the extensive caveats accompanying Defendants' statements. Mot. at 15-16. Defendants repeatedly warned about the risks of DXC's complex integration efforts and associated costs—e.g., cautioning that DXC might be unable "to achieve the expected benefits of our restructuring plans," Ex. 14 at 43, which could "adversely affect [the] business," Ex. 17 at 27. Plaintiff faults Defendants for describing these risks as, well, *risks*. *E.g.*, Opp. at 18 (emphasizing that "Defendants warned that they '***might*** be unable to achieve the expected benefits of our restructuring plans'"). But that misses the point: The challenged

7

statements were "not worded as guarantees." *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 321 (4th Cir. 2019). And no particularized facts show certainty that DXC's efforts were doomed to fail, so any suggestion that Defendants' risk warnings were not meaningful—or misleading in their own right—is baseless. *Infra* at 10-14; Mot. at 18-22.

On the second prong, Plaintiff lacks particularized allegations showing that Defendants actually knew any forward-looking statements and associated remarks were false when made. *See* Mot. at 16-17, 18-28. Plaintiff does not address this independently dispositive prong, apart from incorporating the Opposition's scienter discussion. Opp. at 17. But that scienter argument asserts only purportedly "reckless conduct," claiming it is "implausible" that Defendants "did not know about DXC's [purported] failure to integrate" given its supposed "obviousness." *Id.* at 22-23. Plaintiff's recklessness argument fails on its own terms. *Infra* at 14-20. For purposes of the safe harbor, however, having reason to know something is not the same as *actually* knowing it. *See Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009); *accord In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *9 (D. Md. Aug. 5, 2021). In any event, Plaintiff has not pointed to *any* specific facts actually known to Defendants before their respective statements—relying solely on post hoc (1) anecdotes from low-level employees with no meaningful contact with Defendants, and (2) comments from Fernandez, DXC's new CEO. *See, e.g.*, Opp. at 23-24 (citing AC ¶¶ 157, 189-92, 272-274). As discussed below, none of that shows any challenged statement was untrue, let alone that Defendants knew as much when the statements were made. *Infra* at 10-20.

C.    **Defendants' Opinions Are Not Actionable**

Plaintiff does not deny that nine challenged statements are opinions presumptively immune from liability under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). Opp. at 20 & n.12; App. A. But the Opposition's assertion (at 20) that each such "statement is actionable" fundamentally misunderstands the *Omnicare* framework.

8

Most egregiously, Plaintiff claims that Defendants' opinions are actionable simply because they purportedly "omitted" Plaintiff's version of the truth.  Opp. at 21 & n.6.  That sweeping argument would make *any* opinion legally actionable based on a bare allegation that it omitted an allegedly conflicting fact.  *Omnicare* holds the opposite:  "[T]he omission of a fact that merely rebuts" an opinion "fails to render [it] misleading."  575 U.S. at 188.  Rather, an opinion can be misleading by omitting information "about how the speaker has formed the opinion"—e.g., saying, "We believe our conduct is lawful" without having "consulted a lawyer."  *Id.*  Or independent evidence can show that an opinion was not "sincerely held."  *Id.* at 187.  But here, Plaintiff puts forward no particularized allegations in either respect.  Mot. at 17-22.

Plaintiff also erroneously claims that a few of Defendants' opinions "contain embedded factual statements."  Not so.  As *Omnicare* explained, a statement saying "I believe" a given proposition will "remain true" even if the speaker "got the facts wrong."  575 U.S. at 183-84; *see* Mot. at 18.  An embedded factual statement requires saying "I believe" one thing "because" *some other thing* is true.  *Id.*  No such embedded factual declaration exists here.  For starters, Defendants did not "concede" that the statement alleged in ¶ 231 contains an embedded representation of fact.  Opp. at 20.  They explained that the "*arguable* embedded factual assertion" about "$300 million in potential future cash flow improvements" was "*also* prefaced by 'I think.'"  Mot. at 18 (first emphasis added).  So at most, the remark contained a second embedded *opinion*.  Plaintiff does not dispute that point, or that DXC *did* cut TSI costs by more than $300 million.  *Id.*

As for Sharp's November 3, 2021 statement that "we believe [TSI efforts] are a prudent investment," AC ¶ 213, Plaintiff claims the preceding sentence—"A key driver of improving cash flow is to continue to reduce our restructuring and TSI spend"—is an embedded factual statement.  Opp. at 21.  But the "key driver" assertion supplies no basis for the "prudent investment" opinion;

each addresses the countervailing goals of reducing TSI costs while still undertaking integration efforts. AC ¶ 213. The prudent-investment opinion is thus fully protected under *Omnicare*, and Plaintiff does "not seriously contest" the truth of Defendants' separate assertion that reducing expenses was important to improving cash flow. *K12*, 54 F.4th at 184. The rest of Defendants' opinions are similarly non-actionable. *See* App. A (cataloging statements).

### D.    No Particularized Allegations Contradict The Challenged Statements

Even if a controvertible statement of present fact could be discerned here, the AC's "basic problem is that the facts it alleges do not contradict [Defendants'] public disclosures." *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 182 (4th Cir. 2007). Plaintiff's theory is that Defendants told investors DXC had "completed its integration efforts," when in truth "DXC had failed to fully integrate." Opp. at 1. But Defendants never said that—and DXC concededly continued to invest over $100 million annually in ongoing integration efforts through the end of the Class Period, while explicitly cautioning that there was "more to do." Ex. 4 at 8; *see* AC ¶ 9; Mot. at 4-7.

### 1.    No Allegations Contradict The Challenged Statements

The crux of Plaintiff's claims is a bare assertion that Defendants said DXC had "completed its integration efforts" and was "finally" ready to "deliver stable profits." Opp. at 1. But the actual challenged statements, together with materials cited in the AC, refute that contention: Defendants consistently tempered reports on their progress throughout the Class Period—emphasizing that DXC was in the "early innings" of its "transformation journey," Ex. 4 at 5; Ex. 5 at 14, and "still [had] work to do" to realize its integration objectives, Ex. 6 at 11. Indeed, even at the end of the Class Period, DXC was *undisputedly* still spending $100 million annually on those efforts. AC ¶ 9. And Plaintiff does not dispute that DXC *did* deliver stable profits through much of the Class Period—including over four consecutive quarters in FY23, before an industry-wide downturn—while simultaneously reducing TSI costs by two-thirds. Mot. at 1, 5-8. Accordingly, the AC

alleges no particularized facts contradicting what Defendants actually said.

Take the first category of statements, which includes remarks like: "Our focus is to embed [TSI] expenses over time into the normal performance of the business," AC ¶ 222, and "[t]he biggest driver" of increased free cash flow "has been the focus on driving down" costs, *id.* ¶ 241. No alleged facts suggest DXC was *not* focused on reducing TSI costs, and Plaintiff concedes DXC successfully reduced those expenses by several hundred million dollars. Opp. at 6. Relatedly, Plaintiff claims Defendants told investors that DXC was "winding down" its restructuring and integration *efforts*—but in reality Defendants said that "[o]ne of our key initiatives" is "to wind down restructuring and TSI *costs*." *Id.* at 1 (emphasis added); *see* AC ¶¶ 196, 206. That distinction is critical. Cutting TSI costs involves eliminating wasteful or unnecessary TSI spend and otherwise using funds earmarked for integration more efficiently. And regardless, this costs-focused statement does not say that DXC's integration efforts were complete or problem free.

Plaintiff also attacks Sharp's statement that DXC was "evaluating and ending [integration] projects and shutting them down" and "getting them completed." AC ¶ 201; *see* Opp. at 11. But that statement does not say, as Plaintiff suggests, that DXC completed *every* integration project. And no allegations support the implausible assertion that DXC failed to complete *any* integration tasks after years of effort and billions of dollars spent. Likewise, no facts contradict Salvino's September 14, 2021 statement that "the stabilization phase" was "over." AC ¶ 210. Again, it is undisputed that DXC's earnings were in fact stabilized over the ensuing two years. Mot. at 5-7.

As for the second category, Plaintiff offers no meaningful argument whatsoever. These statements described DXC's cost-reduction efforts as "tightly manage[d]," AC ¶¶ 236, 240, 246, 256, "highly focused," *id.* ¶ 213, "disciplined," *id.* ¶ 215, and "thoughtful," *id.* Besides being obvious puffery, these statements are supported by the AC, which acknowledges that Defendants

11

succeeded in reducing their TSI expenditures by hundreds of millions of dollars. *Id.* ¶¶ 133-34.

Plaintiff also cannot justify the AC's attack on the third category, which noted "significant strides" and "progress on reducing Restructuring and TSI expense," *id.* ¶¶ 221-22, "a lot of work" towards achieving "positive cash flow," *id.* ¶ 241, "success[] in achieving [DXC's] cost reduction goals," *id.* ¶ 257, and so on, *e.g.*, *id.* ¶¶ 214, 220, 227, 250; *see* Mot. at 19. Plaintiff appears to fault these statements for touting "purported progress integrating [DXC's] acquisitions." Opp. at 11. But these remarks praised DXC's undisputed progress in *reducing TSI expenses*. They did not speak to progress on integrating the business, much less represent that the integration efforts management discussed transparently were somehow complete or problem-free.

All told, then, this case does not involve "similar allegations" to the cases cited in the Opposition. Opp. at 13. For example, as explained, the defendants in *Henry Schein* made specific, concrete assertions that discrete integration efforts involving particular "software" programs and "sales" personnel "had been completed." 552 F. Supp. 3d at 412, 416. Moreover, the court there expressly distinguished another case where—as here—statements about "post-merger integration efforts" were "largely opinion-based assessments as to the organization's progress toward integration." *Id.* at 416 (citing *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *2-3, 11 (S.D.N.Y. Mar. 30, 2021)). Similarly, in *In re EQT Corp. Securities Litigation*, a gas company made "clear and specific statements"—lacking here—that it "was successfully drilling longer lateral wells" at "decreased cost[]" due to an acquisition, when in reality the company had "experienced significant cost overruns and problems in drilling ultra-long lateral[]" wells. 504 F. Supp. 3d 474, 493-94 (W.D. Pa. 2020).[5] And in *Ottmann v. Hanger Orthopedic Group, Inc.*,

---

[5]  *See also In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 816 (N.D. Ill. 2017) (unequivocal statement that "acquisitions are fully integrated" when in reality integration problems "ultimately contributed to significant inaccuracies in [the defendant's] reported financial performance);

the defendant misleadingly "failed to disclose" a critical development that, "because the two companies were now viewed as one" following a merger, "rehabilitation clinics were referring a smaller percentage of patients to company practitioners." 353 F.3d 338, 351 (4th Cir. 2003). Plaintiff points to no comparable undisclosed harm resulting from DXC's integration efforts and instead merely criticizes their effectiveness after the fact.

### 2. Plaintiff's Extended Criticism Of DXC's Integration Efforts Is Irrelevant And Unsupported

Plaintiff's criticism of DXC's integration efforts is beside the point. As explained, Defendants' statements largely concerned DXC's concededly successful efforts to reduce TSI *costs*—and none suggested the integration process was complete. *Supra* at 10-12. So even at face value, Plaintiff's attack fails to contradict anything Defendants said. But regardless, Plaintiff's criticism does not hold up on its own terms, as Defendants' Motion explained. *See* Mot. at 20-22.

Plaintiff insists the AC's reliance on Fernandez's years-later announcement of a renewed integration effort is not "fraud by hindsight" pleading, because those comments supposedly "revealed the true state of affairs that existed *during* the Class Period." Opp. at 13 (emphasis in original). That assertion distorts Fernandez's actual comments. He specifically acknowledged Defendants' "previous [integration] work" and made clear he was "not running away from it," while emphasizing that DXC already had "what we need to compete profitably and grow," even though—in his opinion—there was more work to do. AC ¶¶ 190-91. It is scarcely unusual for a "new CEO" to bring new direction and "distance himself from" his predecessor in this way. *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *22 (N.D. Cal. Mar. 21, 2018); *see* Mot. at 22. That ordinary situation looks nothing like Plaintiff's cases, where "contemporaneous

---

*Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *5 (D.N.J. July 27, 2018) (similar); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 292 (S.D.N.Y. 2018) (similar).

documents," together with "admissions from the defendants themselves" during "post-class period deposition testimony and emails," directly evidenced a contradictory state of affairs "at the time of their [prior] representations." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009); *see also In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 180-81 (S.D.N.Y. 2003) ("desperate handwritten plea" about "ballooning debt" and formal "report" warning of imminent bankruptcy).

Plaintiff's confidential-witness allegations face similar problems. Plaintiff has no answer for the reality that these former employees ("FEs") mostly just parrot Plaintiff's own assertions by "confirm[ing]" propositions evidently spoon-fed to them by Plaintiff's counsel. Mot. at 20. Nor can Plaintiff distinguish the "generalized subjective assessments" offered here from those alleged—and rejected by this Court—in *In re DXC Technology Company Securities Litigation*, 2020 WL 3456129, at *11 (E.D. Va. June 2, 2020). There were fifteen FEs in that case, *id.* at *6 n.4, so Plaintiff's repeated quantity-over-quality emphasis on the "***sixteen***" FEs in this one proves nothing, AC ¶¶ 2, 12, 14, 24. And here, as there, low-level employees "simply characterize [integration efforts] and the impact they had on particular people or segments" through a smattering of anecdotes. *DXC*, 2020 WL 3456129 at *11; *see* Mot. at 21. No case Plaintiff cites suggests *that* is enough—and it is not.[6]

## II.   PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Plaintiff's separate "failure to adequately allege scienter is enough to doom" this lawsuit. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021). The PSLRA requires this Court to "compare the malicious and innocent inferences cognizable from the facts pled" and

---

[6] In *Berson v. Applied Signal Technology, Inc.*, it was "entirely plausible" that FEs were "in a position to infer the issuance of stop-work orders" concealed by the defendants, because such orders have "the very obvious effect of putting numerous employees out of work." 527 F.3d 982, 985 (9th Cir. 2008). In *Institutional Investors Group v. Avaya, Inc.*, the FEs personally observed "deep and unusual discounting" across the "range of [the company's] U.S. business" that "directly conflict[ed]" with the CFO's denial of discounts. 564 F.3d 242, 264 (3d Cir. 2009). No such first-hand account of contemporaneous facts contradicting Defendants' statements is alleged here.

14

"only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Id.* at 608. Yet the Opposition ignores the glaring problems with the AC's scienter theory and the strength of the innocent inference. Mot. at 23-28.

### A. Plaintiff's Scienter Theory Is Illogical And Unsubstantiated

The Opposition doubles down on an illogical theory: Plaintiff accuses Defendants of abruptly making a secret "deliberate decision not to integrate" DXC further, despite "years of [ongoing] restructuring" efforts and "billions of dollars spent" on TSI costs. Opp. at 12, 27. But Plaintiff does not explain *why* Defendants would do something so bizarre. In fact, Plaintiff concedes Defendants had nothing to gain from defrauding investors—not one Defendant is alleged to have sold stock when DXC's share price was purportedly inflated or to have otherwise benefited from their supposed scheme. Opp. at 22. By itself, that lack of motive "weigh[s] heavily" against a finding of scienter. *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 752 (4th Cir. 2021).

Moreover, Plaintiff does not dispute that Defendants had every reason *not* to artificially boost DXC's stock price, given the Company's own billion-dollar buyback during the Class Period. Mot. at 24. Puzzlingly, Plaintiff implores the Court to ignore this fact simply because the AC itself does not include "affirmative motive allegations." Opp. at 28 & n.18. That makes no sense. If, as Plaintiff concedes, stock buybacks can refute "affirmative" motive allegations, they surely can reinforce the *lack* of motive allegations here. DXC's stock repurchase confirms the obvious: Defendants had no reason to risk their careers by clandestinely abandoning DXC's post-merger integration goals and then lying about their actions. And DXC undisputedly continued to invest hundreds of millions of dollars in integration throughout the Class Period, foreclosing any reasonable (much less compelling) inference that those efforts were somehow abandoned. AC ¶ 9.

Stuck with such a deeply implausible theory, Plaintiff claims the requisite strong inference of scienter can be pled simply by alleging that Defendants had reason to know about a purported

15

"lack of integration" at DXC. Opp. at 23. But "[s]imply knowing" allegedly omitted "information would not be enough for scienter." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 243 (4th Cir. 2023). Rather, Plaintiff had to plead particularized facts showing that each Defendant acted "intentionally or with 'severe recklessness' regarding the danger of *deceiving the plaintiff*." *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) (emphasis added). That is, Plaintiff must establish that Defendants' allegedly "misleading statement[s]" themselves were made with wrongful intent. *Id.* But here, as explained, Defendants' remarks focused on efforts to manage costs—and never once asserted that DXC's integration process itself was finished or difficulty-free. *Supra* at 10-12. So Plaintiff's contention that Defendants purportedly knew about integration challenges, even if true, is irrelevant.

At any rate, as Defendants' Motion explained, neither the FEs nor Fernandez is alleged to have had contemporaneous insight into Defendants' states of mind when they spoke. Mot. at 26. And the Fourth Circuit's decision affirming this Court in *DXC* forecloses Plaintiff's insistence that the FEs need not have had "direct interaction with Defendants." Opp. at 25. In fact, the FEs there allegedly "did notify" executives "of their concerns" directly, but even that was not enough given their "vague and conclusory" allegations. *DXC*, 19 F.4th at 609. This case is even weaker: Plaintiff's best evidence is an allegation that two FEs were passive attendees at meetings with Salvino "where employees discussed integration problems such as internal competition." Opp. at 24 (citing AC ¶¶ 157, 272). But that in no way shows Defendants intentionally or with severe recklessness misled investors. If anything, that DXC's leadership met with and solicited feedback from employees reflects "diligence" in tackling the integration challenge—not some "nefarious purpose." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 889 (4th Cir. 2014).

16

Plaintiff also asserts that Sharp and Salvino's departures were "suspiciously-timed." Opp. at 27. In support, the Opposition notes that "Sharp's resignation preceded the first corrective disclosure by less than three months," *id.*—but that disclosure merely announced "disappointing first quarter results," AC ¶ 288. Plaintiff also says that Salvino's departure "coincid[ed] with the second corrective disclosure," Opp. at 27—yet the second corrective disclosure was itself *the announcement of Salvino's departure*, rendering this argument totally circular, AC ¶ 292. So while Plaintiff "seeks to infer scienter from the departure of [two] senior executives," the AC does not "allege facts sufficient to connect" the mere fact of those "departure[s] with [D]efendants' alleged scienter." *Suarez v. Advance Auto Parts, Inc.*, 2025 WL 283690, at *7 (E.D.N.C. Jan. 23, 2025).

Ultimately, Plaintiff falls back on speculation that Defendants *must* have lied about (or acted with severe recklessness towards) integration problems, given their positions, in-depth knowledge of DXC's business, and the need for extra caution after an unrelated SEC inquiry. Opp. at 25-26. Defendants' Motion already explained why that is wrong: (1) almost all securities-fraud defendants are senior officers; (2) any good executive will be heavily involved in company operations; and (3) prior SEC scrutiny would have made it even more foolish for Defendants (with no upside) to misrepresent DXC's integration efforts. Mot. at 25-27. Plaintiff has no response.

### B.      The Innocent Inference Is Far More Compelling

Plaintiff's scienter theory is nowhere near "as compelling as [the] opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiff claims that "Defendants fail to identify 'the existence of a plausible—and largely uncontested—innocent narrative' to counter Plaintiff's scienter allegation." Opp. at 27 (quoting *DXC*, 19 F.4th at 613). But as Defendant's Motion explained, the innocent inference is obvious: Defendants did their best to navigate the daunting challenge of integrating two corporate giants and fourteen other acquired businesses, while striving to manage hundreds of millions of dollars in related annual expenses. Mot. at 27-28.

17

Plaintiff responds that this nonculpable account "does not explain why Defendants chose to repeatedly misrepresent DXC's integration efforts." Opp. at 27. But that circular argument simply assumes Plaintiff's own distorted interpretation of the alleged facts. The PSLRA demands a "comparative inquiry" into "[h]ow likely is it that one conclusion" (i.e., the inference of scienter), "as compared to others" (i.e., a nonculpable inference), "follows from the underlying facts." *Tellabs*, 551 U.S. at 323. Here, it is far less likely that Defendants risked everything to furtively abandon DXC's integration goals and lie about it, rather than simply acted in good faith under difficult circumstances. The AC and documents incorporated therein strongly support an inference that Defendants endeavored to advance DXC's integration, manage TSI costs where possible, and keep investors informed—all while showing their commitment to that effort by spending $1 billion buying back the very DXC stock Plaintiff alleges they inflated. Mot. at 27-28.

## III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

This lawsuit fails for yet a third independent reason, as Defendants' Motion explained: None of the three purported corrective disclosures alleged in the AC revealed new information that "relate[d] back to the [alleged] misrepresentation[s]." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472-73 (4th Cir. 2011); *see* Mot. at 28-30. Plaintiff does not even acknowledge that bedrock principle, let alone explain how the AC's barebones loss causation allegations satisfy it.

Start with the first alleged corrective disclosure—the mere fact that "DXC reported disappointing first quarter results" for FY24 on "revenue growth" and "free cash flow." AC ¶ 288. Plaintiff insists this "earnings announcement revealed" DXC's integration process was "far from complete." Opp. at 29 (citing AC ¶ 290). But Defendants never said otherwise. *Supra* at 10-12. And more fundamentally, Plaintiff does not—and cannot—explain how this generic earnings announcement "revealed facts that were related in any manner to the [allegedly] fraudulent nature" of any challenged statement. *Katyle*, 637 F.3d at 475. Plaintiff's loss causation theory is thus

18

"unsustainable," even at the pleading stage. *Id.* (affirming dismissal); *see also Loos v. Immersion Corp.*, 762 F.3d 880, 888 (9th Cir. 2014) ("disappointing earnings" did not indicate "fraud," absent additional information establishing a specific link with challenged statements).[7]

Plaintiff's second corrective disclosure—the December 20, 2023 news of Salvino's resignation—suffers the same defect. The "announcement of [a CEO's] resignation" cannot "in and of itself constitute a corrective disclosure." *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014); *see* Mot. at 29-30 n.14 (collecting cases). Here, the general fact of Salvino's departure "did not . . . reveal to the market any undisclosed truth" about DXC's integration efforts, much less contradict anything Defendants said. *Katyle*, 637 F.3d at 478. Ignoring that authority, Plaintiff cites two cases involving "executive resignations"—but both alleged "other disclosures" specifically linking those resignations to the alleged fraud, which are missing here.[8] Plaintiff also points to analyst reports that (1) noted "the resignation news was accompanied by DXC reaffirming only its [free cash flow] guidance" and not other financial targets, and (2) "tied the stock price decline to both 'the abrupt nature of Salvino's departure'" and "'challenges in [DXC's] transformation.'" Opp. at 29-30 (quoting AC ¶¶ 188, 294-96). But those assertions do not even purport to link Salvino's resignation with supposedly failed integration efforts—and they "certainly do[] not imply that [Defendants] had issued fraudulent [statements]." *Katyle*, 637 F.3d at 475. In any event, concerns

---

[7] So contrary to Plaintiff's assertion, the AC indeed "allege[s] **no link** between disclosure and the [alleged] fraud." Opp. at 29 n.19. And this case is nothing like *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593 (E.D. Va. 2015), where loss causation rested on not just an "earnings announcement" but also an incriminating online "post," a "federal investigation," a highly critical "presentation" from a hedge fund, and a "national television broadcast report" spotlighting the defendant's "scheme of covering up regulatory violations." *Id.* at 609.

[8] *See Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 965, 70 (E.D. Va. 2020) (CEO resigned the "same day" company announced an expected $76.5 million loss in antitrust litigation); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 675 (D.S.C. 2016) (three resignations taken "in combination with [several] other" substantive disclosures).

19

about DXC's difficult and long-running integration journey were "hardly novel," *id.*, as the AC itself emphasizes, *see, e.g.*, AC ¶¶ 106, 114, 130, 140 (investor questions about integration efforts).

Finally, Plaintiff insists that Fernandez's post hoc comments announcing renewed integration efforts "reveal[ed] 'enough facts for the market to finally recognize what [defendants'] previous statements had materially omitted.'" Opp. at 30 (quoting *Singer v. Reali*, 883 F.3d 425, 447 (4th Cir. 2018)). But again, nothing in Fernandez's opinions on how to improve DXC's business contradicted any challenged statement, which largely concerned efforts to reduce TSI *costs* without asserting that the integration undertaking was done or issue-free. *Supra* at 13-14. That distinguishes this case from Plaintiff's lead authority, where—unlike here—the company's CEO definitively told the market, "[W]e've completed the integration of both the [predecessor companies'] organization and back end systems." *Massachusetts Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 232, 236 (1st Cir. 2013). Fernandez's hindsight comments are not a viable corrective disclosure.

## IV.   THIS CASE SHOULD BE DISMISSED WITH PREJUDICE

The "final sentence" of the Opposition includes a perfunctory request for leave to amend, which does "not qualify as [a] motion[] for leave to amend." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008); *see* Opp. at 30. Plaintiff also nowhere explains how it would amend the AC if given the chance—or even dispute that amendment would be futile given the multiple fundamental problems with this lawsuit. *See* Mot. at 30. The PSLRA was designed to "to sort out the meritorious claims from the abusive ones early in litigation," *Cozzarelli*, 549 F.3d at 624, and this case falls in the latter category. The AC should be dismissed with prejudice.

## CONCLUSION

Defendants respectfully request that the Court dismiss this case with prejudice.

20

Date: February 27, 2025

Respectfully submitted,

/s/ Stephen P. Barry

Stephen P. Barry (Va. Bar No. 81839)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20005
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
stephen.barry@lw.com

Jamie L. Wine (admitted *pro hac vice*)
Kevin M. McDonough (admitted *pro hac vice*)
Melange T. Gavin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
jamie.wine@lw.com
kevin.mcdonough@lw.com
melange.gavin@lw.com

Nicholas Rosellini (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
nick.rosellini@lw.com

*Counsel for Defendants DXC Technology Company, Michael J. Salvino, Kenneth P. Sharp, and Robert F. Del Bene*

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 27th day of February, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all registered users.

*/s/ Stephen P. Barry*

Stephen P. Barry
