UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

IN RE DXC TECHNOLOGY          )   Case 1:24-cv-1351
COMPANY SECURITIES            )
LITIGATION                    )   Alexandria, Virginia
                              )   March 7, 2025
                              )   10:21 a.m.
_____)   Pages 1 - 27

TRANSCRIPT OF MOTION TO DISMISS

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

APPEARANCES:

FOR THE PLAINTIFF:

    NATHAN HASIUK, ESQUIRE
    KESSLER TOPAZ MELTZERCHECK, LLP
    280 King of Prussia Road
    Radnor, Pennsylvania  19087
    (484) 270-1498

    SUSAN R. PODOLSKY, ESQUIRE
    THE LAW OFFICES OF SUSAN R. PODOLSKY
    1800 Diagnal Road, Suite 600
    Alexandria, Virginia  22314
    (571) 366-1702

FOR THE DEFENDANTS:

    JAMIE L. WINE, ESQUIRE
    STEPHEN P. BARRY, ESQUIRE
    MELANGE T. GAVIN, ESQUIRE
    LATHAM & WATKINS LLP
    1271 Avenue of the Americas
    New York, New York  10020
    (212) 906-1200

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Civil Action 1:24-cv-1351, *In re DXC Technology Company Securities Litigation*.

Counsel, will you please note your appearances for the record.

MS. PODOLSKY:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. PODOLSKY:  Susan Podolsky on behalf of lead plaintiff Sparinvest S.A.  With me is Mr. Nathan Hasiuk from the Kessler Topaz firm, and he will be presenting argument.

THE COURT:  All right.  Welcome.

MS. PODOLSKY:  Thank you, sir.

THE COURT:  Good morning.

MS. WINE:  Good morning, Your Honor.  Jamie Wine of Latham & Watkins representing defendants DXC Technology Company and individual defendants Michael Salvino, Kenneth Sharp, and Robert Del Bene.  And with me today are my colleagues Stephen Barry and Melange Gavin.

THE COURT:  All right.  Welcome to everyone.

We're here on the defendants' motion to dismiss for failure to state a claim.  I've reviewed the briefing and the statements at issue.  I'd be

pleased to hear further from counsel.

MS. WINE:  Your Honor, good morning again and thank you.  We appreciate that you've reviewed the briefing and that you also might remember DXC from our last time here.  I was here a few years ago on the prior case on a motion to dismiss argument.  And unfortunately, DXC is a target of yet another unmeritorious case, and we think that your prior opinion and the guidance in there will be useful.  That was affirmed by the Fourth Circuit in a published opinion.  For the reasons I'll articulate, we actually think this has a stronger case for dismissal than the prior case.

So I'm going to highlight those bases for dismissal today.  But if I could have your indulgence just to step back and start a little bit at a high level.

THE COURT:  All right.

MS. WINE:  This is exactly the kind of lawsuit that the PSLRA was designed to stop in its tracks.  You have a plaintiff who's working backwards from a stock drop to manufacture a theory of fraud, both by using hindsight critiques of business strategies and also trying to shoehorn statements made by the defendants into their theory and even by, we

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

would say, misrepresenting to the Court what defendants actually said in those statements.  I'll get into that in a moment.  But this complaint really comes nowhere close to satisfying the pleading standards that they are required to meet.

The backstory of the case begins even before the class period.  This is back when DXC was first created in 2017.  It was the merger of two giant previously existing technology companies.

THE COURT:  Right.

MS. WINE:  Then there was a flurry of MNA activity.  There were multiple acquisitions.  Fourteen more companies were acquired, six in the first year after its existence.  So there was a ton of activity. Those, obviously, were significant potential benefits for DXC, what the company saw in doing this, expanding its footprint, you know, going into different markets, expanding its product portfolio.

But also, of course, on the other hand, there's going to be a lot of logistical difficulties in integrating all of these companies.  It was going to be complex.  It was also going to be expensive.  You are combining companies, employee bases.  You're combining systems.  You're looking at real estate footprints. There's a whole host of activities that go into

integrating this many companies.

And DXC describes this all -- it put all of the acquisition costs and restructuring costs into one bucket that we explain in our briefs.  We're generically calling it TSI costs.  But these were all disclosed within the time period, and it was no secret to the market that this integration process was complex and challenging and that it might fail.

DXC management repeatedly cautioned in public filings and elsewhere that they, quote, may not achieve some or all of the expected benefits of the restructuring, that the restructuring may adversely affect the business.

DXC management also explained that this integration process would take a very long time.  They expressly warned throughout the class period that the process was ongoing, far from complete.

It was described in multiple phases, three different phases, five different steps.  They said things like DXC was in the early innings of the integration process and that there was more to do. These comments are all over the public filings and the risk factors.

And you know, in this process, management needs to make decisions about how much money to spend

on this multifaceted process while also trying to realize the benefits that they're hoping to get from it with good financial performance.

And because there is no one indicator that tells you when integration is finished or even substantially complete or sufficiently complete, those decisions require exercises of judgment by management. And of course, the goal was to gradually reduce the spend on this restructuring as the company matured, and you'll see that they did that.

But the integration is still ongoing even when those costs are gradually being reduced, and here they more than gradually -- they ultimately went from like a billion annually down to about a hundred million annually. And that's because, of course, you often have a lot of the substantial costs upfront with acquisitions and having to invest in new systems and all that.

Then the costs start grinding down, but you're still integrating. You're still figuring out how to get everybody up and running on their laptops or even the different systems that you invested in, right. So the money is winding down. The integration is still ongoing.

And then reasonable minds, of course, can

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

disagree about where to spend, how much to spend, what your priorities are, what you do first, but that's all the stuff that falls within the exercise of management judgment.

And here, if you look at plaintiffs' allegations, they actually point to a story of success in this endeavor even though they try to suggest otherwise. If you look at the amended complaint and the public documents that are incorporated there, there's no question that DXC reduced the annual spend, as I mentioned, by two-thirds over the relevant period and that they guided DXC to generally strong financial results throughout fiscal year '21 and '22, as well as four consecutive quarters of stable revenue in fiscal '23. That's not a story of fraud. That's actually showing that they were doing what they said they were going to do.

So let's get to the specifics of dismissal. I know the Court is well familiar with the pleading standard under the PSLRA and the Supreme Court's guidance in *Tellabs*. So there's three basic reasons this complaint should be dismissed:

First, all of the challenged statements are nonactionable because they're either puffery, forward-looking statements, or opinion statements or

some combination of those three.  We have a chart where we laid all of that out.  I'll get into any specifics you want, but just as a general matter, they all fall into those buckets.  They're all nonactionable as a matter of law, and that's it.  They can't support a fraud claim, period.

Not to mention that plaintiff fails to plead with particularity that any of the challenged statements were actually false or misleading when made.  The most egregious example of this is really the crux of plaintiffs' complaint, which is an accusation they litter in their complaint.  You will see it multiple times.

They say that defendants said that the integration process was complete.  Now, if you look at every time they make that statement in their complaint, they never put quotes around that word, and they never have a citation to where defendants said integration was complete.  And that is because defendants never said that.  They never said it was complete.  You can't find that anywhere in defendants' statements.

The next reason you get dismissal is *scienter*, and this is where I will submit to you that the case here is stronger for dismissal than the prior 2019 *DXC* securities case that you dismissed.

So as you know, when you're looking at *scienter*, you have to do a holistic comparative analysis.  You have to look at the complaint and the things that are referenced in the complaint and say, like, what's more compelling?  The fraudulent, you know, motives behind this that plaintiffs' claim or an innocent inference that defendants were just doing the best they could in their judgment as management?

And most significantly here, there is not a single allegation suggesting that any defendant, let alone all of them, had any reason to commit securities fraud.  There are no insider stock sales, none.  There are no incentive bonuses or any kind of special compensation that might motivate an executive to manipulate a financial metric.

In the prior case, you might recall, we actually did have insider sales.  Now, they were pursuant to a 10b5-1 plan which you looked at, but there were sales.  You at least had to consider that.  We don't have anything like that whatsoever here.  In fact, we have something that supports the innocent inference, which is we have DXC buying back its own stock throughout the class period to the tune of a billion dollars.  So that actually argues against any inference of manipulating the stock here.

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

So they want you to conclude in light of those facts that defendants risk their careers, their reputations to lie about what was going on with integration and the progress they were making despite having nothing to gain, and that makes no sense.

The more compelling inference is a nonfraudulent one that defendants acted in good faith, they executed their business strategy to much success even if there were some challenges, which everybody recognized there might be some challenges. And even if a new CEO came in and had his own ideas about what should have been done, that's normal.

The last thing that I'd to say on *scienter* is they obviously rely heavily on a bunch of former employee allegations. Again, we had that in the 2019 case, and I would argue that there the allegations were even -- they weren't good there but may be even a little better. So here's why. We basically have almost the same number. There were 15 there, 16 here. They both have just generalized allegations about things not going the way it was supposed to or some customer complaints without really any specifics.

In both cases, you have former employees that did not report to or regularly interact with the individual defendants. And in the prior case, the

reason I say maybe it's a little stronger is there you at least had one former employee who was in a meeting with an individual defendant.  You found that there weren't enough specifics to really make anything of that.

Here, we don't even have that.  The only meeting they allege in the complaint here is a meeting from 2019, two years prior to the start of our three-year class period.  That's all they have here. So I would argue the allegations here are weaker.

Lastly, loss causation.  I'm not sure how much I need to dwell on that now.  We don't think, though, there's anything to even get passed a motion to dismiss on loss causation.  They have three alleged corrective disclosures, none of which they tie to the specific allegations here about the integration process.

You've got just disclosure of a typical, you know, stock drop.  You've got the resignation of the CEO, but that's not tied to integration.  There's nothing there that's revealing any truth on the market. In any event, those revelations don't say anything different from what we said all along, which was integration is ongoing.  Again, we never said it was complete.

I'm going to stop there. There's a lot more I could say on each one of those topics, but I won't. If you have any questions, I'm happy to take them. Otherwise, I cede the floor.

THE COURT: Thank you.

MS. WINE: Thank you.

THE COURT: Counsel.

MR. HASIUK: Thank you, Your Honor. Nathan Hasiuk with Kessler Topaz on behalf of lead plaintiff Sparinvest.

Counsel talked a lot about what the company was saying during the class period, the reported reductions and restructuring and TSI expenses. I think counsel acknowledged that the company put integration costs in the bucket of restructuring TSI. So throughout the class period, they're reporting reductions in TSI and restructuring costs. And importantly, they were attributing the reduction in those costs, those concrete financial metrics, to the integration progress that they were making.

Now, counsel says, well, we never said integration was complete. We said it was in the early innings. We said there was a lot more work to do, but on June 17, 2021, an analyst at the company's Investor Day -- this is in paragraph 201 of the complaint --

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

asked, "What are you doing to reduce that line item, TSI and restructuring like specifically?"

And Salvino said, "The focus there is around making sure that any integration that we've done is done in the appropriate way and move on from there."

And Defendant Sharp chimed in and said, "Literally, we've been going through and evaluating and ending those projects and shuting them down, getting them completed and getting them to the right results."

They made similar statements throughout the class period.  They said that they had taken significant strides to embed these types of expenses into the normal performance of the business.

They said that they were shrinking restructuring in TSI costs or a result of the operational work that we were doing.  So every quarter they go up to investors, and they tell investors they're restructuring expenses, these burdensome expenses -- that total $900 million a year at one point -- are going down and it's a result of the operational work that we're doing.  We're shutting the projects down.  We're getting them completed.  We're getting them to the right results.

Now, as counsel pointed out, DXC had a long history of problems with restructuring, and that's why

these statements were so important to investors. And if you look at the analysts' commentary that we allege in our complaint, contemporaneous with each of these statements, analysts are saying -- for example, in 2021, they say enough work has been done to give us incremental confidence that they were laying a foundation for a company that was poised to deliver predictable growth. Over a year into this journey, DXC has moved -- resolutions for historical issues of long delay are showing signs of success. Similar commentary was issued throughout the class period. Investors are saying there is evidence that there's transformation, this multiphase journey that the company is on -- a large part of which was doing away with these burdensome restructuring expenses -- integrating the business is happening.

So the notion that these statements, which were tied to concrete financial metrics that were clearly of importance to investors, didn't communicate anything meaningful is simply not supported by the class period contemporaneous analysts' commentary.

Counsel mentioned the statements that were made at the end of the class period. I think defendants do a lot in their briefing to dismiss and minimize those, but this was the company's CEO. On

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

May 16, 2024, DXC's current CEO, Raul Fernandez, who was the third CEO in four years -- announced yet another restructuring initiative.

This time, the third time, he explained the reasons why the company had to do this, and he said, "As someone who just got here" -- he had only been the CEO for a few months -- "it's clear to me that the previous restructurings did not set a fully integrated baseline for profitable growth."

He said that there are a number of systems still in place that were acquired over time, never integrated, never integrated, never de-duped, a number of business processes that got stacked on top of each other.  He said we have to de-dupe, streamline, and do some work that should have been done before that wasn't.

Your Honor, we submit that when you compare the statements that were made during the class period touting these reductions and restructuring expenses, the progress that the company has made with integration, and you compare them to the statements of the company's own CEO at the end of the class period, you can see that this complaint sufficiently pleads falsity.

They cite in their brief the case *Teachers'*

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

*Retirement System v. Hunter*.  It's a Fourth Circuit case.  The standard for falsity, according to that case, is you have to plead sufficient facts to support a reasonable belief in the allegation that the defendants' statement was misleading.

When you look at the commentary from Fernandez at the end of the class period, that sent the stock price down 17 percent and led analysts to say things like can this business be fixed, control alt delete again, yet another transition year.

When you compare those statements using that standard, sufficient facts to support a reasonable belief that the statements were misleading, we think we satisfy it.  And that's before you even get to the former employees.

And the former employees were there during the class period.  All we have to plead is that those individuals were in a position to know the information that's attributed to them.  And what they say is that the company had failed to engage in basic integration work.  We had separate systems.  We had separate processes, separate back-end functions, the very back-end functions that Mr. Fernandez said that the company needed to de-dupe and streamline and integrate at the end of the class period.

There was a tool competition and tool disfunction --

(Reporter clarification.)

MR. HASIUK:  The very dysfunction that Mr. Fernandez acknowledged at the end of the class period when he said, "It's clear to me that this work needs to be done," because, he said, "It's absolutely needed because otherwise we just continue to carry a really not fully functional organization."

Defense counsel says, "Well, you know, this is common.  New CEOs come in, and they try to distance themselves from prior management."  But here you have a CEO who is telling the market that my company is not fully functional.  I think you'd be hard-pressed to find another example of that.

We cite numerous cases, including recent cases out of the Ninth Circuit, *NVIDIA*, which they don't distinguish in the reply, where the court looked at end-of-class-period commentary and used that commentary to find that prior statements were false and the defendants knew it.

We cite many other similar cases, the *Vivendi* case out of the Southern District of New York, the *Henry Schein* where courts have looked at what was said at the end of the class period and concluded -- you

know, looked at that and found that it bears on what defendants knew during the class period.

And here you have contemporaneous accounts from the witnesses, the former employees who are identified in the complaint, that describe that internal dysfunction of the company, and you have the end-of-class-period commentary from Mr. Fernandez.

And we think that not only gives the Court a sufficient factual basis to find falsity but also *scienter* because, importantly, Mr. Fernandez told the market that, "Although I have just got here" -- I have only been here for a few months -- it's clear to me." So that gives rise to a strong inference in this case that defendants knew or recklessly disregarded that there was a danger of misleading investors when every quarter they went out and touted these reductions in restructuring costs.

It's not as if a company goes from being integrated to being unintegrated overnight.  This was not some newly emerging situation that Mr. Fernandez was observing.  It was the same situation that existed during the class period as recounted by the former employees.

So defendants say, "Well, we had no motive to commit fraud.  You need stock sales."  Well, stock

sales are not an element of 10b.  What we have to prove is a strong inference of *scienter*, and we think we've done that through the accounts of the former employees, the comments of Mr. Fernandez, and defendants' own statements.  I've quoted a few of them, but it's important.  If you look at what defendants actually said during the class period -- for example, on May 25, 2022, paragraph 134, Salvino stated, "There's literally eight things that we look at on a quarterly basis starting with restructuring and TSI costs."

So they were telling investors, "We personally are going through and evaluating and ending those projects, shutting them down, getting them completed, getting them to the right results.  This is something we look at every quarter."

So the notion that we haven't pled sufficient facts to show that defendants were aware of the lack of integration that's described both by Mr. Fernandez, the company's CEO, and the witnesses is simply untenable.

Of course, there have been many cases that have been sustained involving similar claims -- we cite these in our briefing -- where companies misrepresented the state of integration of the company.  Many of those cases did not involve stock sales.  They are not a prerequisite to finding a sufficient claim of fraud in

this case.

Similar with the company's stock buybacks, every statement in this case was made by an individual, Mr. Salvino, Mr. Sharp, and later Mr. Del Bene. The fact that the company was repurchasing its own shares doesn't in any way undermine a strong inference of *scienter*. Announcing a buyback program, which many companies do, does not give the company's officers license to lie. So we don't think that -- if it has any relevance to *scienter* at all, it certainly doesn't rebut the strong inference of *scienter* that arises from the facts plead in the complaint.

And just quickly with respect to loss causation, if you look at each of these disclosures, they were related to the restructuring -- the reductions in restructuring costs that we alleged defendants misrepresented during the class period, in particular, the May 16, 2024, disclosure where Mr. Fernandez specifically discusses the lack of integration at the company.

And if you look at the analysts' commentary that follows that, they are clearly responding from new information related to the company's purported progress with respect to integration, for example, saying things like, investors have seen this before; clearly, a heavy

lift is required; this is now the company's third attempt at steering the ship in the proper direction; yet another transition year.  Questioning in one case the Royal Bank of Canada, paragraph 195, can this business be fixed?

This is extreme commentary from analysts who had previously been bullish on the company and who are now realizing that contrary to what defendant said, there is a material amount of work that still needs to be done, which is effectively the first phase of this multiphase transformation by the company.

Part of that final corrective was Mr. Fernandez announcing that the company's free cash flow, which was increasing as a result of these reported reductions in restructuring expenses, was going to be about half of what they earned the previous year.  So the fiscal year ending in the beginning of 2024, the fiscal year 2025 free cash flow guidance was guided at approximately half of what the company earned the previous year.  So this is taking a giant step back.

So, Your Honor, we think we've pled sufficient facts to support falsity, *scienter*, and loss causation.

Defendants' specific challenges to individual

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

statements -- we don't, obviously, have time to go through each of them.  I would just point out that if you look at the language they use, they're using present tense historical language.  These are not assumptions that underlie projections, and they are certainly sufficiently concrete to be material.  And we know that from looking at the contemporaneous commentary of analysts.

And many of the questions -- many of the statements were, in fact, made and given in response to questions from analysts who were trying to get insight into what defendants were doing to reduce these restructuring expenses.  There's one I quoted before that asked specifically, "What are you doing to reduce these restructuring costs," and the answer was, "We're integrating the business."  So we submit those statements were materially misleading when made. They're sufficiently factual to give rise to a 10b claim.

So unless Your Honor has any questions, that's all I have for you.

THE COURT:  All right.  Thank you.

MR. HASIUK:  Thank you.

THE COURT:  Counsel, I'll give you the last word.

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

MS. WINE:  Just very briefly, Your Honor.

We hear a lot there about sufficient facts. The standard is particularized facts.  Again, you know that.  I'm not going to reiterate it, but I feel like throughout their brief and argument, they're running from the standard.

The last point on present tense, there's Fourth Circuit case law directly on point that says use of the present tense doesn't mean that it's not a forward-looking statement.  And if you're talking about what you're doing now that supports your ability to achieve future goals or projections, that's totally fair under the safe harbor.  I'm sure you're familiar with all of that case law.

So just specifically, counsel just pointed out a few things.  He talked about the Investor Day presentation and some of the former employee allegations.  All of that is just talking about little pieces of this integration, and none of it is inconsistent with what defendants said.

So from the Investor Day presentation, you know, they talked about certain projects getting towards completion and the analysts noting that there was incremental progress.  Yes, that's exactly what we told the market.  That very presentation is where they

Case 1:24-cv-01351-AJT-WEF   Document 77   Filed 03/07/25   Page 25 of 27 PageID# 1233

25

said the integration journey was in progress.  This is all consistent.  It's in progress.

There's a lot of little facets to it.  Some little pieces of it are going to get towards completion; some aren't.  So the former employees who are complaining about their little slice of the massive DXC world and something not being integrated or somebody still using an old e-mail address, yes, this was all in process.  This is all entirely consistent.

Mr. Fernandez' comments, the one thing you didn't here today, is right in those comments.  He's the new CEO.  He acknowledged the progress that was made on integration by prior management.  He acknowledged that.  He then said he thought there were some other things they could do and some more priorities, but he acknowledged that there was progress made on the integration.  So, again, nothing inconsistent there.

Counsel mentioned the *Henry Schein* case. It's not a Fourth Circuit case, but it's something I'm familiar with.  I was actually retained to represent the defendants after they lost the motion to dismiss. So I happen to be familiar with the facts.  If you look at that case, the defendants there made unequivocal statements that the integration projects they were

working on were complete.  They actually made that statement in that case.  That's why they couldn't get past the motion to dismiss.

In fact, if you look at a case that's distinguished in that opinion, it's the *In re Diebold Nixdorf* -- if I'm pronouncing that correctly -- *Securities Litigation*.  The court points to that case and says there the facts were different, and those facts are very similar to ours.

So what happened in that case that was distinguished by the *Schein* court is that the challenged statements were all about integration efforts and the fact that they were making progress towards integration, not an unequivocal statement that integration was complete.

Lastly, I didn't hear, really, anything on *scienter*.  I would just say, of course, our point on the buybacks wasn't a license to lie.  It's just more evidence that when you're weighing the competing inferences of *scienter*, it's another factor that says this doesn't make sense that under this context, these defendants would lie.  The more reasonable inference is that they were doing their best.  They were trying to make progress towards integration, and they have nothing to gain from lying.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

I'd like to thank counsel.  The argument has been helpful.  I'll take it under advisement and get you an opinion just as soon as I can.

MR. HASIUK:  Thank you, Your Honor.

MS. WINE:  Thank you, Your Honor.

THE COURT:  All right.

-----------------------------------
Time:  10:49 a.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

_____
/s/
Rhonda F. Montgomery, CCR, RPR

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599